# United States Court of Appeals for the Federal Circuit

**In re: ADAPTREND, INC.,**
*Appellant*

Appeal from the United States Patent and Trademark
Office, Trademark Trial and Appeal Board in No. 92074784.

**CORRECTED BRIEF OF APPELLANT ADAPTREND, INC.**

MANDOUR & ASSOCIATES, APC
Gordon E. Gray (CA SBN 175209)
8605 Santa Monica Blvd., Suite 1500
Los Angeles, CA 90069
Telephone: (858) 487-9300
Attorneys for Appellant,
Adaptrend, Inc.

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

## In re: ADAPTREND, INC.,

No.: 2023-1195

## <u>CERTIFICATE OF INTEREST</u>

Pursuant FCR 47.4, Counsel for Appellant, Adaptrend, Inc., certifies the following:

1.      The full name of every entity represented by me is: Adaptrend, Inc.

2.       The name of the real party in interest (if the party names in the caption are not the real party in interest) represented by me is: Not applicable.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are: None.

4.      The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this court is: Gordon E. Gray of Mandour & Associates, APC.

5.      There are no cases that are pending in this or any other court which counsel believes will directly affect or be directly affected by this appeal.

6.  Organization Victims and Bankruptcy Cases: None/Not Applicable.

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES .....................................................................1

STATEMENT OF JURISDICTION.......................................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............................1

STATEMENT OF THE CASE AND FACTS .........................................................2

SUMMARY OF THE ARGUMENT ......................................................................4

ARGUMENT ........................................................................................................5

   I.   APPLICABLE STANDARDS OF REVIEW ..................................................5

   II.  THE BOARD SHOULD NOT HAVE GRANTED SUMMARY
   JUDGMENT BECAUSE THERE WAS A GENUINE DISPUTE AS TO
   PETITIONER'S ALLEGED PRIORITY OF USE. .............................................7

     A.  The Izumi Declaration and Exhibit C Lack Foundation and are
     Inadmissible Hearsay Regarding the Alleged 2016 Oral Assignment. ...............8

     B.  The Narita Declaration Lacked Foundation and was Inadmissible Hearsay
     Regarding the Alleged 2016 Oral Assignment.................................................14

     C.  The Reply Declarations of Izumi and Narita Do Not Support the Board's
     Entry of Summary Judgment. ..........................................................................17

     D.  Summary Judgment is Inappropriate Because There Was a Genuine
     Dispute as to Narita's Alleged Continuous Use of the Subject Mark. ..............20

   III. NARITA EXPORT DID NOT HAVE ENTITLEMENT TO A
   STATUTORY CAUSE OF ACTION FOR ITS PETITION TO CANCEL........24

CONCLUSION AND RELIEF SOUGHT ...........................................................28

# TABLE OF AUTHORITIES

**Cases**

*Action Temporary Servs., Inc. v. Labor Force, Inc.*,
  870 F.2d 1563 (Fed. Cir. 1989)...............................................................................5
*Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*,
965 F.3d 1370 (Fed. Cir. 2020)..............................................................................24
*Aycock Eng. v. Airflite*, 560 F.3d 1350 (Fed. Cir. 2009) ........................................25
*B&B Hardware, Inc. v. Hargis Indus.*, Inc., 135 S. Ct. 1293 (2014) ......................12
*Celotex Corp. v. Catrett*, 477 U.S. 317 (1987) .........................................................6
*Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298 (Fed. Cir. 2020) ...........................24
*Doeblers' Pennsylvania Hybrids v. Doebler*,
  442 F.3d 812 (3rd Cir. 2006) ........................................................................ 10, 11
*Empresa Cubana Del Tabaco v. Gen. Cigar Co.*,
753 F.3d 1270 (Fed. Cir. 2014)...............................................................................24
*Gaia Technologies, Inc. v. Reconversion Technologies, Inc.*,
  93 F.3d 774 (Fed. Cir. 1996)....................................................................... 5, 7, 26
*Kate Spade LLC v. Thatch, LLC*, 126 USPQ2d 1098 (TTAB 2018) ......................12
*Lencco Racing Co. v. Jolliffe*, 215 F.3d 1341 (Fed. Cir. 1999)................................6
*Lipton Indus., Inc. v. Ralston Purina Co.*,
  670 F.2d 1024 (TTAB 1982) .................................................................................25
*Lloyd's Food Products Inc. v. Eli's Inc.*, 987 F.2d 766 (Fed. Cir. 1993).................6
*Minneapolis St. Louis R.R. Co. v. Peoria Perkin Union Ry. Co.*,
  270 U.S. 580 (1926)................................................................................................25
*Olde Tyme Foods Inc. v. Roundy's Inc.*, 961 F.2d 200 (Fed. Cir. 1992)..................6
*Opryland USA Inc. v. The Great American Music Show, Inc.*,
  970 F.2d 847 (Fed. Cir. 1992)....................................................................... 6, 19, 22
*Proctor Gamble Co. v. Paragon Trade Brands, Inc.*,
  917 F. Supp. 305 (D. Del. 1995).............................................................................26
*Ritchie v. Simpson*, 170 F.3d 1092 (Fed. Cir. 1999)...............................................25
*Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538  (Fed. Cir. 1995)..................................7
*Saab Cars USA, Inc. v. United States*, 434 F.3d 1359 (Fed. Cir. 2006)...................7
*Sartor v. Ark. Natural Gas Corp.*, 321 U.S. 620 (1944)........................................13
*Semcon Tech, LLC v. Micron Technology, Inc.*,
  660 F. App'x 908 (Fed. Cir. 2016)...........................................................................6
*T.A.B. Systems v. Pactel Teletrac*, 77 F.3d 1372 (Fed. Cir. 1996) ...........................5
*Tiger Lily Ventures Ltd. v. Barclays Capital Inc.*,
  35 F.4th 1352, 1360 (Fed. Cir. 2022) .....................................................................23
*TMT North America, Inc. v. Magic Touch GmbH*, 124 F.3d 876

(7th Cir. 1997) ......................................................................................11

*Typeright Keyboard v. Microsoft Corp.*, 374 F.3d 1151 (Fed. Cir. 2004) .............13

*Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1951 (2019) .........24

*Westrex Corporation v. New Sensor Corporation*,
    83 U.S.P.Q.2d 1215, (TTAB. May 11, 2007) ..........................................20

**Statutes**

15 U.S.C. § 1052(d) ......................................................................... 20, 21

15 U.S.C. § 1060(a)(3) ............................................................................27

15 U.S.C. § 1127 ....................................................................................22

28 U.S.C. § 1295(a)(4)(B) .........................................................................1

**Other Authorities**

*Black's Law Dictionary* (11th ed. 2019) ...................................................25

**Rules**

37 CFR § 2.124 ......................................................................................12

FCR 47.4 .................................................................................................2

Fed. R. Civ. P. 28 ..................................................................................12

Fed. R. Civ. P. 56(c) ...............................................................................6

Fed. R. Evid. 602 ....................................................................... 9, 14, 15, 21

Fed. R. Evid. 802 ........................................................................ 9, 14, 21, 23

Fed. R. Evid. 803(6) .................................................................. 10, 16, 22, 23

Fed. R. Evid. 803(6)(A)-(C) ......................................................... 10, 16

TBMP § 520 ..........................................................................................12

TBMP § 703.01(b) ........................................................................... 12, 17

## STATEMENT OF RELATED CASES

Other than the proceeding before the Trademark Trial and Appeal Board from which this appeal is taken, this case has not previously been before this Court or any other Court. There are no cases that are pending in this or any other court which counsel believes will directly affect or be directly affected by this appeal.

## STATEMENT OF JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(4)(B). Appellate jurisdiction is based upon a timely appeal filed on November 22, 2022 appealing the final decision of the Trademark Trial and Appeal Board dated September 20, 2022.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1. Whether the Trademark Trial and Appeal Board erred in granting summary judgment cancelling Appellant's TONOSAMA trademark registration;

2. Whether there is a genuine issue of material fact regarding the alleged oral assignment from Kabushiki Kaisha TI Express to Narita Export LLC;

3. Whether the Trademark Trial and Appeal Board erred by denying Appellant's objections to the Narita declaration;

4. Whether the Trademark Trial and Appeal Board erred by denying

Appellant's objections to the Izumi declaration;

5. Whether the Trademark Trial and Appeal Board erred by finding Narita Export LLC had priority to the TONOSAMA trademark; and,

6. Whether Narita Export LLC has an entitlement to a statutory cause of action in the present case.

## STATEMENT OF THE CASE AND FACTS

Adaptrend, Inc. ("Adaptrend") owns U.S. Trademark Reg. No. 5,873,672 ("the '672 registration") for the mark TONOSAMA, in standard characters, for "gift baskets containing candy; candy; candies; gift baskets containing candy and Japanese candies" in International Class 30. [Appx234-235.] The '672 registration issued on October 1, 2019. *Id.* Narita Export LLC ("Narita Export") filed Application Serial No. 88665122 ("the '122 application") for the same mark, TONOSAMA, and the same goods on October 23, 2019 based on an allegation of use date of March 27, 2016. [Appx236-250.] Narita Export filed its petition to cancel the '672 registration on July 22, 2020. [Appx251-252.] Narita Export's petition claimed a likelihood of confusion between the TONOSAMA marks and that it had prior common law rights to the TONOSAMA mark for the cited goods. [Appx253-256.] In particular, the petition alleged "TONOSAMA has been used continuously by Petitioner and Petitioner's predecessor in interest from at least

March 28, 2016 to the present...". [Appx253.] Adaptrend answered and denied Narita Export's claims. [Appx257-261.]

Narita Export provided its initial disclosures on December 29, 2020 and failed to identify either the oral agreement or the document claiming to memorialize the oral agreement. [Appx262-266.] Adaptrend responded to Narita Export's interrogatories and document requests on May 24, 2021. [Appx155-183.] In those responses, Adaptrend withdrew affirmative defenses of non-ownership and abandonment "without prejudice pending further discovery." *Id.* Nearly *one year* after filing its petition to cancel and nearly two months after Adaptrend's discovery responses, Narita Export recorded a *nunc pro tunc* assignment, signed *October 20, 2020*, that claimed to memorialize a November 25, 2016 oral agreement assigning the TONOSAMA trademark from Kabushiki Kaisha TI Express ("KKTI") to Narita Export. [Appx290-291.] The document was signed by Teruhiko Izumi, President of KKTI. *Id.* The document was recorded on July 7, 2021, nearly two months after Adaptrend's discovery responses cited by the Board in its decision. *Id.* Narita Export responded to Adaptrend's written discovery on July 9, 2021. [Appx276-289.] Discovery closed on July 28, 2021. [Appx294.] Narita Export's motion for summary judgment was filed on January 7, 2022. [Appx19.] Adaptrend opposed and objected to the declarations of Messrs. Izumi and Narita and the alleged trademark

assignment. [Appx199-216.] Narita Export replied and submitted reply

declarations of both Mr. Izumi and Mr. Narita in response to Adaptrend's

objections and opposition. [Appx217-233.] The Board entered summary

judgment on September 20, 2022. [Appx1-18.]

## SUMMARY OF THE ARGUMENT

The Trademark Trial and Appeal Board erred by granting summary

judgment in favor of Narita Export when there was a genuine dispute regarding a

pivotal material fact at the center of its case, namely the alleged oral assignment

of trademark rights from KKTI and Narita Export in November 2016. Narita

Export's proffered evidence of the alleged oral assignment was based on

inadmissible hearsay testimony from Messrs. Izumi and Narita that clearly lacked

foundation regarding the claimed oral assignment. Moreover, even if the oral

assignment can be established as a matter of law, Narita Export failed to provide

evidence of continuous use of the subject mark since November 2016. Mr.

Narita's declaration merely claimed, "Since January 1, 2017, Narita has made

more than 6,600 independent sales." [Appx49.] Notably, Mr. Narita failed to

testify as to *when* these sales occurred and failed to provide Amazon and/or other

records to corroborate his testimony.

Furthermore, the void '122 trademark application and the timing of Narita

Export's *nunc pro tunc* assignment, namely *three* months after the initiation of the action before the TTAB, establishes that Narita Export had no entitlement to a statutory cause of action to bring the petition to cancel at the time the petition to cancel was filed. *Gaia Technologies, Inc. v. Reconversion Technologies, Inc.*, 93 F.3d 774, 779-80 (Fed. Cir. 1996). As the requirement for standing is never waived, this would support remand and dismissal of the entire action. Thus, the Board erred by granting summary judgment in favor of Narita Export. Indeed, there were, at minimum, clear, triable and material issues of fact in connection with Narita Export's claim. The case should be remanded for trial or dismissed altogether.

## ARGUMENT

### I. APPLICABLE STANDARDS OF REVIEW

The Federal Circuit, in reviewing the Board's decision, reapplies the legal standard of Federal Rule of Civil Procedure 56(c) to the evidence of record, according to which summary judgment is proper where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *T.A.B. Systems v. Pactel Teletrac*, 77 F.3d 1372, 1374 (Fed. Cir. 1996) (*citing Action Temporary Servs., Inc. v. Labor Force, Inc.*, 870 F.2d 1563, 1565, 10 USPQ2d 1307, 1308-09 (Fed. Cir. 1989).) The party moving for summary judgment has the

initial burden of demonstrating that there is no genuine dispute of material fact remaining for trial and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1987). In considering whether summary judgment is appropriate, all evidence must be viewed in the light most favorable to the nonmovant, and all justifiable inferences are to be drawn in the nonmovant's favor. *Opryland USA Inc. v. The Great American Music Show, Inc.*, 970 F.2d 847, 850, 23 USPQ2d 1471, 1472 (Fed. Cir. 1992). On summary judgment, the Board may not resolve issues of material fact; it may only ascertain whether such issues are present. *Lloyd's Food Products Inc. v. Eli's Inc.*, 987 F.2d 766, 767, 25 USPQ2d 2027, 2029 (Fed. Cir. 1993); *Opryland USA, supra,* 970 F.2d at 850, 23 USPQ2d at 1472; *Olde Tyme Foods Inc. v. Roundy's Inc.*, 961 F.2d 200, 202, 22 USPQ2d 1542, 1544 (Fed. Cir. 1992). Moreover, where the moving party bears the ultimate burden of proof, "summary judgment cannot be granted unless the movant makes a showing on each required element and the nonmovant's response fails to raise a genuine issue of material fact as to any element." *Semcon Tech, LLC v. Micron Technology, Inc.*, 660 F. App'x 908 (Fed. Cir. 2016)(*citing Lencco Racing Co. v. Jolliffe*, 215 F.3d 1341 (Fed. Cir. 1999).) As the leading commentator on federal procedure puts it, "[i]f the motion is brought by a party with the ultimate burden of proof, the movant must still satisfy its burden by showing that it is entitled to judgment as a matter of law even in the absence of an

adequate response by the nonmovant." *See Saab Cars USA, Inc. v. United States*, 434 F.3d 1359, 1368 (Fed. Cir. 2006).

The Federal Circuit, on the issue of entitlement to a statutory cause of action or standing, holds, "The question of a party's standing to bring a case is a jurisdictional one which we review de novo. *Gaia Technologies, Inc. v. Reconversion Technologies, Inc.*, 93 F.3d 774, 777 (Fed. Cir. 1996) (citing *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1551, 35 USPQ2d 1065, 1074 (Fed. Cir.) (*en banc*), cert. denied, 116 S.Ct. 184 (1995)).

## II. THE BOARD SHOULD NOT HAVE GRANTED SUMMARY JUDGMENT BECAUSE THERE WAS A GENUINE DISPUTE AS TO PETITIONER'S ALLEGED PRIORITY OF USE.

Narita Export, in the motion for summary judgment, did not dispute that Appellant Adaptrend's date of first use is at least as early as **June 13, 2016**. [Appx26.] Conversely, Narita Export admitted that it did not make use of the subject mark until **November 25, 2016**. [Appx29.] Instead, Narita Export based its priority claim solely on an alleged oral agreement between Narita Export and KKTI from November 2016 assigning KKTI's alleged rights in the TONOSAMA mark to Narita Export. [Appx27.] With regards to this alleged oral agreement, genuine disputes of material fact abound.

**A. The Izumi Declaration and Exhibit C Lack Foundation and are Inadmissible Hearsay Regarding the Alleged 2016 Oral Assignment.**

Narita Export submitted the declaration of Teruhiko Izumi in support of its motion for summary judgment. [Appx50-52.] Adaptrend objected to the declaration as lacking foundation and comprising inadmissible hearsay per Fed. R. Evid. 602 and 802. [Appx206.] While Mr. Izumi testified that he was the CEO of KKTI in 2016, he does not testify that he or anyone else at KKTI assigned its trademark rights to Narita Export in November 2016. Instead, he claimed:

> On October 20, 2020, I executed a Nunc Pro Tune Trademark Assignment to Narita Export LLC, with an effective date of November 25, 2016. I was president of TI Express at the time of the effective date of the Nunc Pro Tunc Trademark Assignment to Narita. The written assignment memorialized the prior oral trademark assignment of the TONOSAMA mark to Narita. The oral assignment transferred the TONOSAMA mark and the goodwill associated therewith to Narita. Exhibit C to the Summary Judgment Motion is a true and correct copy of the Nunc Pro Tunc Trademark Assignment.

[Appx52 and Appx290-291.] While Mr. Izumi admitted he executed Exhibit C in 2020, three months after initiation of this action, and he claimed he was President of KKTI in 2016, he did *not* claim that he participated in the oral agreement himself or that he witnessed the oral agreement in any way. *Id.* Moreover, Mr. Izumi provided no corroborating details regarding who allegedly participated in the agreement on behalf of Narita Export nor does he provide any documents referring to the oral

agreement or the alleged terms of the oral agreement memorialized in 2020, *e.g.* emails, texts, bank drafts for payment of consideration, *etc*. In short, he provided no foundational basis for his testimony beyond that he was President of KKTI in 2016. Thus, the objection to the Izumi declaration should have been sustained as it lacks foundation. Fed. R. Evid. 602.

To the extent, Mr. Izumi was told of the oral agreement or had another agent of KKTI participate in the alleged oral agreement, Mr. Izumi provides no evidence to support an exception to the hearsay rule. Fed. R. Evid. 802. For example, if Mr. Izumi is testifying as the custodian of records for KKTI for a business records hearsay exception, he would need to establish the following in his declaration:

(6) Records of a Regularly Conducted Activity. A record of an act, event, condition, opinion, or diagnosis if:

(A) the record was made at or near the time by or from information transmitted by someone with knowledge;

(B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

(C) making the record was a regular practice of that activity;

(D) ***all these conditions are shown by the testimony of the custodian or another qualified witness***, or a by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and

(E) ***the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness***.

Fed. R. Evid. 803(6)(emphasis added). Mr. Izumi did not identify the "someone with knowledge" that told him of the oral assignment, when he was allegedly told, or that such a record was kept in the regular course of business. Fed. R. Evid. 803(6)(A)-(C). Moreover, Mr. Izumi's role as the source of the alleged information, particularly regarding his timing of the *Nunc Pro Tunc* Assignment, i.e. three months after the cancellation action commenced, indicates a clear lack of trustworthiness. Mr. Izumi's declaration and Exhibit C are inadmissible hearsay that should have been excluded or left to the fact-finder at trial (after the opportunity to cross-examine the declarant) to determine their credibility and trustworthiness. The Izumi declaration should have been stricken as inadmissible, was not sufficient to support summary judgment, and raised genuine issues of material fact. The Board's denial of Adaptrend's objection was clear error.

Moreover, regardless of the admissibility of Mr. Izumi's declaration, it cannot support entry of summary judgment. The Third Circuit in *Doeblers' Pennsylvania Hybrids v. Doebler*, 442 F.3d 812, 822 (3rd Cir. 2006) warned:

> [C]ourts must be cautious in scenarios that do not involve clear written documents of assignment. 'Requiring strong evidence to establish an assignment is appropriate both to prevent parties from using self-serving testimony to gain ownership of trademarks and to give parties incentive to identify expressly the ownership of the marks they employ.' The plaintiff's reliance on the possibly self-serving testimony of one of its principals regarding events occurring more than 30 years ago creates important questions for a fact-finder regarding [Plaintiff's Vice

President's] credibility, ***and is simply insufficient to prove a trademark assignment as a matter of law***.

*Id.* at 822 (*citing TMT North America, Inc. v. Magic Touch GmbH*, 124 F.3d 876, 884 (7th Cir. 1997)(emphasis added).

Congress routinely requires written assignments for intellectual property rights. *See* 15 U.S.C. §1060 (register trademarks), 35 U.S.C. §261 (patents), and 17 U.S.C. §204 (copyrights). The court in *Doebler, supra,* rightly cautions courts in scenarios where there are no clear written documents of assignment. *Doeblers' Pennsylvania Hybrids, supra.* Instead, the Board, on a motion for summary judgment, relied on the credibility of two self-serving witnesses and admitted friends, Messrs. Izumi and Narita, to establish the existence of an oral assignment in 2016, years prior to the cancellation action. Accordingly, summary judgment was inappropriate for such a credibility determination and the motion should have been denied.

It is important to note that Mr. Izumi, a non-party foreign national from Japan, was not available for deposition during discovery. Japan is **not** a signatory to The Hague Convention on Taking Evidence in Civil or Commercial Matters. *Imamura v. Gen. Elec. Co.*, 371 F. Supp. 3d 1, 13 (D. Mass. 2019). The Court in *Imamura, supra,* explained:

> [The] Hague Convention's streamlined method of securing transcribed testimony is not available here because Japan has not signed on to the Convention. Instead, under the U.S.-Japan Consular

Convention, a party seeking to acquire testimony must take a deposition at a U.S. consulate supervised by a consular officer. It usually takes six months to a year to obtain testimony from Japanese witnesses. Notably, this process only applies to willing witnesses; to compel testimony from unwilling witnesses, parties must ask a U.S. court to issue a "letter rogatory" that passes through diplomatic channels and must be enforced by a Japanese judge.

*Imamura, supra,* at 13 (citations omitted). The operative Board Rule, TBMP § 520, does not allow for a discovery deposition on written questions (or otherwise) of a non-Hague national. *See* 37 CFR § 2.124 and Fed. R. Civ. P. 28. The fact that Mr. Izumi was unavailable for deposition during discovery further degrades the trustworthiness of his declaration.

Conversely, Mr. Izumi would have to be made available for cross-examination if his testimony was presented at trial before the Board. TBMP § 703.01(b) and 37 CFR § 2.123(a)(1). In fact, Narita Export's failure to make Mr. Izumi available for cross-examination during the testimony period would result in the Board's refusal to consider his testimony at trial. *Kate Spade LLC v. Thatch, LLC*, 126 USPQ2d 1098, 1104, n. 9 (TTAB 2018) and TBMP §703.01(b), fn. 4. Therefore, it is not certain that Mr. Izumi's testimony would even be available, let alone admissible, at trial.

The United States Supreme Court in *B&B Hardware, Inc. v. Hargis Indus.*, Inc., 135 S. Ct. 1293 (2014), held that the TTAB's decisions have preclusive effect, in part, because witness testimony is subject to cross-examination. *Id.* at

1300.  The Board's decision to accept the Izumi declaration on summary judgment in the present case was erroneous because, *inter alia,* it denied Adaptrend the ability to cross-examine the declarant at trial on issues of credibility.

The Board held in the present case:

Testimony, even of a single witness, if 'sufficiently probative,' may be sufficient to prove priority. **The determinative factor is whether the testimony is 'characterized by contradictions, inconsistencies, and indefiniteness' and whether it carries with it conviction of accuracy and applicability**.

[Appx8.] (emphasis added).  This is a clear admission that the Board made credibility determinations not permitted on summary judgment regarding Mr. Izumi and Mr. Narita's declarations.

It is well-established that the Board should not be engaged in credibility determinations on a motion for summary judgment:

Summary judgment should not be denied simply because the opposing party asserts that the movants' witnesses are not to be believed. However, summary judgment is not appropriate where the opposing party offers specific facts that call into question the credibility of the movants' witnesses.

*Typeright Keyboard v. Microsoft Corp.*, 374 F.3d 1151, 1158-59 (Fed. Cir. 2004);

*citing Sartor v. Ark. Natural Gas Corp.*, 321 U.S. 620, 628-29 (1944)

(reversing summary judgment where the only evidence in support of the movants contention was the testimony of its experts and there were specific bases for doubting the credibility of that testimony). The objection to the Izumi declaration

should have been sustained and the motion for summary judgment denied. The case should be remanded accordingly.

## B. The Narita Declaration Lacked Foundation and was Inadmissible Hearsay Regarding the Alleged 2016 Oral Assignment.

Narita Export also submitted the declaration of Keigo Narita in support of its motion for summary judgment. [Appx48-49.] The declaration of Mr. Narita, like the Izumi declaration, lacks foundation and is inadmissible hearsay regarding the alleged 2016 oral assignment. Adaptrend objected to the Narita declaration, accordingly per Fed. R. Evid. 602 and 802. [Appx205-206.]

Mr. Narita's declaration states that it is based on his personal knowledge *or on business records.* [Appx48](emphasis added). However, he fails to identify which basis is the foundation for his testimony regarding the alleged 2016 oral assignment. *Id.* His sole testimony regarding the alleged 2016 oral assignment is: "On or about November 25, 2016, TI Express entered into an oral agreement with Narita in which TI Express assigned certain assets to Narita, including all rights, title, and interest in the TONOSAMA trademark, and the goodwill associated therewith, for candy, chocolates, snack foods, and related products." [Appx48.] Thus, Mr. Narita failed to state that he personally participated in the alleged oral agreement, that he personally witnessed the oral agreement, or that he was told about the alleged oral agreement by another officer/agent of Narita Export. Moreover, Mr.

Narita, like Mr. Izumi, provided no corroborating details regarding who allegedly participated in the agreement on behalf of Narita Export nor did he provide any documents referring to the oral agreement or the alleged terms of the oral agreement memorialized in 2020, e.g. emails, texts, bank drafts for consideration, etc. In fact, it is not clear from his declaration whether Mr. Narita was the President of Narita Export LLC *in 2016* at the time of the alleged oral agreement. Mr. Narita's declaration merely claims: "I am the President of Narita Export LLC." [Appx48.] In short, he provided no foundational basis for his testimony beyond that he is currently the President of Narita Export. Thus, the objection to the Narita declaration should have been sustained as it lacked foundation. Fed. R. Evid. 602. Instead, the Board incorrectly ruled:

> Mr. Narita, as the president of the assignee, [is] positioned to know or
> have access to information relevant to the substance of [his] respective
> declaration[s] and the assignment reference therein.

[Appx9.] "Positioned to know" or "access to information' does meet the foundational requirements of Fed. R. Evid. 602 as this is not "personal knowledge." The objection to the Narita declaration should have been sustained.

Mr. Narita's declaration, like Mr. Izumi, also fails to satisfy an exception to the hearsay rule. To the extent, Mr. Narita was told of the oral agreement or had another agent of Narita Export participate in the alleged oral agreement, Mr. Narita

provides no evidence to support an exception to the hearsay rule. *See* Fed. R. Evid.

803. For example, if Mr. Narita was testifying as the custodian of records for Narita

Export for a business records hearsay exception, he would need to establish the

following in his declaration:

> (6) Records of a Regularly Conducted Activity. A record of an act, event, condition, opinion, or diagnosis if:
>
> (A) the record was made at or near the time by or from information transmitted by someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling,
>
> whether or not for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) ***all these conditions are shown by the testimony of the custodian or another qualified witness***, or a by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
>
> (E) ***the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness***.

Fed. R. Evid. 803(6)(emphasis added). Mr. Narita did not identify the "someone

with knowledge" that told him of the oral assignment, when he was allegedly told,

or that such a record (or even what type of record) was kept in the regular course of

business. Fed. R. Evid. 803(6)(A)-(C). Mr. Narita's declaration is inadmissible

hearsay regarding the alleged 2016 oral agreement that should have been excluded

or left to the fact-finder at trial to determine its trustworthiness.

Moreover, as discussed above, Narita's testimony was insufficient to prove a trademark assignment as a matter of law. *Doebler, supra* at 822. Mr. Narita, like Mr. Izumi, is also a Japanese foreign national unavailable for a discovery deposition. [Appx262-266.]. Mr. Narita, like Mr. Izumi, would also have been required to be produced for a cross-examination at trial or his testimony would have been disregarded. TBMP §703.01(b) and 37 CFR §2.123(a)(1); *Kate Spade LLC*, *surpra,* and TBMP §703.01(b), fn. 4. The Narita declaration is inadmissible, not sufficient to support summary judgment, and raises genuine issues of material fact, namely the credibility of Mr. Narita himself and the alleged foundational basis for his knowledge. The objection to his declaration should have been sustained. Accordingly, Narita Export's motion for summary judgment should have been denied by the Board.

## C. The Reply Declarations of Izumi and Narita Do Not Support the Board's Entry of Summary Judgment.

Narita Export, in response to Appellant's objections citing the evidentiary and credibility issues with the Izumi and Narita declarations, submitted reply declarations from Messrs. Izumi and Narita. [Appx229-233.] However, the reply declarations raise even more issues of credibility and trustworthiness that should have barred entry of summary judgment.

Messrs. Izumi and Narita, having been notified of the deficiencies surrounding their prior testimony by Adaptrend in its opposition brief, failed to provide answers or corroboration in response and Adaptrend had no opportunity to respond. As a matter of due process, the reply declarations cannot support entry of summary judgment.

The Izumi reply declaration does not identify the terms of the alleged oral assignment beyond that it was a transfer of "all right, title, and interest in the TONOSAMA trademark, and its associated goodwill." [Appx232.] The Izumi reply declaration admits that the alleged transfer was "without compensation." [Appx232.] Thus, at minimum, there is no identified consideration for the alleged assignment. Moreover, there are no corroborating documents from Mr. Izumi such as emails or other correspondence discussing the alleged assignment. In fact, Mr. Izumi does not even say whether the alleged oral assignment occurred over the phone or in person. Mr. Izumi, though claiming he "personally reached an oral agreement" with Mr. Narita, provides no corroborating details regarding the alleged agreement. [Appx230.]

The Narita reply declaration, even with the benefit of Adaptrend's criticisms, is uncorroborated, indefinite, and untrustworthy as well. [Appx230-231.] Mr. Narita's reply declaration devotes exactly one sentence to the alleged oral agreement. *Id.* Mr. Narita states:

On November 25, 2016, acting in my capacity as the Director of Narita LLC, I personally reached an oral agreement with Mr. Izumi to transfer all the right, title, and interest in the TONOSAMA trademark to Narita LLC, without compensation.

[Appx230.] As with Mr. Izumi, the Narita reply declaration admits that the alleged transfer was "without compensation." *Id.* Thus, again, there is no identified consideration for the alleged assignment. Moreover, there are no corroborating documents from Mr. Narita such as emails or other correspondence discussing the alleged assignment and, conveniently, the "without compensation" claim deprives the record of a check or bank transfer document. In fact, Mr. Narita also fails to state whether the alleged oral assignment occurred over the phone or in person. Mr. Narita, like Mr. Izumi, though claiming he "personally reached an oral agreement" with Mr. Izumi, provides no corroborating details regarding the alleged agreement. [Appx230-234.] The reply declarations are, at minimum, indefinite.

The Board was simply asked to believe that on November 25, 2016 – out of the blue – Messrs. Izumi and Narita spoke in some fashion and the trademark was transferred without compensation and without any other terms or details identified. This is simply not credible and should not have been the basis for entry of summary judgment when, as required, the Izumi and Narita declarations should be viewed in the light most favorable to the nonmovant, and all justifiable inferences are to be drawn in the nonmovant's favor. *Opryland USA Inc. v. The Great American Music Show, Inc.*, 970 F.2d 847, 850, 23 USPQ2d 1471, 1472 (Fed. Cir. 1992).

**D. Summary Judgment is Inappropriate Because There Was a Genuine Dispute as to Narita's Alleged Continuous Use of the Subject Mark.**

Narita Export, to establish priority for its alleged common law rights, was required to prove it owned 1) a mark or trade name previously used in the United States and 2) not abandoned. 15 U.S.C. § 1052(d). The Board's ruling asserts that Adaptrend waived an affirmative defense of abandonment. [Appx1-2.] However, "not abandoned" is a statutory element of the priority claim required to be proven by Petitioner Narita Export at summary judgment. 15 U.S.C. § 1052(d) and *Westrex Corporation v. New Sensor Corporation*, 83 U.S.P.Q.2d 1215 (TTAB May 11, 2007).

Adaptrend did state it was not pursuing an affirmative defense of abandonment in its discovery responses. [Appx4-5.] However, this does not remove the requirement that Narita Export had the burden of proof to establish prior *continuous* use of its mark as a matter of law. 15 U.S.C. §1052(d). Narita clearly failed to do so. The Board's failure to uphold this requirement is fatal to the entry of summary judgment as a matter of law.

Moreover, Adaptrend's discovery response was propounded in May of 2021. [Appx182.] Narita Export did not produce its "evidence" of use or the 2020 *nunc pro tunc* document memorializing the alleged November 2016 oral assignment until

July of 2021 and only days before the close of discovery and months after Adaptrend's responses. [Appx288 and Appx294-296].

Narita Export has submitted only the declaration testimony of Mr. Narita to establish continuous use. [Appx49.] Oddly, though it subpoenaed Amazon for sales records, Narita did not ask for and has not provided records from Amazon in support of this motion showing continuous sales of goods marked with TONOSAMA by Narita Export. *See* [Appx126-136]. Instead, Narita Export's only proffered evidence of *continuous* use from 2016 is the following testimony from Mr. Narita:

> 4. *In 2016*, sales by TI Express of TONOSAMA products, together with subsequent sales by Narita, amounted to more than 900 independent sales into the U.S. Cumulative sales during that calendar year were in excess of $22,000.

> 5. After its acquisition of the TONOSAMA mark, Narita continued to make substantial sales of products in connection with the TONOSAMA mark. Since *January 1, 2017*, Narita has made more than 6,600 independent sales into the U.S. Cumulative sales since then have been in excess of $78,000.

[Appx19](emphasis added). Again, Mr. Narita's testimony falls short and Adaptrend objected to his declaration based on lack of foundation and hearsay. Fed. R. Evid. 602 and 802. [Appx205-206]. In paragraph 4, Mr. Narita testifies only regarding sales of marked goods in 2016. [Appx49]. In paragraph 5, Mr. Narita testifies only that "Since January 1, 2017, Narita has made more than 6,600 independent sales into the U.S." *Id.* Critically, Mr. Narita fails to testify whether

sales occurred *after 2017* in 2018, 2019 or 2020 to the date of the petition in this action. All inferences must be drawn in favor of the nonmovant, Adaptrend. *Opryland USA Inc. v. The Great American Music Show, Inc.*, 970 F.2d 847, 850, 23 USPQ2d 1471, 1472 (Fed. Cir. 1992). In fact, to the extent sales by Petitioner occurred solely in 2017 as must be inferred in Adaptrend's favor, this would be *prima facie* evidence of abandonment of the alleged trademark rights by Narita Export. *See* 15 U.S.C. § 1127.

Furthermore, Mr. Narita again failed to establish an exception to the hearsay rule for his testimony on sales. As stated above, Mr. Narita only testified that he is the current president of Narita Export (as of January 6, 2022) rather during the years in question, namely 2017 to 2020. Thus, as a custodian of records, he must rely solely on business records kept in the normal course of business. Fed. R. Evid. 803(6). Instead, he failed to identify what records he is relying upon (e.g. Amazon records or Narita Export's own books of account) and how those records are kept and he failed to provide corroborating documents, namely the records he relies upon for the basis of his testimony. This calls into question the trustworthiness of Mr. Narita's testimony, raises a genuine issue of material fact, and makes his testimony insufficient to support summary judgment. Narita Export, thus, was not able to establish continuous use of the mark and Narita Export's motion for summary judgment should have been denied.

The reply declaration of Mr. Narita is also inadmissible hearsay per Fed. R. Evid. 802 and does not constitute an exception to the hearsay rule. Despite the benefit of the criticisms of Adaptrend's opposition, Mr. Narita's reply declaration also provides no business records, either from Narita Export or Amazon, upon which to base his testimony. Again, as a custodian of records (he does not claim to have personally sold anything), he must rely solely on business records kept in the normal course of business. Fed. R. Evid. 803(6). Instead, he fails to identify what records he is relying upon (*e.g.* Amazon records or Narita Export's own books of account) and how those records are kept and he fails to provide corroborating documents, namely the records he relies upon for the basis of his testimony. *Id.* This again calls into question the trustworthiness of Mr. Narita's testimony, raises a genuine issue of material fact, and makes his testimony insufficient to support summary judgment. Narita Export, thus, was not able to establish continuous use of the mark and Narita Export's motion for summary judgment should have been denied.

The issue of whether Narita Export did or did not abandon the TONOSAMA mark is highly factual. *Tiger Lily Ventures Ltd. v. Barclays Capital Inc.*, 35 F.4th 1352, 1360 (Fed. Cir. 2022). The Federal Circuit held, "Abandonment of a trademark is a question of fact, which we review for substantial evidence." *Id.* Narita Export, as the petitioner with the burden of proof in a cancellation proceeding, failed to submit any admissible evidence of continuous use and summary judgment

should have been denied. The summary judgment should be overturned, and the case should be remanded for trial, accordingly.

## III. NARITA EXPORT DID NOT HAVE ENTITLEMENT TO A STATUTORY CAUSE OF ACTION FOR ITS PETITION TO CANCEL.

The murky nature of Narita Export's alleged common law trademark rights indicates it did not have an entitlement to a statutory cause of action for its petition to cancel. Though not raised below, it is well-settled that the requirement for standing and/or "entitlement to a statutory cause of action" is never waived. *Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1951 (2019). Entitlement to a statutory cause of action, formerly referred to as "standing" by the Federal Circuit and the Board, is an element of the plaintiff's case in every *inter partes* proceeding.[1] *See Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 2020 USPQ2d 11277 (Fed. Cir. 2020), *cert. denied*, 141 S. Ct. 2671 (2021); *Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 2020 USPQ2d 10837 (Fed. Cir. 2020), *reh'g en banc denied* 981 F.3d 1083, 2020 USPQ2d 11438 (Fed. Cir. 2020), *cert. denied*, 142 S. Ct. 82 (2021); *Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014). To establish standing, a plaintiff

---

[1] For simplicity, the term "standing" will be used in place of "entitlement to a statutory cause of action" in this brief.

must demonstrate: (i) an interest falling within the zone of interests protected by the statute and (ii) a reasonable belief in damage proximately caused by the registration of the mark. *Corcamore*, 2020 USPQ2d 11277 at *4. *See also Empresa Cubana*, 111 USPQ2d at 1062; *Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023, 1025 (Fed. Cir. 1999); *Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185, 189 (TTAB. 1982).

In the decision below, Narita Export's alleged basis for its standing is its pending trademark application. [Appx11-12]. However, the '122 application was a use-based application claiming a date of first use of March 27, 2016. *Id.* Accordingly, the '122 application was void *ab initio* because, as demonstrated above, Narita Export cannot prove it acquired the alleged common law trademark rights to TONOSAMA from KKTI. "Void *ab initio*" means "[n]ull from the beginning." *Black's Law Dictionary* (11th ed. 2019). The Federal Circuit held, "The registration of a mark that does not meet the use requirement is void *ab initio*." *Aycock Eng. v. Airflite*, 560 F.3d 1350, 1357 (Fed. Cir. 2009). Thus, Narita Export, because its trademark application was void *prior* to its filing of the petition to cancel, cannot establish standing for its petition. The United States Supreme Court has long held: "The jurisdiction of the lower court depends upon the state of things existing at the time the suit was brought." *Minneapolis St. Louis R.R. Co. v. Peoria Perkin Union Ry. Co.*, 270 U.S. 580, 586 (1926)(emphasis added.). At the time the petition

was filed, Narita Export's trademark application was void and could not support standing.

The *nunc pro tunc* assignment is, likewise, unavailing as a basis for Narita Export's standing for the petition. *Gaia Technologies, Inc. v. Reconversion Technologies, Inc.*, 93 F.3d 774, 779-80 (Fed. Cir. 1996). The Federal Circuit in *Gaia Technologies, supra,* held: "This agreement is not sufficient to confer standing on Gaia retroactively." The *Gaia* court, quoting *Proctor Gamble Co. v. Paragon Trade Brands, Inc.*, 917 F. Supp. 305, 38 USPQ2d 1678 (D. Del. 1995), admonished:

> As a general matter, parties should possess rights before seeking to have them vindicated in court. Allowing a subsequent assignment to automatically cure a standing defect would unjustifiably expand the number of people who are statutorily authorized to sue. Parties could justify the premature initiation of an action by averring to the court that their standing through assignment is imminent. Permitting non-owners and licensees the right to sue, so long as they eventually obtain the rights they seek to have redressed, would enmesh the judiciary in abstract disputes, risk multiple litigation, and provide incentives for parties to obtain assignments in order to expand their arsenal and the scope of litigation. Inevitably, delay and expense would be the order of the day.

*Id.* at pp. 779-80. Here, the *nunc pro tunc* assignment is dated *October 20, 2020*, more than three months after the filing of the petition to cancel. [Appx290-291.] In fact, the alleged assignment was not recorded until *July of 2021*. [Appx292-293.]

Narita Export filed the '122 application after Adaptrend obtained its '672 trademark registration, filed its petition to cancel the '672 registration, and only *then*

executed the *nunc pro tunc* assignment after the action was initiated (and waited to produce the assignment until the close of discovery). Narita Export's exercise in bootstrapping is directly contrary to the holding of *Gaia Technologies, supra*, requiring a plaintiff to perfect its standing *prior* to filing an action. The present case should be remanded and Narita Export's petition to cancel should be dismissed.

As noted above, a valid assignment of a federal trademark registration must be in writing. 15 U.S.C. § 1060(a)(3). Narita Export, as an alleged owner of common law trademark rights, should not be entitled to broader access to establish standing to petition to cancel a federally registered trademark. At minimum, an alleged oral assignment that claims priority ahead of documented sales of trademarked goods should raise the existence of credibility issues that bar summary judgment. The case should be remanded, and the petition dismissed for lack of entitlement to a statutory cause of action.

## CONCLUSION AND RELIEF SOUGHT

Appellant Adaptrend, Inc. respectfully requests that the judgment be over turned, the case be remanded and allowed to proceed to trial on the merits including, but not limited to, the cross-examination of Mr. Narita and Mr. Izumi or, alternatively, the case should be remanded and dismissed for lack of entitlement to a statutory cause of action.

Respectfully Submitted,

MANDOUR & ASSOCIATES, APC

Date: June 9, 2023

By:＿/s/ Gordon E. Gray＿＿＿＿＿＿＿
Gordon E. Gray (SBN 188896)
Email: ggray@mandorulaw.com
Attorneys for Appellant,
Adaptrend, Inc.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2023-1195

**Short Case Caption:** In re: ADAPTREND, INC.

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 7392 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 06/09/2023

Signature: /s/ Gordon E. Gray

Name: Gordon E. Gray

<u>**PROOF OF SERVICE**</u>

I hereby certify that on the below date I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit using the Appellate Electronic Filing system which will provide notice of the same on the parties of record.

I hereby certify that on the below date I also served the foregoing document on the following by email:

Patrick G. Burns
GREER BURNS & CRAIN LTD
300 South Wacker Drive, Suite 2500
Chicago, IL 60606
Email: tmdocket@gbclaw.net, pburns@gbclaw.net, smelby@gbclaw.net

Date: <u>July 13, 2023</u>

By: <u>   /s/ Gordon E. Gray           </u>
Gordon E. Gray (SBN 188896)
Email: ggray@mandourlaw.com

**ADDENDUM**

UNITED STATES PATENT AND TRADEMARK OFFICE
**Trademark Trial and Appeal Board**
**P.O. Box 1451**
**Alexandria, VA 22313-1451**
General Contact Number: 571-272-8500
General Email: TTABInfo@uspto.gov

wbc

Mailed: September 20, 2022

Cancellation No. 92074784

*Narita Export LLC*

*v.*

*Adaptrend, Inc.*

**Before Wolfson, Goodman and Hudis,**
    **Administrative Trademark Judges.**

**By the Board:**

Adaptrend, Inc. (Respondent) owns a registration on the Principal Register for the mark TONOSAMA, in standard characters, for "gift baskets containing candy; candy; candies; gift baskets containing candy and Japanese candies" in International Class 30 (Respondent's Registration).[1]

Narita Export LLC (Petitioner) seeks to cancel Respondent's Registration based on Petitioner's claim of likelihood of confusion under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), grounded on its alleged prior common law rights in the mark TONOSAMA for "confectionery, namely, candy chocolate, snack foods in the nature of rice-based snack foods, chocolate-based snack foods, coffee-based snack foods,

---

[1] Registration No. 5873672 issued on October 1, 2019. The registration states that the English translation of TONOSAMA is "feudal lord."

Appx1

wheat-based snack foods, grain-based snack foods, cereal-based snack foods, quinoa-based snack foods, multigrain-based snack foods, ice-cream-based snack foods, frozen-yogurt-based snack foods, corn-based snack foods." In further support of its likelihood of confusion claim, Petitioner pleads ownership of an application to register on the Principal Register the standard character TONOSAMA mark for these same goods (Petitioner's Application),[2] noting that the USPTO refused registration of its application based on a likelihood of confusion with the mark of Respondent's Registration. 1 TTABVUE.[3]

In its answer, Respondent denies the salient allegations of the petition to cancel and enumerates four of what it identifies as affirmative defenses:

1. The Petition to Cancel fails to state a claim upon which relief can be granted;
2. Upon information and belief, Petitioner does not have proper chain of title for its ownership of its cited marks;
3. Upon information and belief, Petitioner's purported assignments of its cited mark are invalid; and
4. Upon information and belief, Petitioner and/or their predecessor in interest have abandoned their rights, if any, in the cited mark.

4 TTABVUE 2-3.

This proceeding now comes before us on Petitioner's motion for summary judgment. Petitioner asserts there are no genuine disputes of material fact regarding

[2] Application Serial No. 88665122 was filed October 23, 2019 based on an allegation of use anywhere of March 27, 2016 pursuant to Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a).

[3] Citations to the record or briefs in this opinion include citations to the publicly available documents on TTABVUE, the Board's electronic docketing system. The number preceding "TTABVUE" corresponds to the docket entry number; the number(s) following "TTABVUE" refer to the page number(s) of that particular docket entry. TRADEMARK TRIAL AND APPEAL BOARD MANUAL (TBMP) §§ 106.03, 801.01, 801.03 (2022).

its entitlement to bring a statutory cause of action; its ownership of the common law mark TONOSAMA in the U.S.; its priority of use of the mark in U.S. commerce and its showing of a likelihood of confusion, mistake or deception of consumers.[4] For the reasons that follow, we grant Petitioner's motion.

## I.      Summary Judgment Standard

Summary judgment is an appropriate method of disposing of cases in which the record shows no genuine disputes as to material facts, thus leaving the case to be resolved as a matter of law. *See* Fed. R. Civ. P. 56(a). In deciding motions for summary judgment, all evidence must be viewed in a light favorable to the non-movant, and all justifiable inferences are to be drawn in the non-movant's favor. The Board may not resolve disputes of material fact; it may only ascertain whether such disputes are present. *See Lloyd's Food Prod. Inc. v. Eli's Inc.*, 987 F.2d 766, 25 USPQ2d 2027, 2029-30 (Fed. Cir. 1993); *Opryland USA Inc. v. Great Am. Music Show Inc.,* 970 F.2d 847, 23 USPQ2d 1471, 1472 (Fed. Cir. 1992); *Olde Tyme Foods Inc. v. Roundy's Inc.*, 961 F.2d 200, 22 USPQ2d 1542, 1546 (Fed. Cir. 1992).

The burden is on the party moving for summary judgment to demonstrate the absence of any genuine dispute of material fact, and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The initial burden at summary judgment is greater than the evidentiary burden at trial. *See* TBMP § 528.01 and authorities cited therein. When the moving party's motion is supported by sufficient evidence to

---

[4] 25 TTABVUE. The Board has considered the parties' submissions and arguments and presumes the parties' familiarity with the factual bases for the motions. We do not recount all facts or arguments here except as necessary to explain the Board's order.

indicate that there is no genuine dispute of material fact, and that the moving party is entitled to judgment as a matter of law, the burden then shifts to the nonmoving party to demonstrate the existence of specific, genuinely disputed facts which must be resolved at trial. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 160-61 (1970). The nonmoving party may not rest on the mere allegations of its pleadings or assertions of counsel, but must designate specific portions of the record or produce additional evidence showing the existence of a genuine dispute of material fact for trial. Fed. R. Civ. P. 56(c); TBMP § 528.01.

## II.    Initial Matters

### A. Respondent's Asserted Affirmative Defenses

An answer should include any defenses that the defendant may have to the claim or claims asserted by the plaintiff. Fed. R. Civ. P. 8(b)(1)(A) and 8(c)(1); Trademark Rule 2.114(b)(1), 37 C.F.R. 2.114(b)(1). Although Respondent raised the purported defense of failure to state a claim upon which relief can be granted (enumerated defense No. 1), as the Board has reiterated on several occasions, this is not a true affirmative defense. *John W. Carson Found. v. Toilets.com, Inc.*, 94 USPQ2d 1942, 1949 (TTAB 2010) ("The asserted defense of failure to state a claim is not a true affirmative defense because it relates to an assertion of the insufficiency of the pleading of opposer's claim rather than a statement of a defense to a properly pleaded claim.").

Respondent also asserts the affirmative defenses of abandonment and non-

ownership. 4 TTABVUE 3 at ¶¶ 15-17.[5] Neither of these affirmative defenses remain at issue because Respondent answered Petitioner's interrogatories by withdrawing each affirmative defense "without prejudice pending further discovery." 25 TTABVUE 143-44. We agree with Petitioner that because of this withdrawal, Respondent can no longer rely upon the affirmative defenses of abandonment and nonownership, nor can Respondent raise arguments related to these defenses in Respondent's responsive brief. 31 TTABVUE 4-5.

Respondent is therefore estopped from pursuing these defenses within the context of the motion for summary judgment or presenting arguments and evidence related to these defenses. Notwithstanding, because Petitioner relies on common law trademark rights, it has the burden to establish ownership of such rights, as well as priority in these rights and likelihood of confusion. *See, e.g., Exec. Coach Builders, Inc. v. SPV Coach Co.*, 123 USPQ2d 1175, 1180 (TTAB 2017); *Life Zone Inc. v. Middleman Grp. Inc.*, 87 USPQ2d 1953, 1959 (TTAB 2008).

### B. Evidentiary Matters

In support of its motion for summary judgment, Petitioner submits the declarations of its attorney, Ms. RiKaleigh Johnson, and accompanying exhibits; its president, Mr. Keigo Narita, and accompanying exhibits; and the former president of

---

[5] Respondent's assertions of improper assignment and chain of title (4 TTABVUE 3 at ¶¶ 15-16) are subcategories of a non-ownership defense.

Kabushiki Kaisha TI Express ("TI Express"), Mr. Teruhiko Izumi, and accompanying exhibits. 25 TTABVUE 26-180.

In his declaration, Mr. Izumi asserts that, during his time as president of TI Express, TI Express selected and created the TONOSAMA mark and logo, and had its first sale of "TONOSAMA branded candy and snack foods in the U.S. on March 27, 2016"; that TI Express made its sale through its "Amazon seller account 'Dream Express Japan'"; and that Mr. Izumi was the owner of Dream Express Japan. 25 TTABVUE 32-33. In support thereof, Exhibit E of the Izumi declaration includes a screenshot[6] of "TI Express' Amazon seller account Dream Express Japan," which shows the sale of TONOSAMA candy to a customer in "Fenton, MI" with a purchase date of March 27, 2016, and a ship by date of "Mon, Mar 28 to Tue, Mar 29, 2016." *Id.* at 33, 119 at Exhibit E.

Mr. Izumi further declares that on October 20, 2020, he executed a nunc pro tunc trademark assignment to Petitioner with an effective date of November 25, 2016, which memorialized the parties' "oral trademark assignment of the TONOSAMA mark to [Petitioner]" along with the goodwill associated with the mark; that TI Express made "substantial sales of the TONOSAMA products from March 27, 2016, until it assigned its TONOSAMA assets to Petitioner in November, 2016"; that sales by TI Express and subsequently by Petitioner during 2016 "amounted to more than 900 independent sales in the U.S. … in excess of $22,000." *Id.* at 33-34. In support thereof, the Izumi declaration includes a copy of that nunc pro tunc assignment. *Id.*

---

[6] The website accessed is sellercentral.amazon.ca/orders-v3/order/109-3362950-8206635 on July 4, 2021. 25 TTABVUE 119.

at 106-07. The nunc pro tunc assignment reads that TI Express is assigning to Petitioner "all right, title and interest in and to [TONOSAMA], and any and all goodwill associated with [TONOSAMA] … pursuant to an oral agreement between the Parties." *Id*. at 106.

Mr. Narita, in his declaration, repeats the assertions regarding TI Express' assignment of the TONOSAMA mark and TI Express' and Petitioner's sales of TONOSAMA goods in 2016. *Id*. at 30-31. Mr. Narita further asserts in his declaration that after Petitioner acquired the TONOSAMA mark, it "continued to make substantial sales of products in connection with the TONOSAMA mark"; that "since January 1, 2017, [Petitioner] has made more than 6,600 independent sales into the U.S. … in excess of $78,000"; and that sales were made through Petitioner's Amazon account "world bridge from Japan" with the date of first sale in the U.S. using the TONOSAMA mark being November 25, 2016. *Id*. at 31.

Respondent argues these declarations are inadmissible hearsay and lack foundation. Specifically, Respondent asserts that Mr. Izumi does not claim he participated in the oral agreement, only that he was president at the time of the oral agreement and that he executed the nunc pro tunc assignment; that Mr. Izumi does not provide any documents referring to the oral agreement (e.g., emails, texts, bank draft for payment); and that to the extent Mr. Izumi was told about the oral agreement or is otherwise relying on his position as the custodian of record, no

evidence in the record supports an exception to otherwise disqualify the statements as hearsay, such as the business records hearsay exception. 30 TTABVUE 10.

As to the Narita declaration, Respondent asserts that Mr. Narita does not specifically indicate that he "personally participated in the alleged oral agreement, that he personally witnessed the oral agreement, or that he was told about the alleged oral agreement"; that Mr. Narita provides no corroborating details or documents; that it is not clear if Mr. Narita was president of Petitioner at the time of the oral agreement; and that to the extent Mr. Narita was told about the agreement, there is no evidence to support an exception to the hearsay rule. *Id.* at 12-13.

Affidavits or declarations may be submitted in support of, or in opposition to, a motion for summary judgment provided that they are "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Pursuant to Fed. R. Evid. 602, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Testimony, even of a single witness, if "sufficiently probative," may be sufficient to prove priority. *Powermatics, Inc. v. Glebe Roofing Products Co.*, 341 F.2d 127, 144 USPQ 430, 432 (CCPA 1965); *Kohler Co. v. Baldwin Hardware Corp.*, 82 USPQ2d 1100, 1108-09 (TTAB 2007). The determinative factor is whether the testimony is "characterized by contradictions, inconsistencies, and indefiniteness" and whether it carries with it conviction of accuracy and applicability. *B. R. Baker*

*Co. v. Lebow Bros.*, 150 F.2d 580, 66 USPQ 232, 236 (CCPA 1945); *see also Powermatics,* 144 USPQ at 432.

Further, a declaration can adequately support a motion for summary judgment when the declarant's position with the employer renders the declarant competent to provide the testimony on the particular issues which the declaration concerns. *See, e.g.*, *In re DBC*, 545 F.3d 1373, 89 USPQ2d 1123, 1131 (Fed. Cir. 2008); *Ava Ruha Corp. dba Mother's Milk Mkt. v. Mother's Nutritional Ctr., Inc.*, 113 USPQ2d 1575, 1578 (TTAB 2015). Mr. Izumi, as the former president of the assignor during the "time of the selection of the TONOSAMA mark, … the first sale of the goods and subsequent sales in 2016, and the oral trademark assignment," 25 TTABVUE 32, and Mr. Narita, as the president of the assignee, *id.* at 30, are positioned to know or have access to information relevant to the substance of their respective declarations and the assignment referenced therein.

We find no genuine dispute of material fact that the Izumi and Narita declarations made a sufficient showing of personal knowledge of the facts stated therein. Although Respondent asserts the declarants failed to lay a proper foundation of personal knowledge, each declaration is based on the declarant's position as president and is based on the declarant's "personal knowledge or on business records that were made at the time or in the regular course of business." 25 TTABVUE 30, 32; *see Kemi*

*Organics, LLC v. Rakesh Gupta,* 126 USPQ2d 1601, 1608 n. 22 (TTAB 2018); *Ava Ruha Corp.*, 113 USPQ2d at 1578 (citations omitted).

Petitioner also submits rebuttal declarations from Messers. Izumi and Narita that respond directly to Respondent's criticism that the declarants did not testify to being present at the time of the alleged oral assignment. Specifically, Mr. Narita declares that he has been "friends with Teruhiko Izumi since January 1, 2015," 31 TTABVUE 14 at ¶2; that he "personally reached an oral agreement with Mr. Izumi to transfer all the right, title and interest in the TONOSAMA trademark to [Petitioner]," *id.* at 14 at ¶3. Mr. Izumi declares that he "personally reached an oral agreement" with Mr. Narita on November 25, 2016 regarding the transfer of the TONOSAMA mark, *id.* at 16 at ¶5.

Because Petitioner's supplemental declarations address a specific argument raised by Respondent in opposition to summary judgment, these declarations constitute proper rebuttal; to that extent we consider them. *Cf. Exec. Coach Builders, Inc.*, 123 USPQ2d at 1176 ("We have accorded the testimony [including rebuttal testimony] and evidence whatever probative value it merits, keeping Applicant's objections [based on admissibility and probative value] in mind"); *Newegg Inc. v. Schoolhouse Outfitters, LLC*, 118 USPQ2d 1242, 1244 (TTAB 2016) (what constitutes proper expert rebuttal testimony discussed); *Alcatraz Media Inc. v. Chesapeake Marine Tours Inc.*, 107 USPQ2d 1750, 1755 (TTAB 2013) ("The Board does not ordinarily strike testimony taken in accordance with the applicable rules on the basis of substantive objections; rather, such objections are considered by the Board in its

evaluation of the probative value of the testimony at final hearing."), *aff'd mem.*, 565 F. App'x 900 (Fed. Cir. 2014).

## III.    Entitlement to a Statutory Cause of Action

To prevail on summary judgment, Petitioner must demonstrate the absence of a genuine dispute of material fact as to its entitlement to a statutory cause of action. *Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 2020 USPQ2d 10837, at *3 (Fed. Cir. 2020) *cert. denied,* 142 S. Ct. 82 (2021) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125-26, 109 USPQ2d 2061, 2067 n.4 (2014)). A party in the position of plaintiff may petition to cancel a registration when the cause of action is within the zone of interests protected by the statute, 15 U.S.C. § 1064, and the plaintiff has a reasonable belief in damage that is proximately caused by the continued registration of the mark. *Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 2020 USPQ2d 11277, at *6-7 (Fed. Cir. 2020), *cert. denied*, 141 S. Ct. 2671 (2021).

Demonstrating a real interest in cancelling the registration of a mark satisfies the zone-of-interests requirement, and demonstrating a reasonable belief in damage by the registration of a mark suffices to show damage proximately caused by registration of the mark. *Corcamore, LLC*, 2020 USPQ2d 11277, at *7-8. "In most settings, a direct commercial interest satisfies the 'real interest' test." *Herbko Int'l v. Kappa Books*, 308 F.3d 1156, 64 USPQ2d 1375, 1377 (Fed. Cir. 2002).

In its motion for summary judgment, Petitioner identifies as an undisputed fact the Office's refusal to register Petitioner's Application and includes printouts from

the USPTO's TRADEMARK STATUS AND DOCUMENT RETRIEVAL (TSDR) database, of Petitioner's Application showing current active status and title in Petitioner along with copies of the Office's refusal to register Petitioner's Application because of a likelihood of confusion with Respondent's Registration. 25 TTABVUE 4-5, 59-64. Respondent's response to summary judgment acknowledges these facts are undisputed. 30 TTABVUE 7. Therefore, there is no genuine dispute that Petitioner has a legitimate interest in seeking cancellation of Respondent's Registration and a reasonable belief in damage should Respondent's mark continue to be registered. *See, e.g.*, *Empresa Cubana del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014); *Hole In 1 Drinks, Inc. v. Michael Lajtay*, 2020 USPQ2d 10020, at *3 (TTAB 2020); *ShutEmDown Sports Inc. v. Lacy*, 102 USPQ2d 1036, 1041 (TTAB 2012); *Life Zone Inc.*, 87 USPQ2d at 1959 (entitlement to oppose found because the opposed application was cited as a potential bar to opposer's registration).

We find there is no genuine dispute of material fact regarding Petitioner's entitlement to a statutory cause of action.

## IV.  Petitioner's Claim under Trademark Act Section 2(d)

Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), provides that a likelihood of confusion claim for cancellation of a registration that has been on the Principal Register for fewer than five years may be brought on the basis of a petitioner's "ownership of 'a mark or trade name previously used in the United States . . . and not abandoned.'" *Exec. Coach Builders, Inc.*, 123 USPQ2d at 1180 (quoting 15 U.S.C. § 1052(d)).

## A. Priority

As the plaintiff herein, Petitioner bears the burden of establishing its priority, that is of proving its claim of acquisition of prior proprietary rights in the TONOSAMA mark. *Hydro-Dynamics, Inc. v. George Putnam & Co., Inc.*, 811 F.2d 1470, 1 USPQ2d 1772, 1773 (Fed. Cir. 1987); *cf. Embarcadero Techs., Inc. v. RStudio, Inc.*, 105 USPQ2d 1825, 1834 (TTAB 2013). Because Petitioner does not own a U.S. registration, it bears the burden of demonstrating no dispute of material fact that it owns a proprietary interest in its pleaded mark through use of its mark prior to any date upon which Respondent may rely. *See Herbko Int'l*, 64 USPQ2d at 1378; *Hydro-Dynamics*, 1 USPQ2d at 1773; *Otto Roth & Co. v. Univ. Foods Corp.*, 640 F.2d 1317, 209 USPQ 40, 43-45 (CCPA 1981); *Giersch v. Scripps Networks, Inc.*, 90 USPQ2d 1020, 1023 (TTAB 2009).

In considering evidence of prior use, we must not consider individual portions of the summary judgment record in isolation, but must "look at the evidence as a whole, as if each piece of evidence were part of a puzzle which, when fitted together, establishes prior use." *Kemi Organics, LLC,* 126 USPQ2d at 1605-06 (quoting *W. Fla. Seafood Inc. v. Jet Rests. Inc.*, 31 F.2d 1122, 31 USPQ2d 1660, 1663 (Fed. Cir. 1994)). "Oral testimony [or in this case, testimony in written declarations], if sufficiently probative, is normally satisfactory to establish priority of use in a trademark proceeding." *Powermatics,* 144 USPQ at 432; *see also Exec. Coach Builders, Inc.*, 123 USPQ2d at 1184; *Nat'l Bank Book Co. v. Leather Crafted Pros., Inc.*, 218 USPQ 826, 828 (TTAB 1993).

As noted, the application underlying Respondent's Registration was filed on March 27, 2019. Respondent may rely upon this date for its priority. Unless Respondent can prove an earlier date of use than its underlying application filing date, in order to prevail on priority Petitioner need only establish a first use date earlier than March 27, 2019. 15 U.S.C. § 1057(c); *Cent. Garden & Pet Co. v. Doskocil Mfg. Co.*, 108 USPQ2d 1134, 1140-41 (TTAB 2013); *cf. Brewski Beer Co. v. Brewski Brothers Inc.*, 47 USPQ2d 1281, 1284 (TTAB 1998) ("Of course, petitioner [who owns a registration] or respondent may rely on its registration for the limited purpose of proving that its mark was in use as of the application filing date"); *Intersat Corp. v. Int'l Telecomms. Satellite Org.*, 226 USPQ 154, 156 n. 5 (TTAB 1985) ("The earliest date of first use upon which [defendant] can rely in the absence of testimony or evidence is the filing date of its application").

In its brief in opposition to Petitioner's motion for summary judgment, Respondent asserts that its "date of first use is at least as early as **June 13, 2016**" (emphasis in original), 30 TTABVUE 9, which is the date Respondent provided in its answers to Petitioner's interrogatory Nos. 5-6 inquiring of Respondent's first sales of gift baskets and candy under the mark, 25 TTABVUE 142-43. This date is earlier than its alleged first use in commerce date.

Considered together, the unassailed Izumi and Narita declarations, supported by a copy of an Amazon order, 25 TTABVUE 119, state that Petitioner's first sale of TONOSAMA branded goods, including candy, in the U.S. was March 27, 2016, *id*. at 31, 33. *See W. Fla. Seafood Inc. v. Jet Rests. Inc.*, 31 USPQ2d 1663 ("one should look

at the evidence as a whole, as if each piece of evidence were part of a puzzle which, when fitted together, establishes prior use."). Although the documentary evidence is minimal with respect to sales of candy subsequent to Petitioner's date of first use, the Izumi and Narita declarations present the undisputed fact that Petitioner first used in commerce the TONOSAMA mark with candy on March 27, 2016. This is the priority date on which Petitioner may rely.

We need not decide whether Respondent's assertion that its date of first use is at least as early as June 13, 2016, raises a genuine dispute of material fact, because "[w]hether we accord Respondent the priority filing date on the face of [its] registration or the earlier priority filing date now alleged to be the accurate date," there is no genuine dispute that Petitioner's prior use date of the TONOSAMA mark on candy is earlier than either priority date asserted by Respondent. *Kemi Organics, LLC*, 126 USPQ2d at 1605. We thus find that there is no genuine dispute that Petitioner has priority.

### B. Likelihood of Confusion

Our determination under Trademark Act Section 2(d) is based on an analysis of all of the probative facts in evidence that are relevant to the factors bearing on the likelihood of confusion. *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973) ("*DuPont*") (cited in *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 113 USPQ2d at 2049); *see also In re Majestic Distilling Co.*, 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003). "In discharging this duty, the thirteen *DuPont* factors 'must be considered' 'when [they] are of record.'" *In re Guild Mortg.*

*Co.*, 912 F.3d 1376, 129 USPQ2d 1160, 1162 (Fed. Cir. 2019) (quoting *In re Dixie Rests. Inc.*, 105 F.3d 1405, 41 USPQ2d 1531, 1533 (Fed. Cir. 1997); *DuPont*, 177 USPQ at 567).

"Not all *DuPont* factors are relevant in each case, and the weight afforded to each factor depends on the circumstances. Any single factor may control a particular case." *Stratus Networks, Inc. v. UBTA-UBET Commc'ns Inc.*, 955 F.3d 994, 2020 USPQ2d 10341, at *3 (Fed. Cir. 2020) (citing *Dixie Rests.*, 41 USPQ2d at 1406-07). In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the goods or services. *See In re Chatam Int'l Inc.*, 380 F.3d 1340, 71 USPQ2d 1944, 1945-46 (Fed. Cir. 2004); *Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) ("The fundamental inquiry mandated by § 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks."); *see also In re i.am.symbolic, llc*, 866 F.3d 1315, 123 USPQ2d 1744, 1747 (Fed. Cir. 2017).

As discussed above, Petitioner has established priority of use of the TONOSAMA mark on candy. As to the first two *DuPont* factors, Petitioner asserts, and Respondent does not dispute, that the parties' respective marks, TONOSAMA and TONOSAMA, are identical, 25 TTABVUE 17, and that the parties' respective goods are legally identical in part ("candy chocolate" and "candy") and otherwise related ("candy chocolate" and "gift baskets containing candy"), *id*. at 17-19. Respondent asserts no arguments or evidence disputing the similarity of the parties' marks or relatedness

of the goods. *See* 30 TTABVUE. We find no genuine dispute as to the similarity of the marks and the relatedness of the goods.[7]

As to the third *DuPont* factor, channels of trade, it is undisputed that Petitioner's and Respondent's channels of trade both include Amazon. 25 TTABVUE 8, 32-33, 119; 30 TTABVUE 7. In addition, because Respondent's unrestricted identification of goods is not limited by channels of trade, Respondent's goods are presumed to travel in all ordinary channels of trade which include Petitioner's proven channel of trade. *Bell's Brewery, Inc. v. Innovation Brewing*, 125 USPQ2d 1340, 1345 (TTAB 2017) (although no trade channel presumptions attach to common law mark for beer, Board noted that "there are no restrictions or limitations in Applicant's description of goods" and presumed "that Applicant's beer will move in all channels of trade normal for such goods … including Opposer's trade channels"). Thus, there is no genuine dispute that the parties' channels of trade overlap.

In view thereof, we find no genuine dispute of material facts regarding the similarity of the parties' marks, relatedness of the goods and overlap in channels of trade.

Petitioner also presents arguments and evidence related to *DuPont* factors four through six regarding conditions of sale, strength of its mark and third-party marks.[8]

---

[7] In the context of likelihood of confusion, it is sufficient if likelihood of confusion is found with respect to use of the mark on any item that comes within the description of goods in the application or registration. *Tuxedo Monopoly Inc. v. General Mills Fun Group,* 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981).

[8] Petitioner also argues that the remaining *DuPont* factors "are of little or no relevance to this summary judgment motion." 25 TTABVUE 22. Respondent does not argue to the contrary.

*See* 25 TTABVUE 21-22, 51 and 58 at Exh. A, 119 at Exh. E, 155 at Exh. J. Although Petitioner has not shown an absence of a genuine dispute of material fact regarding these factors, given the identicality of the parties' marks and legally identical nature of the parties' goods, these *DuPont* factors are unnecessary to our analysis of likelihood of confusion in deciding Petitioner's summary judgment motion. *See Herbko Int'l, Inc.,* 64 USPQ2d at 1380 ("The likelihood of confusion analysis considers all *DuPont* factors for which there is record evidence but 'may focus ... on dispositive factors, such as similarity of the marks and relatedness of the goods'"); *Kellogg Co. v. Pack'em Enters., Inc.*, 951 F.2d 330, 21 USPQ2d 1142, 1144 (Fed. Cir. 1991) (Board did not err in granting summary judgment on dispositive *DuPont* factor of dissimilarity of the marks, even though Opposer presented evidence and argument that other *DuPont* factors remained in dispute).

Petitioner thus has established the lack of a genuine dispute of material facts as to its entitlement to a statutory cause of action, priority, and likelihood of confusion between the parties' marks when used on Respondent's identified goods and Petitioner's proven common law goods. Petitioner therefore is entitled, as a matter of law, to judgment in its favor as to its Trademark Act Section 2(d) claim.

**Decision**

Petitioner's motion for summary judgment is hereby **granted** and judgment is entered against Respondent on Petitioner's claim under Trademark Act Section 2(d). Registration No. 5873672 will be cancelled in due course.

KeyCite Red Flag - Severe Negative Treatment
Unconstitutional or PreemptedHeld Unconstitutional by Iancu v. Brunetti, U.S., June 24, 2019

United States Code Annotated
   Title 15. Commerce and Trade
    Chapter 22. Trademarks (Refs & Annos)
     Subchapter I. The Principal Register

15 U.S.C.A. § 1052

§ 1052. Trademarks registrable on principal register; concurrent registration

Effective: October 6, 2006
Currentness

No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it--

**(a)** Consists of or comprises immoral, deceptive, or scandalous matter; or matter which may disparage or falsely suggest a connection with persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute; or a geographical indication which, when used on or in connection with wines or spirits, identifies a place other than the origin of the goods and is first used on or in connection with wines or spirits by the applicant on or after one year after the date on which the WTO Agreement (as defined in section 3501(9) of Title 19) enters into force with respect to the United States.

**(b)** Consists of or comprises the flag or coat of arms or other insignia of the United States, or of any State or municipality, or of any foreign nation, or any simulation thereof.

**(c)** Consists of or comprises a name, portrait, or signature identifying a particular living individual except by his written consent, or the name, signature, or portrait of a deceased President of the United States during the life of his widow, if any, except by the written consent of the widow.

**(d)** Consists of or comprises a mark which so resembles a mark registered in the Patent and Trademark Office, or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive: *Provided,* That if the Director determines that confusion, mistake, or deception is not likely to result from the continued use by more than one person of the same or similar marks under conditions and limitations as to the mode or place of use of the marks or the goods on or in connection with which such marks are used, concurrent registrations may be issued to such persons when they have become entitled to use such marks as a result of their concurrent lawful use in commerce prior to (1) the earliest of the filing dates of the applications pending or of any registration issued under this chapter; (2) July 5, 1947, in the case of registrations previously issued under the Act of March 3, 1881, or February 20, 1905, and continuing in full force and effect on that date; or (3) July 5, 1947, in the case of applications filed under the Act of February 20, 1905, and registered after July 5, 1947. Use prior to the filing date of any pending application or a registration shall not be required when the owner of such application or registration consents to the grant of a concurrent registration to the applicant. Concurrent registrations may also be issued by the Director when a court of competent jurisdiction has finally determined that more than one person is entitled to use the same or similar marks in

Addendum Page 1

commerce. In issuing concurrent registrations, the Director shall prescribe conditions and limitations as to the mode or place of use of the mark or the goods on or in connection with which such mark is registered to the respective persons.

**(e)** Consists of a mark which (1) when used on or in connection with the goods of the applicant is merely descriptive or deceptively misdescriptive of them, (2) when used on or in connection with the goods of the applicant is primarily geographically descriptive of them, except as indications of regional origin may be registrable under section 1054 of this title, (3) when used on or in connection with the goods of the applicant is primarily geographically deceptively misdescriptive of them, (4) is primarily merely a surname, or (5) comprises any matter that, as a whole, is functional.

**(f)** Except as expressly excluded in subsections (a), (b), (c), (d), (e)(3), and (e)(5) of this section, nothing in this chapter shall prevent the registration of a mark used by the applicant which has become distinctive of the applicant's goods in commerce. The Director may accept as prima facie evidence that the mark has become distinctive, as used on or in connection with the applicant's goods in commerce, proof of substantially exclusive and continuous use thereof as a mark by the applicant in commerce for the five years before the date on which the claim of distinctiveness is made. Nothing in this section shall prevent the registration of a mark which, when used on or in connection with the goods of the applicant, is primarily geographically deceptively misdescriptive of them, and which became distinctive of the applicant's goods in commerce before December 8, 1993.

A mark which would be likely to cause dilution by blurring or dilution by tarnishment under section 1125(c) of this title, may be refused registration only pursuant to a proceeding brought under section 1063 of this title. A registration for a mark which would be likely to cause dilution by blurring or dilution by tarnishment under section 1125(c) of this title, may be canceled pursuant to a proceeding brought under either section 1064 of this title or section 1092 of this title.

### CREDIT(S)

(July 5, 1946, c. 540, Title I, § 2, 60 Stat. 428; Pub.L. 87-772, § 2, Oct. 9, 1962, 76 Stat. 769; Pub.L. 93-596, § 1, Jan. 2, 1975, 88 Stat. 1949; Pub.L. 100-667, Title I, § 104, Nov. 16, 1988, 102 Stat. 3937; Pub.L. 103-182, Title III, § 333(a), Dec. 8, 1993, 107 Stat. 2114; Pub.L. 103-465, Title V, § 522, Dec. 8, 1994, 108 Stat. 4982; Pub.L. 105-330, Title II, § 201(a)(2), (12), Oct. 30, 1998, 112 Stat. 3069, 3070; Pub.L. 106-43, § 2(a), Aug. 5, 1999, 113 Stat. 218; Pub.L. 106-113, Div. B, § 1000(a)(9) [Title IV, § 4732(b)(1)(B)], Nov. 29, 1999, 113 Stat. 1536, 1501A-583; Pub.L. 109-312, § 3(a), Oct. 6, 2006, 120 Stat. 1732.)

### VALIDITY

<The United States Supreme Court has held that the disparagement clause of Lanham Act (15 U.S.C.A. § 1052(a)), prohibiting federal trademark registration for marks that might disparage any persons, living or dead, was facially invalid under First Amendment protection of speech, as it offended a bedrock First Amendment principle that speech may not be banned on the ground that it expresses ideas that offend. Matal v. Tam, U.S.2017, 582 U.S. 218, 137 S.Ct. 1744, 198 L.Ed.2d 366.>

<The United States Supreme Court held that the Lanham Act's bar under subsection (a) of this section on the registration of "immoral" or "scandalous" trademarks discriminates on the basis of viewpoint and, thus, violates the First Amendment. Iancu v. Brunetti, (U.S. June 24, 2019) 139 S.Ct. 2294, 204 L.Ed.2d 714.>

Notes of Decisions (4468)

15 U.S.C.A. § 1052, 15 USCA § 1052
Current through P.L.118-5. Some statute sections may be more current, see credits for details.

Addendum Page 2

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Addendum Page 3

---

United States Code Annotated
    Title 15. Commerce and Trade
        Chapter 22. Trademarks (Refs & Annos)
            Subchapter I. The Principal Register

15 U.S.C.A. § 1060

§ 1060. Assignment

Effective: November 2, 2002

Currentness

**(a)(1)** A registered mark or a mark for which an application to register has been filed shall be assignable with the good will of the business in which the mark is used, or with that part of the good will of the business connected with the use of and symbolized by the mark. Notwithstanding the preceding sentence, no application to register a mark under section 1051(b) of this title shall be assignable prior to the filing of an amendment under section 1051(c) of this title to bring the application into conformity with section 1051(a) of this title or the filing of the verified statement of use under section 1051(d) of this title, except for an assignment to a successor to the business of the applicant, or portion thereof, to which the mark pertains, if that business is ongoing and existing.

**(2)** In any assignment authorized by this section, it shall not be necessary to include the good will of the business connected with the use of and symbolized by any other mark used in the business or by the name or style under which the business is conducted.

**(3)** Assignments shall be by instruments in writing duly executed. Acknowledgment shall be prima facie evidence of the execution of an assignment, and when the prescribed information reporting the assignment is recorded in the United States Patent and Trademark Office, the record shall be prima facie evidence of execution.

**(4)** An assignment shall be void against any subsequent purchaser for valuable consideration without notice, unless the prescribed information reporting the assignment is recorded in the United States Patent and Trademark Office within 3 months after the date of the assignment or prior to the subsequent purchase.

**(5)** The United States Patent and Trademark Office shall maintain a record of information on assignments, in such form as may be prescribed by the Director.

**(b)** An assignee not domiciled in the United States may designate by a document filed in the United States Patent and Trademark Office the name and address of a person resident in the United States on whom may be served notices or process in proceedings affecting the mark. Such notices or process may be served upon the person so designated by leaving with that person or mailing to that person a copy thereof at the address specified in the last designation so filed. If the person so designated cannot be found at the address given in the last designation, or if the assignee does not designate by a document filed in the United States Patent and Trademark Office the name and address of a person resident in the United States on whom may be served notices or process in proceedings affecting the mark, such notices or process may be served upon the Director.

---

Addendum Page 4

**CREDIT(S)**

(July 5, 1946, c. 540, Title I, § 10, 60 Stat. 431; Pub.L. 87-772, § 6, Oct. 9, 1962, 76 Stat. 770; Pub.L. 93-596, § 1, Jan. 2, 1975, 88 Stat. 1949; Pub.L. 100-667, Title I, § 112, Nov. 16, 1988, 102 Stat. 3939; Pub.L. 105-330, Title I, § 107, Oct. 30, 1998, 112 Stat. 3068; Pub.L. 106-43, § 6(a), Aug. 5, 1999, 113 Stat. 220; Pub.L. 106-113, Div. B, § 1000(a)(9) [Title IV, § 4732(b)(1)(B)], Nov. 29, 1999, 113 Stat. 1536, 1501A-583; Pub.L. 107-273, Div. C, Title III, § 13207(b)(5), Nov. 2, 2002, 116 Stat. 1907.)

Notes of Decisions (318)

15 U.S.C.A. § 1060, 15 USCA § 1060
Current through P.L.118-5. Some statute sections may be more current, see credits for details.

United States Code Annotated
    Title 15. Commerce and Trade
        Chapter 22. Trademarks (Refs & Annos)
            Subchapter III. General Provisions

15 U.S.C.A. § 1127

§ 1127. Construction and definitions; intent of chapter

Effective: October 6, 2006

Currentness

In the construction of this chapter, unless the contrary is plainly apparent from the context--

The United States includes and embraces all territory which is under its jurisdiction and control.

The word "commerce" means all commerce which may lawfully be regulated by Congress.

The term "principal register" refers to the register provided for by sections 1051 to 1072 of this title, and the term "supplemental register" refers to the register provided for by sections 1091 to 1096 of this title.

The term "person" and any other word or term used to designate the applicant or other entitled to a benefit or privilege or rendered liable under the provisions of this chapter includes a juristic person as well as a natural person. The term "juristic person" includes a firm, corporation, union, association, or other organization capable of suing and being sued in a court of law.

The term "person" also includes the United States, any agency or instrumentality thereof, or any individual, firm, or corporation acting for the United States and with the authorization and consent of the United States. The United States, any agency or instrumentality thereof, and any individual, firm, or corporation acting for the United States and with the authorization and consent of the United States, shall be subject to the provisions of this chapter in the same manner and to the same extent as any nongovernmental entity.

The term "person" also includes any State, any instrumentality of a State, and any officer or employee of a State or instrumentality of a State acting in his or her official capacity. Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this chapter in the same manner and to the same extent as any nongovernmental entity.

The terms "applicant" and "registrant" embrace the legal representatives, predecessors, successors and assigns of such applicant or registrant.

The term "Director" means the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office.

The term "related company" means any person whose use of a mark is controlled by the owner of the mark with respect to the nature and quality of the goods or services on or in connection with which the mark is used.

The terms "trade name" and "commercial name" mean any name used by a person to identify his or her business or vocation.

The term "trademark" includes any word, name, symbol, or device, or any combination thereof--

Addendum Page 6

**(1)** used by a person, or

**(2)** which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter,

to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown.

The term "service mark" means any word, name, symbol, or device, or any combination thereof--

**(1)** used by a person, or

**(2)** which a person has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter,

to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown. Titles, character names, and other distinctive features of radio or television programs may be registered as service marks notwithstanding that they, or the programs, may advertise the goods of the sponsor.

The term "certification mark" means any word, name, symbol, or device, or any combination thereof--

**(1)** used by a person other than its owner, or

**(2)** which its owner has a bona fide intention to permit a person other than the owner to use in commerce and files an application to register on the principal register established by this chapter,

to certify regional or other origin, material, mode of manufacture, quality, accuracy, or other characteristics of such person's goods or services or that the work or labor on the goods or services was performed by members of a union or other organization.

The term "collective mark" means a trademark or service mark--

**(1)** used by the members of a cooperative, an association, or other collective group or organization, or

**(2)** which such cooperative, association, or other collective group or organization has a bona fide intention to use in commerce and applies to register on the principal register established by this chapter,

and includes marks indicating membership in a union, an association, or other organization.

The term "mark" includes any trademark, service mark, collective mark, or certification mark.

The term "use in commerce" means the bona fide use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark. For purposes of this chapter, a mark shall be deemed to be in use in commerce--

Addendum Page 7

**(1)** on goods when--

    **(A)** it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and

    **(B)** the goods are sold or transported in commerce, and

**(2)** on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

A mark shall be deemed to be "abandoned" if either of the following occurs:

    **(1)** When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

    **(2)** When any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark. Purchaser motivation shall not be a test for determining abandonment under this paragraph.

The term "colorable imitation" includes any mark which so resembles a registered mark as to be likely to cause confusion or mistake or to deceive.

The term "registered mark" means a mark registered in the United States Patent and Trademark Office under this chapter or under the Act of March 3, 1881, or the Act of February 20, 1905, or the Act of March 19, 1920. The phrase "marks registered in the Patent and Trademark Office" means registered marks.

The term "Act of March 3, 1881", "Act of February 20, 1905", or "Act of March 19, 1920", means the respective Act as amended.

A "counterfeit" is a spurious mark which is identical with, or substantially indistinguishable from, a registered mark.

The term "domain name" means any alphanumeric designation which is registered with or assigned by any domain name registrar, domain name registry, or other domain name registration authority as part of an electronic address on the Internet.

The term "Internet" has the meaning given that term in section 230(f)(1) of Title 47.

Words used in the singular include the plural and vice versa.

The intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and to provide

Addendum Page 8

rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations.

## CREDIT(S)

(July 5, 1946, c. 540, Title X, § 45, 60 Stat. 443; Pub.L. 87-772, § 21, Oct. 9, 1962, 76 Stat. 774; Pub.L. 93-596, § 1, Jan. 2, 1975, 88 Stat. 1949; Pub.L. 98-620, Title I, § 103, Nov. 8, 1984, 98 Stat. 3335; Pub.L. 100-667, Title I, § 134, Nov. 16, 1988, 102 Stat. 3946; Pub.L. 102-542, § 3(d), Oct. 27, 1992, 106 Stat. 3568; Pub.L. 103-465, Title V, § 521, Dec. 8, 1994, 108 Stat. 4981; Pub.L. 104-98, § 4, Jan. 16, 1996, 109 Stat. 986; Pub.L. 106-43, §§ 4(c), 6(b), Aug. 5, 1999, 113 Stat. 219, 220; Pub.L. 106-113, Div. B, § 1000(a)(9) [Title III, § 3005, Title IV, § 4732(b)(1)(A)], Nov. 29, 1999, 113 Stat. 1536, 1501A-550, 1501A-583; Pub.L. 109-312, § 3(e), Oct. 6, 2006, 120 Stat. 1733.)

Notes of Decisions (505)

15 U.S.C.A. § 1127, 15 USCA § 1127
Current through P.L.118-5. Some statute sections may be more current, see credits for details.

Addendum Page 9

United States Code Annotated
Title 28. Judiciary and Judicial Procedure (Refs & Annos)
Part IV. Jurisdiction and Venue (Refs & Annos)
Chapter 83. Courts of Appeals (Refs & Annos)

28 U.S.C.A. § 1295

## § 1295. Jurisdiction of the United States Court of Appeals for the Federal Circuit

Effective: September 16, 2012

Currentness

**(a)** The United States Court of Appeals for the Federal Circuit shall have exclusive jurisdiction--

**(1)** of an appeal from a final decision of a district court of the United States, the District Court of Guam, the District Court of the Virgin Islands, or the District Court of the Northern Mariana Islands, in any civil action arising under, or in any civil action in which a party has asserted a compulsory counterclaim arising under, any Act of Congress relating to patents or plant variety protection;

**(2)** of an appeal from a final decision of a district court of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, the District Court of the Virgin Islands, or the District Court for the Northern Mariana Islands, if the jurisdiction of that court was based, in whole or in part, on section 1346 of this title, except that jurisdiction of an appeal in a case brought in a district court under section 1346(a)(1), 1346(b), 1346(e), or 1346(f) of this title or under section 1346(a)(2) when the claim is founded upon an Act of Congress or a regulation of an executive department providing for internal revenue shall be governed by sections 1291, 1292, and 1294 of this title;

**(3)** of an appeal from a final decision of the United States Court of Federal Claims;

**(4)** of an appeal from a decision of--

**(A)** the Patent Trial and Appeal Board of the United States Patent and Trademark Office with respect to a patent application, derivation proceeding, reexamination, post-grant review, or inter partes review under title 35, at the instance of a party who exercised that party's right to participate in the applicable proceeding before or appeal to the Board, except that an applicant or a party to a derivation proceeding may also have remedy by civil action pursuant to section 145 or 146 of title 35; an appeal under this subparagraph of a decision of the Board with respect to an application or derivation proceeding shall waive the right of such applicant or party to proceed under section 145 or 146 of title 35;

**(B)** the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office or the Trademark Trial and Appeal Board with respect to applications for registration of marks and other proceedings as provided in section 21 of the Trademark Act of 1946 (15 U.S.C. 1071); or

**(C)** a district court to which a case was directed pursuant to section 145, 146, or 154(b) of title 35;

**(5)** of an appeal from a final decision of the United States Court of International Trade;

**(6)** to review the final determinations of the United States International Trade Commission relating to unfair practices in import trade, made under section 337 of the Tariff Act of 1930 (19 U.S.C. 1337);

**(7)** to review, by appeal on questions of law only, findings of the Secretary of Commerce under U.S. note 6 to subchapter X of chapter 98 of the Harmonized Tariff Schedule of the United States (relating to importation of instruments or apparatus);

**(8)** of an appeal under section 71 of the Plant Variety Protection Act (7 U.S.C. 2461);

**(9)** of an appeal from a final order or final decision of the Merit Systems Protection Board, pursuant to sections 7703(b)(1) and 7703(d) of title 5;

**(10)** of an appeal from a final decision of an agency board of contract appeals pursuant to section 7107(a)(1) of title 41;

**(11)** of an appeal under section 211 of the Economic Stabilization Act of 1970;

**(12)** of an appeal under section 5 of the Emergency Petroleum Allocation Act of 1973;

**(13)** of an appeal under section 506(c) of the Natural Gas Policy Act of 1978; and

**(14)** of an appeal under section 523 of the Energy Policy and Conservation Act.

**(b)** The head of any executive department or agency may, with the approval of the Attorney General, refer to the Court of Appeals for the Federal Circuit for judicial review any final decision rendered by a board of contract appeals pursuant to the terms of any contract with the United States awarded by that department or agency which the head of such department or agency has concluded is not entitled to finality pursuant to the review standards specified in section 7107(b) of title 41. The head of each executive department or agency shall make any referral under this section within one hundred and twenty days after the receipt of a copy of the final appeal decision.

**(c)** The Court of Appeals for the Federal Circuit shall review the matter referred in accordance with the standards specified in section 7107(b) of title 41. The court shall proceed with judicial review on the administrative record made before the board of contract appeals on matters so referred as in other cases pending in such court, shall determine the issue of finality of the appeal decision, and shall, if appropriate, render judgment thereon, or remand the matter to any administrative or executive body or official with such direction as it may deem proper and just.

**CREDIT(S)**

Addendum Page 11

(Added Pub.L. 97-164, Title I, § 127(a), Apr. 2, 1982, 96 Stat. 37; amended Pub.L. 98-622, Title II, § 205(a), Nov. 8, 1984, 98 Stat. 3388; Pub.L. 100-418, Title I, § 1214(a)(3), Aug. 23, 1988, 102 Stat. 1156; Pub.L. 100-702, Title X, § 1020(a)(3), Nov. 19, 1988, 102 Stat. 4671; Pub.L. 102-572, Title I, § 102(c), Title IX, § 902(b)(1), Oct. 29, 1992, 106 Stat. 4507, 4516; Pub.L. 106-113, Div. B, § 1000(a)(9) [Title IV, §§ 4402(b)(2), 4732(b)(14)], Nov. 29, 1999, 113 Stat. 1536, 1501A-560, 1501A-584; Pub.L. 111-350, § 5(g)(5), Jan. 4, 2011, 124 Stat. 3848; Pub.L. 112-29, §§ 7(c)(2), 19(b), Sept. 16, 2011, 125 Stat. 314, 332.)

Notes of Decisions (232)

28 U.S.C.A. § 1295, 28 USCA § 1295
Current through P.L.118-5. Some statute sections may be more current, see credits for details.

End of Document                                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
    Title 37. Patents, Trademarks, and Copyrights
        Chapter I. United States Patent and Trademark Office, Department of Commerce (Refs & Annos)
            Subchapter A. General
                Trademarks
                    Part 2. Rules of Practice in Trademark Cases (Refs & Annos)
                        Procedure in Inter Partes Proceedings (Refs & Annos)

37 C.F.R. § 2.124

§ 2.124 Depositions upon written questions.

Effective: January 14, 2017

Currentness

(a) A deposition upon written questions may be taken before any person before whom depositions may be taken as provided by Rule 28 of the Federal Rules of Civil Procedure.

(b)(1) A party desiring to take a testimonial deposition upon written questions shall serve notice thereof upon each adverse party within ten days from the opening date of the testimony period of the party who serves the notice. The notice shall state the name and address of the witness. A copy of the notice, but not copies of the questions, shall be filed with the Trademark Trial and Appeal Board.

(2) A party desiring to take a discovery deposition upon written questions shall serve notice thereof upon each adverse party and shall file a copy of the notice, but not copies of the questions, with the Board. The notice shall state the name and address, if known, of the person whose deposition is to be taken. If the name of the person is not known, a general description sufficient to identify the witness or the particular class or group to which he or she belongs shall be stated in the notice, and the party from whom the discovery deposition is to be taken shall designate one or more persons to be deposed in the same manner as is provided by Rule 30(b)(6) of the Federal Rules of Civil Procedure.

(3) A party desiring to take cross-examination, by written questions, of a witness who has provided testimony by affidavit or declaration shall serve notice thereof upon each adverse party and shall file a copy of the notice, but not copies of the questions, with the Board.

(c) Every notice given under the provisions of paragraph (b) of this section shall be accompanied by the name or descriptive title of the officer before whom the deposition is to be taken.

(d)(1) Every notice served on any adverse party under the provisions of paragraphs (b)(1) and (2) of this section, for the taking of direct examination, shall be accompanied by the written questions to be propounded on behalf of the party who proposes to take the deposition. Every notice served on any adverse party under the provisions of paragraph (b)(3) of this section, for the taking of cross-examination, shall be accompanied by the written questions to be propounded on behalf of the party who proposes to take the cross-examination. Within twenty days from the date of service of the notice of taking direct examination, or service of a testimony affidavit or declaration, any adverse party may serve cross questions upon the party who proposes to take the

deposition. Any party who serves cross questions, whether in response to direct examination questions or under paragraph (b)(3) of this section, shall also serve every other adverse party. Within ten days from the date of service of the cross questions, the party who proposes to take the deposition, or who earlier offered testimony of the witness by affidavit or declaration, may serve redirect questions on every adverse party. Within ten days from the date of service of the redirect questions, any party who served cross questions may serve recross questions upon the party who proposes to take the deposition or who earlier offered testimony of the witness by affidavit or declaration; any party who serves recross questions shall also serve every other adverse party. Written objections to questions may be served on a party propounding questions; any party who objects shall serve a copy of the objections on every other adverse party. In response to objections, substitute questions may be served on the objecting party within ten days of the date of service of the objections; substitute questions shall be served on every other adverse party.

(2) Upon motion for good cause by any party, or upon its own initiative, the Trademark Trial and Appeal Board may extend any of the time periods provided by paragraph (d)(1) of this section. Upon receipt of written notice that one or more testimonial depositions are to be taken upon written questions, the Trademark Trial and Appeal Board shall suspend or reschedule other proceedings in the matter to allow for the orderly completion of the depositions upon written questions.

(3) Service of written questions, responses, and cross-examination questions shall be in accordance with § 2.119(b).

(e) Within ten days after the last date when questions, objections, or substitute questions may be served, the party who proposes to take the deposition shall mail a copy of the notice and copies of all the questions to the officer designated in the notice; a copy of the notice and of all the questions mailed to the officer shall be served on every adverse party. The officer designated in the notice shall take the testimony of the witness in response to the questions and shall record each answer immediately after the corresponding question. The officer shall then certify the transcript and mail the transcript and exhibits to the party who took the deposition.

(f) The party who took the deposition shall promptly serve a copy of the transcript, copies of documentary exhibits, and duplicates or photographs of physical exhibits on every adverse party. It is the responsibility of the party who takes the deposition to assure that the transcript is correct (see § 2.125(c)). If the deposition is a discovery deposition, it may be made of record as provided by § 2.120(k). If the deposition is a testimonial deposition, the original, together with copies of documentary exhibits and duplicates or photographs of physical exhibits, shall be filed promptly with the Trademark Trial and Appeal Board.

(g) Objections to questions and answers in depositions upon written questions may be considered at final hearing.

**Credits**

[30 FR 13193, Oct. 16, 1965, as amended at 37 FR 7608, Apr. 18, 1972; 48 FR 23139, May 23, 1983; 81 FR 69982, Oct. 7, 2016; 81 FR 89383, Dec. 12, 2016]

SOURCE: 30 FR 13193, Oct. 16, 1965; 51 FR 28057, Aug. 4, 1986; 51 FR 28709, Aug. 11, 1986; 65 FR 56793, Sept. 20, 2000; 68 FR 14337, March 25, 2003; 68 FR 48289, Aug. 13, 2003; 79 FR 74638, Dec. 16, 2014; 83 FR 33132, July 17, 2018; 85 FR 73215, Nov. 17, 2020; 86 FR 64325, Nov. 17, 2021, unless otherwise noted.

AUTHORITY: 15 U.S.C. 1113, 1123; 35 U.S.C. 2; sec. 10, Pub.L. 112–29, 125 Stat. 284; Pub.L. 116–260, 134 Stat. 1182, unless otherwise noted. Sec. 2.99 also issued under secs. 16, 17, 60 Stat. 434; 15 U.S.C. 1066, 1067.; Secs. 2.116 to 2.136 also issued under sec. 17, 60 Stat. 434; 15 U.S.C. 1067.

Current through June 9, 2023, 88 FR 37799, with the exception of Title 15, which is current through May 19, 2023, 88 FR 32615. Some sections may be more current. See credits for details.

**End of Document**                                                      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

TBMP 503

Trademark Trial & App. Bd. Man. of Proc. 503 (June 2022)

Patent and Trademark Office U.S. Department of Commerce

**TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE - JUNE 2022**

**CHAPTER 500 STIPULATIONS AND MOTIONS**

**503 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**
Current through June 2022

## 503 Motion to Dismiss for Failure to State a Claim

*Fed. R. Civ. P. 12(b)* **How to Present Defenses.** *Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion: …*

*(6) failure to state a claim upon which relief can be granted; …*

*A motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed. If a pleading sets out a claim for relief that does not require a responsive pleading, an opposing party may assert at trial any defense to that claim. No defense or objection is waived by joining it with one or more other defenses or objections in a responsive pleading or in a motion.*

TBMP 503

**End of Document**  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

TBMP 703.01(b)

Trademark Trial & App. Bd. Man. of Proc. 703.01(b) (June 2022)

Patent and Trademark Office U.S. Department of Commerce

**TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE - JUNE 2022**

**CHAPTER 700 TRIAL PROCEDURE AND INTRODUCTION OF EVIDENCE**

**703 TAKING AND INTRODUCING TESTIMONY**

**703.01 AFFIDAVITS, DECLARATIONS AND ORAL TESTIMONY DEPOSITIONS**
Current through June 2022

703.01(b) Form of Testimony

**37 C.F.R. § 2.123**

(a)(1) *The testimony of witnesses in inter partes cases may be submitted in the form of an affidavit or a declaration pursuant to § 2.20 and in conformance with the Federal Rules of Evidence, filed during the proffering party's testimony period, subject to the right of any adverse party to elect to take and bear the expense of oral cross-examination of that witness as provided under paragraph (c) of this section if such witness is within the jurisdiction of the United States, or conduct cross-examination by written questions as provided in § 2.124 if such witness is outside the jurisdiction of the United States, and the offering party must make that witness available; or taken by deposition upon oral examination as provided by this section or by deposition upon written questions as provided by § 2.124.*

(2) *Testimony taken in a foreign country shall be taken by deposition upon written questions as provided by § 2.124, unless the Board, upon motion for good cause, orders that the deposition be taken by oral examination, or the parties so stipulate; or by affidavit or declaration, subject to the right of any adverse party to elect to take and bear the expense of cross-examination by written questions of that witness. If a party serves notice of the taking of a testimonial deposition upon written questions of a witness who is, or will be at the time of the deposition, present within the United States or any territory which is under the control and jurisdiction of the United States, any adverse party may, within twenty days from the date of service of the notice, file a motion with the Trademark Trial and Appeal Board, for good cause, for an order that the deposition be taken by oral examination.*

(b) *Stipulations. If the parties so stipulate in writing, depositions may be taken before any person authorized to administer oaths, at any place, upon any notice, and in any manner, and when so taken may be used like other depositions. The parties may stipulate in writing what a particular witness would testify to if called; or any relevant facts in the case may be stipulated in writing.*

Ordinarily, the testimony of a witness may be taken by affidavit, declaration or on oral examination pursuant to 37 C.F.R. § 2.123, or by deposition on written questions pursuant to 37 C.F.R. § 2.124.[1] For information concerning testimony depositions on written questions, see TBMP § 703.02.

A party may unilaterally choose to submit the trial testimony of any witness or witnesses of any party in the form of an affidavit or declaration pursuant to 37 C.F.R. § 2.20 and in conformance with the Federal Rules of Evidence, subject to the right of any adverse party to cross-examine the witness orally if the witness is within the jurisdiction of the United States, or by written

Addendum Page 17

questions pursuant to 37 C.F.R. § 2.124 if the witness is not within the jurisdiction of the United States.[2] The affidavit or declaration must be under oath and subject to cross-examination.[3] In addition, the offering party must make the witness available for cross-examination if elected.[4] As with cross-examination at oral testimony depositions, the party cross-examining the affiant or declarant must pay its own travel and attorney expenses.[5] The proffering party has and continues to bear the expense of producing its witness.[6] However, the party seeking oral cross-examination of an affiant or declarant must cover the expense of the court reporter.[7] Any redirect and recross is to be taken at the same time as the oral cross-examination, with the party who originally sought oral cross-examination bearing the cost of the court reporter.[8]

The Board ordinarily finds the vicinity of the witness' place of business or domicile to be a reasonable place for oral cross-examination of an affiant or declarant.[9] By stipulation or upon motion for good cause, oral cross-examination of a witness located within the jurisdiction of the United States may be conducted by telephone or other remote means.[10]

The testimony of a witness ordinarily may also be taken by deposition on written questions.[11] However, testimony taken in a foreign country must be taken: by deposition on written questions, unless the Board, on motion for good cause, orders that the deposition be taken by oral examination, or the parties so stipulate; or by affidavit or declaration, subject to the right of any adverse party to elect to take and bear the expense of cross-examination by written questions of that witness.[12] See TBMP § 404.03(b), TBMP § 520, TBMP § 531 and TBMP § 703.02.

If a declaration or affidavit of a witness in a foreign country is offered, the proffering party must make the witness available for cross-examination by written questions.[13] A party seeking cross-examination by written questions of an affiant or declarant outside the jurisdiction of the United States must cover the expense of the court reporter or other official to swear in the witness, record the answers and to create a written transcript of the examination.[14] See TBMP § 703.02(g) for information on cross-examination of the witness by written questions, including the procedures for redirect and recross by written questions.

In addition, if a party serves notice of the taking of a testimony deposition on written questions of a witness who is, or will be at the time of the deposition, present within the United States (or any territory that is under the control and jurisdiction of the United States), any adverse party may, within 20 days from the date of service of the notice, file a motion with the Board, for good cause, for an order that the deposition be taken by oral examination.[15] What constitutes good cause to take an oral deposition is determined on a case-by-case basis.[16] See TBMP § 531.

Parties may stipulate that depositions may be taken in a foreign country by oral examination.[17] The parties should determine whether the taking of the oral deposition will be permitted by the foreign country, and, if so, what procedure must be followed.[18] See TBMP § 703.01(g).

The parties may also stipulate in writing to any relevant facts in the case, or what a particular witness would testify to if called, or that a party may use a discovery deposition as testimony.[19] See TBMP § 702.04(e) regarding stipulations.

**NOTES:**

Footnotes

1    *See* 37 C.F.R. § 2.123(a)(1) and 37 C.F.R. § 2.123(a)(2). Effective January 14, 2017, the Office amended these rules by allowing a unilateral option for trial testimony by affidavit or declaration subject to the right of oral cross-examination by the adverse party or parties. *See* MISCELLANEOUS CHANGES TO TRADEMARK TRIAL AND APPEAL BOARD RULES, 81 Fed. Reg. 69950, 69951 (October 7, 2016). *See Robinson v. Hot Grabba Leaf, LLC*, 2019 USPQ2d 149089, at *4 n.21 (TTAB 2019) (referencing

Addendum Page 18

TBMP § 703.01(a)), *cancellation order vacated on default judgment*, No. 0:19-cv-61614-DPG (S.D. Fla. Dec. 17, 2019); *Andrusiek v. Cosmic Crusaders LLC*, 2019 USPQ2d 222984, at *2 (TTAB 2019).

2    37 C.F.R. § 2.123(a)(1). *See* MISCELLANEOUS CHANGES TO TRADEMARK TRIAL AND APPEAL BOARD RULES, 81 Fed. Reg. 69950, 69965 (October 7, 2016) ("The Office is amending § 2.123(b) to remove the requirement for written agreement of the parties to submit testimony in the form of an affidavit, as provided in amendments to § 2.123(a)(1), and to clarify that parties may stipulate to any relevant facts."). *See Ricardo Media Inc. v. Inventive Software, LLC*, 2019 USPQ2d 311355, at *2 (TTAB 2019) (amended Trademark Rules provide for testimony by declaration, even in the absence of a stipulation); *Andrusiek v. Cosmic Crusaders LLC*, 2019 USPQ2d 222984, at *2 (TTAB 2019) (the method of cross-examination of a witness who presented testimony by affidavit or declaration depends on whether the witness is located in the United States or outside the jurisdiction of the United States); *Empresa Cubana Del Tabaco v. General Cigar Co.*, 2019 USPQ2d 227680, at *2 (TTAB 2019) (if the offering party submits trial testimony in the form of an affidavit or declaration of a foreign witness, the adverse party may elect to take and bear the expense of cross-examination by written questions of that witness).

3    *See* 37 C.F.R. § 2.123(a)(1); *B&B Hardware, Inc. v. Hargis Industries, Inc.*, 575 U.S. 138, 135 S. Ct. 1293, 113 USPQ2d 2045 (2015) (Supreme Court focused on fact that Board proceedings require testimony to be under oath and subject to cross-examination); MISCELLANEOUS CHANGES TO TRADEMARK TRIAL AND APPEAL BOARD RULES, 81 Fed. Reg. 69950, 69964 (October 7, 2016) (concerning the unilateral option of permitting submission of witness testimony by affidavit or declaration, "The new procedure retains what the Supreme Court focused on in *B&B Hardware, Inc. v. Hargis Industries, Inc.*, 135 S. Ct. 1293, 113 USPQ2d 2045 (2015): That testimony be under oath and subject to cross-examination. The ability to elect cross-examination of the witness in the new unilateral procedure maintains the fairness and weightiness of Board proceedings."); *Andrusiek v. Cosmic Crusaders LLC*, 2019 USPQ2d 222984, at *2 (TTAB 2019) (testimony by declaration or affidavit is subject to the right of the adverse party to elect cross-examination); *Empresa Cubana Del Tabaco v. General Cigar Co.*, 2019 USPQ2d 227680, at *2 (TTAB 2019) (same); *Kate Spade LLC v. Thatch, LLC*, 126 USPQ2d 1098, 1102 (TTAB 2018) ("[T]he right to seek cross examination is integral to the right to offer testimony by declaration."); *TV Azteca, S.A.B. de C.V. v. Martin*, 128 USPQ2d 1786, 1790, 1790 n.16 (TTAB 2018) (statements made in defendant's initial disclosures about attached documents are not properly sworn or otherwise verified under Trademark Rule 2.20 and thus are not testimony; defendant could have introduced additional documents through testimony of potential witness listed in initial disclosure, subject to cross-examination, but defendant chose not to do so); *TV Azteca, S.A.B. de C.V. v. Martin*, 128 USPQ2d 1786, 1790 n.18 (TTAB 2018) (unsworn statement, submitted with duplicate copies of initial disclosures, simply "declaring" use of the mark during the relevant period not considered because defendant's statement that "the foregoing is true and correct" is not in affidavit form).

*See also WeaponX Performance Products. Ltd. v. Weapon X Motorsports, Inc.*, 126 USPQ2d 1034, 1037 (TTAB 2018) (opposer's objection to applicant's testimony declarations overruled where applicant provided notice to opposer via pretrial disclosures about witnesses and the subject matter of their anticipated testimony, testimony declarations were timely served, and opposer had opportunity but chose not to cross-examine the witnesses).

4    37 C.F.R. § 2.123(a)(1); *Andrusiek v. Cosmic Crusaders LLC*, 2019 USPQ2d 222984, at *2-3 (TTAB 2019) (party offering witness testimony by declaration or affidavit bears the expense of producing witnesses for oral cross-examination for witness within jurisdiction of the United States); *Empresa Cubana Del Tabaco v. General Cigar Co.*, 2019 USPQ2d 227680, at *2 (TTAB 2019) (party offering foreign witness testimony by declaration or affidavit must make witness available for cross-examination by written questions); *Kate Spade LLC v. Thatch, LLC*, 126 USPQ2d 1098, 1104 n.9 (TTAB 2018) ("when choosing a declarant, the proffering party must weigh its ability to make the declarant available for cross examination, or risk the Board's refusal to consider the testimony.").

5    *See* MISCELLANEOUS CHANGES TO TRADEMARK TRIAL AND APPEAL BOARD RULES, 81 Fed. Reg. 69950, 69964 (October 7, 2016) ("Even with oral testimony depositions, the party cross-examining the witness must pay its own travel expense and its own attorney expenses. … The goal of the final rule is to minimize the ability of a party seeking cross-examination to thwart the other party's efforts to rein in the cost of litigation by opting for testimony by affidavit or declaration."); *Andrusiek v. Cosmic Crusaders LLC*, 2019 USPQ2d 222984, at *3 (TTAB 2019) (petitioner's counsel alternatively sought to take oral cross-examination remotely due to travel and accommodation expense); *USPS v. RPost Communication Ltd.*, 124 USPQ2d 1045, 1047 and 1047 n.1 (TTAB 2017) (party seeking oral cross-examination of affiant or declarant must pay its own travel and attorney expenses including, if necessary, cost of lodging and procuring accommodation for the deposition); *Barclays Capital Inc. v. Tiger Lily Ventures Ltd.*, 124

USPQ2d 1160, 1166-67 (TTAB 2017) (only new costs to party seeking oral cross-examination of affiant or declarant are that of court reporter and the venue if necessary).

6   *See* MISCELLANEOUS CHANGES TO TRADEMARK TRIAL AND APPEAL BOARD RULES, 81 Fed. Reg. 69950, 69964 (October 7, 2016) ("The proffering party has had and will retain the expense of producing its witness."); *USPS v. RPost Communication Ltd.*, 124 USPQ2d 1045, 1047 and 1047 n.1 (TTAB 2017) (party proffering affiant or declarant for oral cross-examination has and continues to bear expense of producing the witness, as with cross-examination at oral testimony depositions).

7   *See* MISCELLANEOUS CHANGES TO TRADEMARK TRIAL AND APPEAL BOARD RULES, 81 Fed. Reg. 69950, 69964 (October 7, 2016) ("The provision that the party seeking oral cross-examination must bear the expense of oral cross-examination is intended to cover the expense of the court reporter. … The goal of the final rule is to minimize the ability of a party seeking cross-examination to thwart the other party's efforts to rein in the cost of litigation by opting for testimony by affidavit or declaration."); *Andrusiek v. Cosmic Crusaders LLC*, 2019 USPQ2d 222984, at *3 (TTAB 2019) (party seeking to orally cross-examine declarant bears the expense of the court reporter); *USPS v. RPost Communication Ltd.*, 124 USPQ2d 1045, 1047 and 1047 n.1 (TTAB 2017) (same); *Barclays Capital Inc. v. Tiger Lily Ventures Ltd.*, 124 USPQ2d 1160, 1166-67 (TTAB 2017) (only new costs to party seeking oral cross-examination of affiant or declarant are that of court reporter and the venue if necessary).

8   *See* 37 C.F.R. § 2.123(a)(1). *See also* MISCELLANEOUS CHANGES TO TRADEMARK TRIAL AND APPEAL BOARD RULES, 81 Fed. Reg. 69950, 69964 (October 7, 2016) ("Any redirect and recross is to be taken at the same time, with the party the originally sought cross-examination bearing the cost of the court reporter. The goal of the final rule is to minimize the ability of a party seeking cross-examination to thwart the other party's efforts to rein in the cost of litigation by opting for testimony by affidavit or declaration."); *Peterson v. Awshucks SC, LLC*, 2020 USPQ2d 11526, at *4-5 (TTAB 2020) (overruling objection to redirect examination of a testimony declarant after oral cross-examination); *Andrusiek v. Cosmic Crusaders LLC*, 2019 USPQ2d 222984, at *3 (TTAB 2019) (any redirect and recross examination are to be taken at the same time as oral cross-examination).

9   *See Andrusiek v. Cosmic Crusaders LLC*, 2019 USPQ2d 222984, at *1 n.3 (TTAB 2019) (vicinity of the witness's place of business or domicile is a reasonable place for cross-examination); *U.S. Postal Serv. v. RPost Communications Ltd.*, 124 USPQ2d 1045, 1047 n.2 (TTAB 2017) (same).

10  *Andrusiek v. Cosmic Crusaders LLC*, 2019 USPQ2d 222984, at *3 (TTAB 2019) (the Board's rules do not mandate that oral cross-examination of a declarant or affiant be in person; by stipulation of the parties or upon motion for good cause, oral cross-examination may be conducted by telephone or other remote means); *USPS v. RPost Communication Ltd.*, 124 USPQ2d 1045, 1047-48 (TTAB 2017) (oral cross-examination of witness may be taken by telephone or other remote means). *See also Sunrider Corp. v. Raats*, 83 USPQ2d 1648, 1654 (TTAB 2007) (party unable to attend a trial testimony deposition in person may attend by telephone by stipulation or on motion); *Hewlett-Packard Co. v. Healthcare Personnel Inc.*, 21 USPQ2d 1552 (TTAB 1991) (motion of counsel to attend trial deposition by telephone granted).

11  *See* 37 C.F.R. § 2.123(a)(1) and 37 C.F.R. § 2.124; *Health-Tex Inc. v. Okabahi (U.S.) Corp.*, 18 USPQ2d 1409, 1410 (TTAB 1990) (party obtained subpoena from United States district court to compel testimony deposition on written questions of adverse party's United States witness after unsuccessfully attempting to take testimony deposition on written questions on notice alone).

12  37 C.F.R. § 2.123, 37 C.F.R. § 2.123(a)(2), and 37 C.F.R. § 2.124. *See Empresa Cubana Del Tabaco v. General Cigar Co.*, 2019 USPQ2d 227680, at *2 (TTAB 2019) (when direct testimony of a witness outside of the United States is offered by affidavit or declaration, the method of cross-examination available is written questions; there is no exception to take oral cross-examination of a declarant or affiant outside of the United States upon motion for good cause). With respect to discovery depositions, see 37 C.F.R. § 2.120(c)(1); *Jain v. Ramparts Inc.*, 49 USPQ2d 1429, 1431 (TTAB 1998); *Orion Group Inc. v. Orion Insurance Co.*, 12 USPQ2d 1923, 1925-26 (TTAB 1989) (good cause shown to take oral deposition of witness in England under the circumstances and since fares to England were not that much greater than fares within the United States and no translation was required).

13  *See* 37 C.F.R. § 2.123(a) and 37 C.F.R. § 2.123(a)(2); *Empresa Del Tabaco v. General Cigar Co.*, 2019 USPQ2d 227680, at *2 (TTAB 2019) (party offering foreign witness testimony by declaration or affidavit must make witness available for cross-examination by written questions).

14    *Andrusiek v. Cosmic Crusaders LLC*, 2019 USPQ2d 222984, at *3 n.8 (TTAB 2019) (expense of a court reporter (or other officer) is the same whether cross-examination is taken orally or by written questions).

15    37 C.F.R. § 2.123(a)(2). *See* MISCELLANEOUS CHANGES TO TRADEMARK TRIAL AND APPEAL BOARD RULES, 81 Fed. Reg. 69950, 69964 (October 7, 2016) ("The Office is further amending § 2.123(a)(1) to move to § 2.123(a)(2) a provision permitting a motion for deposition on oral examination of a witness in the United States whose testimonial deposition on written questions has been noticed.").

16    *See Century 21 Real Estate Corp. v. Century Life of America*, 15 USPQ2d 1079, 1080 (TTAB 1990), *corrected at* 19 USPQ2d 1479 (TTAB 1990) (good cause shown to take oral deposition of expert witness, during rebuttal testimony period); *Feed Flavors Inc. v. Kemin Industries, Inc.*, 209 USPQ 589, 591 (TTAB 1980) (good cause shown where deponents were former employees of respondent and present employees of petitioner and were being deposed for first time during rebuttal period).

17    37 C.F.R. § 2.123(a)(2). *See Empresa Cubana Del Tabaco v. General Cigar Co.*, 2019 USPQ2d 227680, at *1 n.8 (TTAB 2019) (parties may stipulate that depositions be taken in a foreign country by oral examination).

18    *See Empresa Cubana Del Tabaco v. General Cigar Co.*, 2019 USPQ2d 227680, at *3 n.12 (TTAB 2019) (party seeking to take a deposition in a foreign country should first determine whether it will be permitted by the foreign country, and, if so, what procedure must be followed).

19    37 C.F.R. § 2.123(b). *See Empresa Cubana Del Tabaco v. General Cigar Co.*, 2019 USPQ2d 227680, at *1 n.5 (TTAB 2019) (parties stipulated to introduce the discovery depositions of certain witnesses as trial testimony in lieu of taking their testimonial depositions); *Galaxy Metal Gear Inc. v. Direct Access Technology Inc.*, 91 USPQ2d 1859, 1862 (TTAB 2009) (discovery deposition may be filed by notice of reliance if parties have stipulated to introduction of the deposition); *Bass Pro Trademarks LLC v. Sportsman's Warehouse Inc.*, 89 USPQ2d 1844, 1847 n.5 (TTAB 2008) (stipulation to use discovery depositions as trial testimony); *Target Brands Inc. v. Hughes*, 85 USPQ2d 1676, 1678 (TTAB 2007) (parties stipulated to 13 paragraphs of facts involving such issues as applicant's dates of first use and the extent and manner in which a designation is used and advertised, the channels of trade for such use, and recognition by third parties of such use; and the dates, nature and extent of descriptive uses of designation by opposer's parent company); *Health-Tex Inc. v. Okabashi (U.S.) Corp.*, 18 USPQ2d 1409, 1410 (TTAB 1990) (stipulation for use of discovery deposition as testimony deposition); *Oxy Metal Industries Corp. v. Transene Co.*, 196 USPQ 845, 847 n.20 (TTAB 1977) (litigation expenses can be saved where parties agree to introduce all uncontroverted facts by affidavit or stipulated facts and provide balance through deposition testimony).

TBMP 703.01(b)

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

126 U.S.P.Q.2d 1098 (Trademark Tr. & App. Bd.), 2018 WL 1445797

THIS ORDER IS A PRECEDENT OF THE TTAB

Trademark Trial and Appeal Board

Patent and Trademark Office (P.T.O.)

KATE SPADE LLC

v.

THATCH, LLC

KATE SPADE LLC

v.

THE SPADES TRADEMARK COMPANY, LLC

Opposition No. 91216585; Opposition No. 91217168
March 22, 2018

**\*1  Elizabeth A. Dunn, Attorney:**

This case comes up on Opposer's motion to strike Applicant's pretrial disclosures and to exclude subsequently-filed testimony declarations based on Applicant's failure to timely supplement its initial disclosures regarding three declarants. The motion is fully briefed.

BACKGROUND FACTS

In this consolidated case,[1] Opposer pleads claims of false suggestion of a connection, likelihood of confusion, and dilution, all concerning its KATE SPADE mark. Opposer's mark is used in connection with, among other things, clothing and handbags. Opposer has pleaded ownership of several pertinent registrations, as well as common law rights. The applications against which these claims are asserted are for the marks PATIO BY THE SPADES and THE SPADES, also for clothing and handbags (the subject of the opposed Trademark Act Section 1(b), 15 U.S.C. § 1051(b), applications).

Applicant's Initial Disclosures. Applicant's initial disclosures identified its principals as persons knowledgeable about "Use and ownership of the Applicant's mark; Applicant's planned business operations and activities, including goods and services for which Applicant plans to use the mark, Applicant's trademark application, and facts and defenses alleged in the notice of opposition and answer" and a "representative from Opposer, to be determined" as knowledgeable about "Use and ownership of Opposer's mark; Opposer's business operations and activities, Opposer's products and services, Opposer's trademark applications and registrations, Opposer's assertion of fame, and facts alleged in the notice of opposition and answer." 102 TTABVUE 32-34. Applicant's initial disclosures also identified categories of documents that may be used to support its claims or defenses, including "Documents reflecting third party use and registration of marks similar to Applicant's."

During discovery, Applicant deposed Opposer's former in-house counsel Geri Mankoff-Elias concerning, among other things, her knowledge of third-party use.[2] Trial periods were extended by agreement and suspended pending disposition of contested discovery motions.

Applicant's Supplemental Disclosure. On January 19, 2017, during Opposer's trial period, Applicant supplemented its initial disclosures to identify "Nart-anong Chinda, employee of Cowan, Liebowitz & Latman, P.C., co-counsel to Applicants" as a witness to testify on "[a]uthentication of recently obtained third party use goods for use at trial," as well as "third party

Addendum Page 22

use witnesses to be determined" to testify on "[a]uthentication of third party use goods and services and use of third party marks." 102 TTABVUE 41-43. Ms. Chinda is one of the subjects of this motion. Applicant also served Opposer with documents demonstrating third party use of SPADE marks with its supplemental initial disclosures.

**\*2** On January 26, 2017, Opposer offered the confidential testimony of Ms. Mankoff-Elias regarding Opposer's efforts to enforce its trademark rights.

Applicant's Pretrial Disclosures. On February 17, 2017, Applicant served pretrial disclosures identifying Ms. Chinda as a witness to testify on "[t]hird party use of marks similar to Applicants' and Opposer's marks and/or goods or services" and to "authenticate purchases of third party use goods"; and to introduce exhibits "concerning third party uses of marks similar to Applicants' and Opposer's marks and/or goods or services." Applicant's pretrial disclosures also identified third-party witnesses Gabriel Mann and Medhi Neyestanki (the other two subjects of this motion) to testify on "[a]doption, use and/or registration of third party marks incorporating SPADE, SPADES and/or SPADE DESIGNS or similar marks" and to introduce exhibits "concerning the use and/or intended use or registration of third party marks incorporating SPADE, SPADES and/or SPADE DESIGNS or similar marks." 102 TTABVUE 45-49.

Applicant's Submission of Declaration Testimony. Applicant filed testimony by declaration of Ms. Chinda, Mr. Mann, and Mr. Neyestanki, and Opposer filed notice of its election to cross-examine the three declarants.

On May 19, 2017, the Board issued an order granting an intervening motion to quash the notice of election of cross-examination as to the location of the cross-examination, suspended any cross-examination pending disposition of this motion to strike the pretrial disclosures and testimony declarations, and reset briefing on this motion.

LEGAL STANDARD

Each party to an inter partes proceeding must serve initial disclosures that identify "each individual likely to have discoverable information ... that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1); *see* Trademark Rules 2.116(a) and 2.120(a)(2)(ii), 37 C.F.R. §§ 2.116(a) and 2.120(a)(2)(ii). Parties are also required to supplement their initial disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A); *quoted in Spier Wines (PTY) Ltd. v. Shepher*, 105 USPQ2d 1239, 1241 (TTAB 2012).

**\*3** The Board's rules also require the service of pretrial disclosures. Trademark Rules 2.120(a)(2)(iii) and 2.121, 37 C.F.R. §§ 2.120(a)(2)(iii) and 2.121. Pretrial disclosures must "disclose the name and, if not previously provided, the telephone number and address of each witness from whom [the disclosing party] intends to take testimony, or may take testimony if the need arises, general identifying information about the witness, such as relationship to any party, including job title if employed by a party, or, if neither a party nor related to a party, occupation and job title, a general summary or list of subjects on which the witness is expected to testify, and a general summary or list of the types of documents and things which may be introduced as exhibits during the testimony of the witness." Trademark Rule 2.121(e), 37 C.F.R. § 2.121(e).

Before addressing the specifics of this case, the Board notes that determining a motion to strike pretrial disclosures does not alter the longstanding policy against addressing substantive evidentiary objections prior to final hearing. *Genesco Inc. v. Martz*, 66 USPQ2d 1260, 1263 (TTAB 2003); *M-Tek Inc. v. CVP Systems Inc.*, 17 USPQ2d 1070, 1073 (TTAB 1990). The Board does not read testimony, make prospective or hypothetical evidentiary rulings, or determine the probative value of evidence prior to final hearing. *See ProMark Brands Inc. v. GFA Brands, Inc.*, 114 USPQ2d 1232, 1239 n.32 (TTAB 2015); *Weyerhaeuser Co. v. Katz*, 24 USPQ2d 1230, 1233 (TTAB 1992). No matter what the pretrial or trial motion is titled, the determination of a motion that requires consideration of the substance of trial evidence, and not merely whether the evidence meets the applicable procedural requirements, including disclosure requirements, is deferred. *Carl Karcher Enterprises Inc. v. Carl's Bar & Delicatessen Inc.*, 98

Addendum Page 23

USPQ2d 1370, 1371 n.2 (TTAB 2011) (substantive objections to specific documents or exhibits introduced by the testimony of opposer's witness as being beyond the scope of the disclosure deferred to disposition at final decision). Prior to trial, disclosures are evaluated only for compliance with the procedural rules. *Spier Wines (PTY) Ltd. v. Shepher*, 105 USPQ2d at 1240.

Turning to the merits of the motion to strike, Fed. R. Civ. P. 37(c)(1) governs whether evidence will be excluded for failure to disclose, or allowed because the failure to disclose is substantially justified or harmless. *Great Seats Inc. v. Great Seats Ltd.*, 100 USPQ2d 1323, 1327 (TTAB 2011) (*Great Seats*) (citing *MicroStrategy, Inc. v. Business Objects, S.A.*, 429 F.3d 1344, 77 USPQ2d 1001, 1009-10 (Fed. Cir. 2005) and *Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003)). The five-factor test to determine whether to strike pretrial disclosures involves: "1) the surprise to the party against whom the evidence would be offered; 2) the ability of that party to cure the surprise; 3) the extent to which allowing the testimony would disrupt the trial; 4) importance of the evidence; and 5) the nondisclosing party's explanation for its failure to disclose the evidence." *Great Seats,* 100 USPQ2d at 1327.

 **\*4** Opposer argues none of the three witnesses at issue (Ms. Chinda, Mr. Mann, and Mr. Neyestanki) were identified in Applicant's initial disclosures or during discovery, that Applicant's supplemental initial disclosures served during Opposer's trial period were untimely and deficient, that Opposer was unfairly deprived of the opportunity to seek discovery from the witnesses, and so the disclosures in consequence should be stricken. The Board first addresses whether Applicant's supplemental initial disclosures are deficient.

a) Witness Nart-anong Chinda[3]

There is no disagreement that Ms. Chinda's testimony describes her gathering evidence of third party use by making purchases and printing out Internet information. Because Applicant's initial disclosures, supplemented initial disclosures, and pretrial disclosures are entirely consistent in providing the necessary notice that Applicant would submit documentary evidence of third party use at trial, there has not been any failure to disclose with respect to Ms. Chinda's testimony.

An authenticating witness does not testify as to her own knowledge, independent of the documents to be introduced, but testifies only as to the actions taken to acquire the documentary evidence made admissible by her testimony. *See* Federal Rule of Evidence 901(a) ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."). The probative value of non-testimonial evidence of third party use is limited to what it shows on its face; it does not establish the truth of the matter asserted in the documents. *Ayoub, Inc. v. ACS Ayoub Carpet Serv.*, 118 USPQ2d 1392, 1403 (TTAB 2016). In other words, authentication testimony for documents does not add substantively to the evidence.

In this case, as trial neared, Ms. Chinda collected the third party use evidence, and this evidence, as well as Applicant's planned use of Ms. Chinda as an authenticating witness were promptly disclosed. Applicant supplemented its initial disclosures, which identified documents on third party use, to indicate how the previously-disclosed third party use documents would be introduced into evidence, namely through the testimony of the authenticating witness.[4] This supplemented initial disclosure is sufficient.

Because there is no deficiency in Applicant's disclosure of this evidence, the subsequent pretrial disclosure of the identity of the authenticating witness is timely and the motion to strike the pretrial disclosure of Applicant's authenticating witness Nart-anong Chinda is DENIED.[5]

b) Witnesses Gabriel Mann and Medhi Neyestanki

Applicant's initial disclosures, even as supplemented, do not *specifically* identify the possibility of testimony from Mr. Mann, Principal of Four Jack Brothers, Inc. aka Jack of Spades Enterprises, or Mr. Neyestanki, Principal of Spade Skin Care & More. Opposer was first provided with the witnesses' names in Applicant's pretrial disclosures.

**\*5** As set forth above, however, the initial disclosures do identify third party use as a category of documents that may be used at trial. Applicant's supplementation to its initial disclosures described unnamed "third party use witnesses" who would testify on "[a]uthentication of third party use goods and services and use of third party marks." Applicant's pretrial disclosures then specifically identified Mr. Mann and Mr. Neyestanki, and described the subject of their testimony as "[a]doption, use and/or registration of third party marks incorporating SPADE, SPADES and/or SPADE DESIGNS or similar marks" and the introduction of exhibits "concerning the use and/or intended use or registration of third party marks incorporating SPADE, SPADES and/or SPADE DESIGNS or similar marks."

Turning first to the fourth *Great Seats* factor, the importance of the evidence, Applicant contends that a significant number of third parties are using SPADE marks, and the evidence of third party use may be dispositive in this proceeding.[6] 2013) (*Sheetz*) ("the Board reviews the evidence of third party use for what it shows on its face, not by how it was obtained."). Opposer's vague argument that the testimony regarding third party use could be within the general knowledge of other witnesses that Applicant may call is not persuasive. The Federal Circuit has held, in two cases involving, as here, a likelihood of confusion claim, that evidence of the extensive registration and use of a term by others can be powerful evidence of the term's weakness. *See Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. v. Millennium Sports, S.L.U.*, 797 F.3d 1363, 116 USPQ2d 1129, 1136 (Fed. Cir. 2015); *Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 115 USPQ2d 1671, 1674 (Fed. Cir. 2015). Accordingly, this factor favors Applicant.

Turning next to the fifth *Great Seats* factor, Applicant's explanation for its failure to disclose Mr. Mann and Mr. Neyestanki, Applicant contends that it did not ascertain the identities of the possible trial witnesses until early in February 2017, and served its pretrial disclosures on February 17, 2017. Opposer does not argue that Applicant was aware of the witnesses' identity earlier in the proceeding.[7] Instead, Opposer accepts the explanation, but characterizes this as "dilatory trial preparation" designed to thwart discovery. The Board disagrees. There is "no duty to conduct an investigation of third party use during discovery," and evidence of third party use may be "obtained or created by applicant in anticipation of its testimony period." *Rocket Trademarks Pty Ltd. v. Phard S.p.A.*, 98 USPQ2d 1066, 1071-72 (TTAB 2011) (*Rocket*). *Accord Sheetz,* 108 USQ2d at 1348.[8]

**\*6** A party is not required, in advance of trial, to disclose each document or other exhibit it plans to introduce. *British Seagull Ltd. v. Brunswick Corp.*, 28 USPQ2d 1197, 1201 (TTAB 1993), *aff'd*, 35 F.3d 1527, 32 USPQ2d 1120 (Fed. Cir. 1994); *Sports Auth. Mich., Inc. v. PC Auth., Inc.*, 63 USPQ2d 1782, 1788 (TTAB 2001). This did not change with the Board's adoption of initial and pretrial disclosures. MISCELLANEOUS CHANGES TO TRADEMARK TRIAL AND APPEAL BOARD RULES, 72 Fed. Reg. 42242, 42246 (August 1, 2007) ("Pretrial disclosures are governed by Federal Rule 26(a)(3), but the Board does not require pretrial disclosure of each document or other exhibit that a party plans to introduce at trial under Rule 26(a)(3)(C)."). Accordingly, this factor also favors Applicant.

Turning to the first *Great Seats* factor, Applicant contends that there was no surprise to Opposer, or need to individually identify the witnesses before pretrial disclosures, because Applicant's initial disclosures listed third party use as a category of evidence upon which Applicant could rely at trial, and the third party use by both Jack of Spades Enterprises and Spade Skin Care & More was known to Opposer. More specifically, Applicant points out that Opposer itself produced evidence of this use during discovery and submitted it as evidence during its trial period. Without describing confidential matter, the record demonstrates that Opposer knew of the two parties as third party users, and was aware of the subject matter ultimately covered by the testimony of Mr. Mann and Mr. Neyestanki. Even if Opposer was not aware of every fact set forth in their declarations, the record reflects that it was aware of the pertinent information therein. *See Galaxy Metal Gear Inc. v. Direct Access Tech., Inc.*, 91 USPQ2d 1859 (TTAB 2009) ("there is no need, as a matter of course, to submit a supplemental disclosure to include information already revealed by a witness in a deposition or otherwise through formal discovery, including the identity of the witness."); Fed. R. Civ. P. 26(e) Notes of Advisory Committee on Rules - 1983 Amendment ("no obligation to provide supplemental or corrective information that has been otherwise made known to the parties in writing or during the discovery process, as when a witness not previously disclosed is identified during the taking of a deposition. . . ."). This factor favors Applicant.

Turning to the second and third *Great Seats* factors, i.e., the non-offering party's ability to cure the surprise and the disruption to trial if the testimony is allowed, notwithstanding the listing of third party use in Applicant's initial disclosures, Opposer did not seek discovery regarding third party use. Opposer did not claim surprise upon receipt of the supplemented initial disclosures which disclosed that Applicant would submit testimony on third party use as well as documentary evidence. Instead, more than three months after Applicant supplemented its initial disclosures, Opposer argues in its motion to strike that cross examination is not sufficient to test the testimony of Mr. Mann and Mr. Neyestanki, and that discovery is necessary to obtain documents which will verify statements regarding their testimony on third party use. Opposer's argument is not persuasive. Based on the limited nature of the testimony regarding third party use, broad discovery is unnecessary. Opposer is free to challenge the evidence about third party use.[9] Any need for Opposer to have learned about Applicant's evidence earlier could have been addressed months ago and Opposer has only its own inaction to blame. Accordingly, the second and third factors favor Applicant.

**\*7** On balance, because Applicant's failure to disclose in the supplemented initial disclosures the identity of the witnesses who would be testifying as to the disclosed subject of third party use is both substantially justified and harmless, the motion to strike the pretrial disclosure of Mr. Mann and Mr. Neyestanki is DENIED.[10]

PROCEEDINGS ARE RESUMED.

Opposer is ordered to file a new notice of election of cross examination to be completed within thirty days from the mailing date of this order. Remaining dates are reset below.

| | |
|---|---|
| Plaintiff's Rebuttal Disclosures Due | 5/18/2018 |
| Plaintiff's 15-day Rebuttal Period Ends | 6/10/2018 |
| Plaintiff's Opening Brief Due | 8/9/2018 |
| Defendant's Brief Due | 9/8/2018 |
| Plaintiff's Reply Brief Due | 9/23/2018 |
| Request for Oral Hearing (optional) Due | 10/3/2018 |

In each instance, a copy of the transcript of testimony together with copies of documentary exhibits, must be served on the adverse party within thirty days after completion of the taking of testimony. Trademark Rule 2.l25, 37 C.F.R. § 2.125. An oral hearing will be set only upon request filed as provided by Trademark Rule 2.l29, 37 C.F.R. § 2.129.

Footnotes

1  Opposition No. 91216585 is designated as the "parent" case, and all TTABVUE citations are to that opposition proceeding. Because the two applicants are affiliated companies with common controlling ownership and management, this order refers to Applicant in the singular.

2  Because the deposition is designated as confidential, it will not be described in more detail.

3  In its reply brief, Opposer contends that Applicant's disclosures regarding Ms. Chinda's testimony are untimely, violate Applicant's disclosure obligations, and the testimony should be precluded, but offers to withdraw the motion to exclude testimony with respect to Ms. Chinda. If a party withdraws a motion, the Board generally gives it no consideration. But here, because Opposer apparently reserves the right to attack the disclosures and testimony at a later date, and the motion has been fully briefed, the Board does not accept Opposer's qualified withdrawal, but addresses the merits of the motion.

4    Under the Board's rules and practice, except for documents deemed to be self-authenticating, "[t]estimony affidavits, declarations and depositions are the means by which a party may introduce into the record not only the testimony of its witnesses, but also those documents and other exhibits that may not be made of record by notice of reliance." Trademark Trial and Appeal Board Manual of Procedure (TBMP) § 703.01(a) (June 2017).

5    Applicant notes that Opposer's response to an earlier motion states in a footnote "While Opposer has ultimately elected not to [cross-examine] Ms. Chinda, it still preserves its objection to Applicant's late disclosure of the witness." 105 TTABVUE 3. Opposer has not formally withdrawn its election to cross-examine, and the statement was made before the disputes regarding the testimony were resolved. As the parties were informed by the Board's May 19, 2017 order, the right to seek cross examination is integral to the right to offer testimony by declaration. *Cf. B&B Hardware, Inc. v. Hargis Industries, Inc.*, 135 S. Ct.1293, 113 USPQ2d 2045, 2049 (2015). Accordingly, the Board does not find that Opposer has waived that right here. However, given the nature of Ms. Chinda's testimony in authenticating documents, it would appear that any cross examination may be very short and limited. *See Sheetz of Del., Inc. v. Doctor's Assocs. Inc.*, 108 USPQ2d 1341, 1347 (TTAB

6    Under *Great Seats*, the Board considers in general terms the parties' arguments and case law regarding the importance of that type of evidence with respect to the pleaded claims and defenses. *See Spier Wines (PTY) Ltd. v. Shepher*, 105 USPQ2d at 1244 ("In determining the importance of the evidence or testimony to the fair adjudication of the proceedings, the Board will consider various factors, including whether the testimony is cumulative or if evidence can be introduced by other means, and whether the proposed testimony would be admissible."); *Great Seats*, 100 USPQ2d at 1328 ("the testimony of the additional witnesses may be important [because] Opposer ... must establish its prior rights in the GREAT SEATS mark to prevail on its Section 2(d) claim ... The Board notes, however, that opposer has two witnesses ... upon whom opposer may rely in support of this opposition."). Determining the importance of the evidence in connection with pretrial disclosures is not equivalent to determining the probative value of evidence, and does not require reading the evidence.

7    The case upon which Opposer relies most in arguing for exclusion has significantly different facts. There the witness was known to the non-disclosing party from the beginning of the proceeding; the witness should have been listed in both initial disclosures and discovery responses; and the identification of the witness in pretrial disclosures resulted in prejudicial surprise to the adverse party. *Spier Wines (PTY) Ltd. v. Shepher*, 105 USPQ2d at 1244.

8    In the *Rocket* case, which addressed facts arising before the Board's adoption of the disclosure model, the Board overruled the objection to documentary evidence of third party use which had not been produced during discovery. The Board found that the evidence of third party use had not yet been collected during discovery, and that the period between the close of defendant's testimony period and the opening of plaintiff's rebuttal testimony period was sufficient to prepare any rebuttal to this evidence.

In the *Sheetz* case, in which the parties waived pretrial disclosures, the Board overruled objections to the testimony of undisclosed declarants on third party use, finding the failure to supplement its initial disclosures or discovery responses was harmless. More specifically, the Board found no surprise in the testimony of the third party use declarants because the declarants either had received cease and desist letters from applicant, or because both parties had submitted evidence of third party use earlier in the proceeding, so "applicant is hard-pressed to argue convincingly that it was surprised that opposer attempted to introduce the declaration of two additional restaurateurs." *Sheetz,* 108 USPQ2d at 1346.

9    Documents necessary for cross examination may be obtained from a non-party by means of a subpoena *duces tecum* issued by the appropriate U.S. district court. *See generally* Fed. R. Civ. P. 45; *El Encanto, Inc. v. Hatch Chile Co., Inc.*, 825 F.3d 1161, 119 USPQ2d 1139, 1144 (10th Cir. 2016); *Dan Foam ApS v. Sleep Innovations, Inc.*, 106 USPQ2d 1939, 1942 (TTAB 2013); TBMP § 404.03(a) (2). As the parties were advised in the Board's order of May 19, 2017, when choosing a declarant, the proffering party must weigh its ability to make the declarant available for cross examination, or risk the Board's refusal to consider the testimony.

10    We further note that to the extent that Mr. Mann and Mr. Neyestanki's testimony serves to impeach the confidential testimony of Opposer's witness and former counsel Ms. MankoffElias, it is also allowed without disclosure under Fed. R. Civ. P. 26(a)(1)(A)(i) and 26(a)(3)(A).

126 U.S.P.Q.2d 1098 (Trademark Tr. & App. Bd.), 2018 WL 1445797

660 Fed.Appx. 908
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or after
Jan. 1, 2007. See also U.S.Ct. of App. Fed. Cir. Rule 32.1.
United States Court of Appeals, Federal Circuit.

SEMCON TECH, LLC, Plaintiff–Appellant

v.

MICRON TECHNOLOGY,

INC., Defendant–Appellee

2015–1936
|
Decided: August 19, 2016

**Synopsis**

**Background:** Patent holder brought action against alleged infringer, alleging infringement of its patent directed to methods for finishing semiconductor wafers during manufacture. The United States District Court for the District of Delaware, Richard G. Andrews., J., granted alleged infringer's motion for summary judgment of invalidity. Patent holder appealed.

**Holdings:** The Court of Appeals, Bryson, Circuit Judge, held that:

[1] genuine issue of material fact existed as to whether patent was invalid as anticipated by prior art, and

[2] Court of Appeals lacked jurisdiction over patent holder's claim that patent was not invalid as anticipated.

Vacated and remanded.

West Headnotes (4)

[1]     **Patents**  🔑  Novelty; anticipation

Genuine issue of material fact existed as to whether prior art disclosed using initial thickness of wafer in calculating rate of removal of material from wafer during polishing process, precluding summary judgment that patent directed to methods for finishing semiconductor wafers during manufacture was invalid as anticipated by prior art.

1 Case that cites this headnote

[2]     **Federal Courts**  🔑  Summary Judgment

**Federal Courts**  🔑  On separate appeal from interlocutory judgment or order

Court of Appeals lacked jurisdiction over patent holder's claim that patent directed to methods for finishing semiconductor wafers during manufacture was not invalid as anticipated by prior art, on holder's appeal from District Court's order granting alleged infringer's motion for summary judgment of invalidity based on anticipation, and denying holder's motion for summary judgment of no anticipation, where District Court's order was not appealable final order, and doctrine of pendent appellate jurisdiction was inapplicable given that issue Court of Appeals decided on appeal, namely, that reasonable finder of fact could find against alleged infringer on issue of anticipation, was separate from question whether reasonable finder of fact could only decide in favor of holder on issue of anticipation. 28 U.S.C.A. § 1295(a) (1).

2 Cases that cite this headnote

[3]     **Patents**  🔑  In general; utility

US Patent 5,499,733, US Patent 6,010,538. Cited as Prior Art.

[4]     **Patents**  🔑  In general; utility

US Patent 7,156,717. Cited.

**\*909**  Appeal from the United States District Court for the District of Delaware in No. 1:12–cv–00532–RGA, Judge Richard G. Andrews.

Addendum Page 28

**Attorneys and Law Firms**

Marc Aaron Fenster, Russ August & Kabat, Los Angeles, CA, argued for plaintiff-appellant. Also represented by Jeffrey Zhi Yang Liao, Adam S. Hoffman, Paul Anthony Kroeger.

Jared Bobrow, Weil, Gotshal & Manges LLP, Redwood Shores, CA, argued for defendant-appellee. Also represented by Aaron Y. Huang.

Before Prost, Chief Judge, Bryson and Stoll, Circuit Judges.

**Opinion**

Bryson, Circuit Judge.

Plaintiff Semcon Tech, LLC, ("Semcon") appeals from a summary judgment entered in favor of defendant Micron Technology, Inc., ("Micron") by the United States District Court for the District of Delaware. The district court held that the asserted claims of U.S. Patent No. 7,156,717 ("the '717 patent") are invalid as anticipated by U.S. Patent No. 6,010,538 ("Sun"). Because we disagree with the analysis that led the district court to conclude that there is no genuine issue of material fact on the issue of anticipation, we vacate the district court's summary judgment order and remand for further proceedings.

I

The '717 patent is directed to methods for finishing semiconductor wafers during manufacture. The methods of the four asserted claims entail carefully reducing the thickness of the wafers by a computer-controlled polishing process that uses pressure and a chemical slurry. The finishing process employs sensors to monitor and adjust the reduction of the thickness of the wafers. When the process reaches a predefined endpoint it stops.

It is undisputed that Sun is a close prior art reference. Like the '717 patent, the Sun patent describes controlling the finishing of a semiconductor wafer using calculations derived from sensor data. The anticipation dispute focuses on only one limitation of the '717 patent: "changing a plurality of control parameters in response **\*910** to an evaluation of both the in situ process information ... and the tracked information ... during at least a portion of the finishing cycle time."[1]

The narrow issue on appeal is whether the district court erred in concluding, on summary judgment, that Sun discloses this limitation of changing the control parameters for the finishing process by using calculations that are based on *both* "tracked information" and "in situ process information," and that no reasonable finder of fact could conclude otherwise. The district court construed tracked information to mean "pre-polishing information about the wafer being polished that is associated with the wafer," and found that the initial thickness of the wafer was an example of tracked information. The court construed in situ process information to mean "information that is sensed from the wafer currently undergoing CMP [chemical-mechanical polishing]." Those constructions are not disputed.

The district court found that Sun disclosed this limitation and based its analysis on statements by Micron's expert, Dr. David Dornfeld. In particular, the court quoted the statement by Dr. Dornfeld in his principal declaration that "Sun discloses that the polishing process can be controlled in real time in response to pre-polish thickness information and information that is sensed from the wafers by sensors before reaching its endpoint." The court also relied on Dr. Dornfeld's statement in Micron's claim chart that "Sun discloses a controller and processor algorithm which, in response to rate information calculated from the initial thickness of the wafer being polished and information detected from sensors, can control the CMP process." Based on that evidence, the court concluded that Sun disclosed the use of tracked information, i.e., the initial thickness of the wafer, in connection with in situ process information obtained from the sensors, to calculate rate of removal information that is used to change the control parameters during the finishing process. The court thus adopted Dr. Dornfeld's conclusion that Sun uses the initial thickness of the wafer to calculate the amount of material removed from the wafer during polishing and thus to calculate the rate of removal of the material from the wafer. The rate of removal, Dr. Dornfeld explained, was used to affect the control parameters for the polishing process.

Semcon contends that the district court erred in its finding as to what Sun discloses. According to Semcon, Sun calculates the rate of material removal from the wafer without reference to tracked information (e.g., the wafer's initial thickness). Instead, Semcon asserts, Sun calculates the rate of removal based exclusively on sensor readings gathered during the polishing process and timing information. As evidence for its interpretation of Sun, Semcon cites portions of the Sun patent and Dr. Dornfeld's deposition testimony, which purportedly

Addendum Page 29

contradicts his declaration. Reviewing that evidence, the district court concluded that Semcon "offers no contrary expert testimony, but instead provides snippets of deposition examination. The snippets do not create a disputed material fact."

In this appeal we examine whether there is a genuine question that Sun discloses the use of the initial thickness of the wafer in calculating the rate of removal of material from the wafer.

**\*911**  II

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is a genuine dispute of material fact "if the evidence is sufficient for a reasonable factfinder to return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A

[1]  The district court relied heavily on Dr. Dornfeld's declaration and his attached claim chart. In particular, the court noted that Dr. Dornfeld referred to column 8, lines 41–67, and Figure 13 from Sun as the basis for his conclusion that Sun discloses using the initial thickness of the wafer in calculating the rate of removal of material from the wafer during the polishing process. In fact, however, the cited portions of Sun do not appear to support Dr. Dornfeld's characterization.

Earlier portions of column 8 of Sun describe how the initial thickness of the wafer can be used to determine the endpoint of the polishing process based on the wafer's current thickness. Sun first explains that "[a]t some point TE, the thickness of the layer has been reduced by a desired amount; that is, an endpoint to the CMP process. This is often all the information that is necessary to control the process and determine its endpoint."[2] Sun, col. 8, ll. 13–20. Sun then adds that "[b]y also knowing the starting thickness of the transparent layer, the measured thickness removed is subtracted to determine the remaining thickness of the layer. It is often desired to determine, as an endpoint of the process, when the layer has been reduced to a certain thickness. The CMP process is then stopped." *Id.*, col. 8, ll. 20–25.

Those portions of column 8 of Sun disclose using the wafer's initial thickness to determine the endpoint of the CMP process based on a target remaining thickness, but they do not address the question whether the wafer's initial thickness is used to calculate the rate of removal that is in turn used to control the process before the endpoint is reached.

To the contrary, the Sun specification at lines 41 through 67 of column 8 states that the rate of removal of material from the wafer is determined from "the amount of material measured to have been removed during a certain time interval," Sun, col. 8, ll. 48–49, which in turn is based on sensor information, in particular the interference measurements depicted in Figure 8A of the patent. Sun explains that "[n]o matter what specific condition is designated as the endpoint of the process of removing material from a transparent layer, that process may be controlled in real time, before reaching its endpoint, from the information being received in the form of Fig. 8A." *Id.*, col. 8, ll. 41–45. The rate of material removal is then calculated by measuring the amount of material removed during a certain time interval and dividing that amount by the time elapsed in that interval. *Id.*, col. 8, ll. 45–50. "In response to such rate information, the CMP process may be adjusted  **\*912**  until a desired removal rate is obtained and maintained." *Id.*, col. 8, ll. 50–52.

That portion of Sun, which was relied upon by Dr. Dornfeld, does not suggest that the rate of removal is determined by calculating the difference between the current thickness of the wafer and its initial thickness over time. Instead, it suggests that the rate of removal is calculated using only sensor information as to the amount of material removed, together with timing information.

Figure 13 of Sun and the accompanying portion of the Sun specification also do not clearly support Dr. Dornfeld's characterization of the Sun reference. The pertinent portion of Figure 13 is set forth below:



FIG. 13A

According to Dr. Dornfeld, Figure 13 shows that the initial thickness of the wafer is used in calculating the amount of material removed from the wafer, and in turn the rate of removal of material. Dr. Dornfeld asserted that along with "in situ process information" from the sensors, the rate information is used to change the control parameters in the CMP process.

Dr. Dornfeld's theory, however, appears to be at odds with the description of the claimed methods in the portion of the specification that addresses Figure 13.

The specification states that Figure 13 illustrates a processing algorithm that is used to determine "when a process of reducing the thickness of the transparent layer **48** ... has reached an endpoint Te." *Id.*, col. 13, line 66, through col. 14, line 3. One item that can be input in the first step of the algorithm, identified as step 116, is "the initial thickness of the film **48**, which can be determined by measurement or ascertained from the parameters of the process **\*913** used to form the layer."[3] As the specification explains, "[i]f the initial film thickness was inputted by the operator in the step **116**, the step **128** also calculates and outputs the remaining thickness of the film at the location of each of the sensor units." *Id.*, col. 14, ll. 50–55. Thus, Sun discloses that initial thickness information can be used to determine when the process endpoint has been reached, but it does not clearly disclose that initial thickness information is used to calculate the rate at which material is removed from the wafers, which in turn results in changing the control parameters in the polishing process.

Instead, the calculation of the removal rate at step 126, according to the Sun specification, is performed by using data from the sensing units together with timing information. That data can be used to calculate the amount of material that has been removed from the wafer and thus the rate of removal of material. Sun, col. 14, ll. 12–45. The specification explains that in step 128 of Figure 13, "the thickness of material that has been removed from the layer **48** is determined by multiplying the removal rate determined in the step **126** by the amount of time that has elapsed during the process." *Id.*, col. 14, ll. 46–49.

Thus, contrary to Dr. Dornfeld's assertion that "rate information [is] calculated from the initial thickness of the wafer being polished," that portion of the Sun specification does not state that the initial thickness of the film is used in calculating the removal rate of material from the film, but rather that the removal rate is determined based on data from the sensing units.

Semcon also contends that Dr. Dornfeld's deposition contradicts the portions of his declaration on which the district court relied. In his deposition, Dr. Dornfeld agreed that determining the rate of removal of material referred to in Sun "does not require a comparison to the initial thickness" of the wafer, and that the rate of removal "is calculated without reference to the initial thickness." Those statements are, at minimum, in tension with Dr. Dornfeld's assertion that Sun discloses that rate information is "calculated from the initial thickness of the wafer being polished." While it may be possible to reconcile Dr. Dornfeld's deposition testimony with his declaration, the district court did not offer an explanation for the apparent inconsistency, and we conclude that the inconsistency between the two is a relevant factor bearing on whether it was appropriate for the district court to grant summary judgment based on Dr. Dornfeld's declaration.[4]

**B**

The law requires that in a summary judgment motion all justifiable inferences be drawn in the nonmovant's favor. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. Based on the portions of the Sun specification cited above, a reasonable factfinder could conclude that Sun does not disclose **\*914** using both the initial thickness of the wafer and sensor information to calculate rate information. For that reason, a reasonable factfinder could conclude that Sun does not disclose the '717 patent's limitation of controlling the process

"in response to an evaluation of both [sensor information] and the tracked information."

The fact that Semcon offered no contrary expert testimony directed to the issue of anticipation does not justify the issuance of summary judgment. Through its textual arguments regarding the Sun reference and its reliance on the apparent inconsistencies between Dr. Dornfeld's deposition testimony and his declaration, Semcon showed why a reasonable finder of fact might disagree with Dr. Dornfeld's anticipation analysis.

That is all that is required on the part of the nonmoving party in opposing a summary judgment motion on an issue as to which the moving party has the burden of proof, as Micron does here. *See Exigent Tech., Inc. v. Atrana Solutions, Inc.*, 442 F.3d 1301, 1307 (Fed. Cir. 2006); *Saab Cars USA, Inc. v. United States*, 434 F.3d 1359, 1368 (Fed. Cir. 2006) (quoting James Wm. Moore et al., *Moore's Federal Practice* ¶ 56.13[1] (3d ed. 2005)) ("[I]f the motion is brought by a party with the ultimate burden of proof, the movant must still satisfy its burden by showing that it is entitled to judgment as a matter of law even in the absence of an adequate response by the nonmovant."); *Lencco Racing Co. v. Jolliffe*, 215 F.3d 1341, 1999 WL 506857, at *4 (Fed. Cir. 1999) ("When the movant bears the burden of proof ... summary judgment cannot be granted unless the movant makes a showing on each required element and the nonmovant's response fails to raise a genuine issue of material fact as to any element.").

This court's law on that issue is consistent with the law in other courts. *See, e.g., Bailey v. McDonnell Douglas Corp.*, 989 F.2d 794, 802 (5th Cir. 1993) ("Where, as here, the *moving party* [will bear] the burden of proof at trial, it must come forward with evidence [on summary judgment] which would entitle it to a directed verdict if the evidence went uncontroverted at trial.... In this situation, only *after* the moving party meets this burden must the non-moving party produce its 'significant, probative evidence.'") (quoting *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264–65 (5th Cir. 1991), and *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991)); *Resolution Trust Corp. v. Gill*, 960 F.2d 336, 340 (3d Cir. 1992) ("[W]here the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the district court should deny summary judgment even if no opposing evidentiary matter is presented."); *Houghton v. South*, 965 F.2d 1532, 1536–37 (9th Cir. 1992).

C

Micron argues that the district court's summary judgment order can be sustained on several alternative grounds. The alternative grounds, however, depend on a reference not relied upon by the district court and on a claim construction issue not addressed by the district court. They are therefore not ripe as grounds for this court to sustain the district court's summary judgment order.

Micron's first proposed alternative ground for affirmance is that U.S. Patent No. 5,499,733 ("Litvak"), which was incorporated by reference in the Sun patent, anticipates the asserted claims of the '717 patent. The district court, however, did not rely on, or even discuss, Litvak in the portion of its summary judgment order **\*915** addressing the relevant limitations.[5] Because the district court did not rely on Litvak, we decline to reach the question whether Litvak could serve as an alternative ground for upholding the district court's order.

Micron also argues that the district court's anticipation judgment can be upheld on the theory that "tracked information" includes not only the initial thickness of the wafer, but also the target amount of film to be removed. The target amount of film to be removed, according to Micron, is used in the Sun process to control the CMP process, thus establishing that Sun anticipates the asserted claims of the '717 patent.

Again, the district court did not rely on that theory as a basis for its anticipation analysis and did not find in its summary judgment order that the term tracked information included the target amount of film to be removed.[6] In the absence of analysis of the "target amount" theory by the district court, we do not address whether that theory could support a summary judgment of anticipation. As in the case of the Litvak reference, the district court may consider on remand whether that theory provides a basis for anticipation.

III

[2] After entering summary judgment of anticipation in favor of Micron, the court denied Semcon's motion for summary judgment of no anticipation as moot. Semcon now argues that, in addition to reversing the summary judgment in favor of Micron, this court should reverse the district court's denial of

Semcon's motion for summary judgment of no anticipation and direct the district court to enter summary judgment on that issue in Semcon's favor. We decline to do so.

The denial of a motion for summary judgment is not a "final decision" of a district court, 28 U.S.C. § 1295(a)(1), and therefore is not ordinarily appealable. *Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1357 (Fed. Cir. 2013); *M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co.*, 439 F.3d 1335, 1344 (Fed. Cir. 2006); *Lermer Germany GmbH v. Lermer Corp.*, 94 F.3d 1575, 1576 (Fed. Cir. 1996). As the Supreme Court has explained, appellate courts lack jurisdiction over the denial of a motion for summary judgment based on disputed issues of fact because such a denial "does not settle or even tentatively decide anything about the merits of the claim." *Switz. Cheese Ass'n, Inc. v. E. Horne's Mkt., Inc.*, 385 U.S. 23, 25, 87 S.Ct. 193, 17 L.Ed.2d 23 (1966); *see also Advanced Software Design Corp. v. Fiserv, Inc.*, 641 F.3d 1368, 1381–82 (Fed. Cir. 2011).

Nor does the doctrine of pendent appellate jurisdiction apply here. That doctrine is reserved for "only the most extraordinary circumstances," *Falana v. Kent State Univ.*, 669 F.3d 1349, 1360 (Fed. Cir. 2012), such as where the pendent issue is "inextricably intertwined" with the principal issue before the court such that it is necessary to review both to ensure meaningful **\*916** review. *See Swint v. Chambers Cty. Comm'n*, 514 U.S. 35, 50–51, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995); *Entegris, Inc. v. Pall Corp.*, 490 F.3d 1340, 1348 (Fed. Cir. 2007). The issue we have decided—that a reasonable finder of fact could find against Micron on the issue of anticipation—is separate from the question Semcon wishes us to decide—whether a reasonable finder of fact could only decide in favor of Semcon on the issue of anticipation.

This court has declined to exercise pendent appellate jurisdiction in cases indistinguishable from this one, where

the court has reversed the grant of summary judgment for the appellee, but has declined to address a request that the court reverse the denial of the appellant's motion for summary judgment. *See, e.g.*, *Advanced Fiber Techs. Trust v. J&L Fiber Servs., Inc.*, 674 F.3d 1365, 1377 (Fed. Cir. 2012).

Although it is within our authority under 28 U.S.C. § 2106 to direct the entry of summary judgment in Semcon's favor on remand, we decline to do so. *See Conoco Inc. v. Dep't of Energy*, 99 F.3d 387, 394–95 (Fed. Cir. 1996). The district court did not rule on the merits of Semcon's motion, but merely dismissed it as moot in light of the court's ruling on Micron's motion. Under these circumstances, it would be inappropriate for this court to go beyond the scope of the final order of invalidity entered by the district court and adjudicate issues not squarely decided by that court in an appealable final judgment. *See id.* at 395 ("[D]irecting summary judgment for the appellant is appropriate only if appellate court is 'quite certain that no further exploration of the facts is in order.' ") (quoting 6 James Wm. Moore et al., *Moore's Federal Practice* ¶ 56.13, at 56–179 (1996 ed.)).

IV

We vacate the summary judgment of invalidity and remand for further proceedings consistent with this opinion. We decline Semcon's request that we direct the district court to enter summary judgment of invalidity in Semcon's favor.

**VACATED AND REMANDED.**

**All Citations**

660 Fed.Appx. 908

Footnotes

1   Although minor variations of this limitation are found among the four asserted claims, Micron acknowledges that claim 1 is representative, and the parties have not argued that the analysis of the anticipation issue differs for any of the asserted claims.

2   The Sun specification describes how the amount of material that has been removed during the process is determined from electromagnetic sensor readings without reliance on initial thickness. Sun, col. 7, line 43, through col. 8, line 16; col. 9, line 1, through col. 12, line 64.

3   Sun makes clear that the film is the top layer of the wafer that is planarized during the CMP process. Sun, col. 7, ll. 41–52.

Addendum Page 33

4     Micron submitted a reply declaration by Dr. Dornfeld following his deposition, in which he sought to reconcile his deposition testimony with his characterizations of the Sun reference. While Dr. Dornfeld's reply declaration reasserts that the removal rate in Sun is calculated based in part on the initial thickness of the wafer, a reasonable finder of fact could conclude that Dr. Dornfeld's reply declaration failed to rebut Semcon's characterization of column 8 of Sun, and could instead credit Dr. Dornfeld's admissions during his deposition that "the rate of material removal does not require a comparison to the initial thickness" and that "rate is calculated without reference to the initial thickness."

5     The court addressed Litvak only in the portion of its summary judgment opinion discussing the uniform region limitations found in claims 37 and 56.

6     The district court's only reference to the amount of film to be removed is in the court's statement that Figure 13A "begins with 'Input Initial Film Thickness & Target Amount of Film to be Removed.' " This direct quotation of the contents of the first box of Figure 13A was not presented as a construction of the term "tracked information." Instead, when referring to tracked information, the court consistently referred to the initial thickness of the film.

---

**End of Document**                                                      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

🏳 KeyCite Yellow Flag - Negative Treatment

Not Followed as Dicta  Ritchie v. Simpson, Fed.Cir., March 15, 1999

670 F.2d 1024

United States Court of Customs and Patent Appeals.

LIPTON INDUSTRIES, INC., assignee,

by assignment and change of name from

Usen Products Company, Appellant,

v.

RALSTON PURINA COMPANY, Appellee.

Appeal No. 81-565.

|

Feb. 18, 1982.

**Synopsis**

Appeal was taken from a decision of the United States Patent and Trademark Office Trademark Trial and Appeal Board, Cancellation No. 11636, granting a petition to cancel registration of a mark for cat food on the ground of abandonment due to nonuse. The Court of Customs and Patent Appeals, Nies, J., held that: (1) petitioner seeking to cancel registration of a mark was not entitled to standing solely because of allegations in its petition; facts regarding standing were part of petitioner's case and would be required to be affirmatively proved; (2) answers of registrant to allegations of petition seeking to cancel registration of mark, which acknowledged pleaded facts that petitioner filed application to register its trademark for cat food and that rejection was made because of registration of registrant, would be deemed admissions which established petitioner's standing; and (3) admission of registrant that its registered mark had not been used in more than two years was sufficient to establish abandonment, thereby permitting cancellation of the mark.

Affirmed.

Markey, C. J., filed a concurring opinion.

West Headnotes (9)

**[1]**   **Trademarks** 🔑 Persons entitled to seek cancellation; standing; parties

For a petitioner to prevail in a proceeding to cancel a registration of trademark, it is incumbent upon that party to show that it possessed standing to challenge the continued presence on the register of the subject registration and that there is a valid ground why the registrant is not entitled under law to maintain the registration.

15 Cases that cite this headnote

**[2]**   **Trademarks** 🔑 Presumptions and burden of proof

Petitioner seeking to cancel registration of a mark was not entitled to standing solely because of allegations in its petition; facts regarding standing were part of petitioner's case and would be required to be affirmatively proved. Lanham Trade-Mark Act, § 14, 15 U.S.C.A. § 1064.

16 Cases that cite this headnote

**[3]**   **Trademarks** 🔑 Persons entitled to seek cancellation; standing; parties

Party has standing to institute cancellation proceedings if that party can demonstrate a real interest in the proceeding. Lanham Trade-Mark Act, § 14, 15 U.S.C.A. § 1064.

18 Cases that cite this headnote

**[4]**   **Trademarks** 🔑 Persons entitled to seek cancellation; standing; parties

To establish a reasonable basis for a belief that one is damaged by the registration sought to be cancelled, a petition, in order to allege standing, may assert a likelihood of confusion which is not wholly without merit or rejection of an application during prosecution. Lanham Trade-Mark Act, § 14, 15 U.S.C.A. § 1064.

16 Cases that cite this headnote

**[5]**   **Trademarks** 🔑 Persons entitled to seek cancellation; standing; parties

Public interest is served in broadly interpreting class of persons Congress intended to be allowed to institute cancellation proceedings, particularly in light of facts that no ex parte vehicle

10 Cases that cite this headnote

**[6]** **Trademarks** ⚷ Persons entitled to seek cancellation; standing; parties

Answers of registrant to allegations of petition seeking to cancel registration of mark, which acknowledged pleaded facts that petitioner filed application to register its trademark for cat food and that rejection was made because of registration of registrant would be deemed admissions which established petitioner's standing, entitling petitioner to rely on any statutory ground which negated registrant's right to the subject registration and entitled petitioner to invoke the general public interest in support of its claim. Lanham Trade-Mark Act, § 14, 15 U.S.C.A. § 1064; Fed.Rules Civ.Proc. Rule 8, 28 U.S.C.A.

27 Cases that cite this headnote

**[7]** **Federal Civil Procedure** ⚷ Failure to deny

An answer which attempts to evade the pleading requirements by the tactic of an equivocal admission or denial is an admission. Fed.Rules Civ.Proc. Rule 8, 28 U.S.C.A.

2 Cases that cite this headnote

**[8]** **Trademarks** ⚷ Extent of Use; Discontinuance and Non-Use

**Trademarks** ⚷ Weight and sufficiency

A petitioner seeking to cancel registration of a mark bears a heavy burden to establish the facts underlying its claim that the mark has been abandoned; strict proof of two-year period of nonuse is required. Lanham Trade-Mark Act, § 45, 15 U.S.C.A. § 1127.

4 Cases that cite this headnote

**[9]** **Trademarks** ⚷ Weight and sufficiency

Admission of registrant that its registered mark had not been used in more than two years was sufficient to establish abandonment, thereby permitting cancellation of the mark. Lanham Trade-Mark Act, § 45, 15 U.S.C.A. § 1127.

1 Case that cites this headnote

**Attorneys and Law Firms**

**\*1025** Francis W. Guay, Washington, D. C., for appellant.

Alpheus E. Forsman and Annette P. Heller, St. Louis, Mo., for appellee.

Before MARKEY, Chief Judge, and RICH, BALDWIN, MILLER and NIES, Judges.

**Opinion**

NIES, Judge.

This is an appeal from the decision of the United States Patent and Trademark Office (PTO) Trademark Trial and Appeal Board (board)[1] granting the petition to cancel appellant's registration[2] of the mark FANCY FIXIN'S for cat food on the ground of abandonment due to nonuse. We affirm.

*Background*

Since one of the principal issues in this case is what facts were established, we will develop them in the course of the opinion. Suffice to say at this time that appellant seeks to uphold a registration, which has been on the register since 1969, on the basis of two shipments of FANCY FIXIN'S cat food. Appellee, who admittedly made only a single shipment of FANCY FIXINS cat food to support an application for registration, seeks to remove appellant's registration as an obstacle to the registration it seeks and relies on the statutory presumption of abandonment raised after nonuse of a registered mark for two consecutive years.[3]

Addendum Page 36

*The Board's Opinion*

The board held that in order to possess standing or a real interest in seeking to challenge a registration on the ground of abandonment, it is incumbent upon a petitioner to establish use of the same or similar mark for the same or similar goods as the mark and goods of the registrant so that the registration is in derogation of the petitioner's right to use its mark in commerce. The board then made extended findings based on appellant's admissions and appellee's answers to appellant's interrogatories which, in the board's view, established that appellee had used the mark as **\*1026** alleged; that such use was bona fide; that appellee's asserted investigation revealed that the registered mark was not in use; that appellee filed an application which was refused because of appellant's registration; that contemporaneous marketing by the parties would unquestionably cause purchaser confusion; and that pending the determination of this proceeding, appellee's action in not continuing to exploit the mark was justified.

Concerning the issue of abandonment, the board invoked the presumption of abandonment arising from two years' nonuse of a mark provided in section 45 of the Lanham Act ([15 U.S.C. s 1127](#)).[4] Since no explanation was given which would justify appellant's nonuse, the mark was found to have been abandoned. One member dissented on the ground that the findings and conclusions drawn by the majority concerning appellee's standing were unjustified.

OPINION

**[1]** For a petitioner to prevail in a cancellation proceeding, it is incumbent upon that party to show (1) that it possesses standing to challenge the continued presence on the register of the subject registration and (2) that there is a valid ground why the registrant is not entitled under law to maintain registration.[5]

There is no dispute between the parties that the above requirements must be met by appellee. The disagreement arises over what constitutes standing and whether appellee has sustained its burden of proof.

*The Position of the Parties*

Appellee's principal argument is that the issue of standing is to be determined on the basis of the well-pleaded allegations of its petition. Since these allegations are sufficient, and in any event the record supports the specific findings of fact by the board concerning its interest in the mark FANCY FIXINS, appellee maintains that it is entitled to be heard on the issue of abandonment, which was established by appellant's admitted nonuse of the mark for a period of more than two years immediately prior to the date of the filing of appellee's petition.

Appellant, on the other hand, argues that the allegations in a petition cannot in themselves establish standing, that appellee must prove credible interest and credible damage to itself from the subject registration which it failed to do, and that because appellee lacks standing, the board improperly shifted the burden to appellant to excuse its nonuse of the registered mark.

*Standing of Appellee/Petitioner*

**[2]** Section 14 of the Lanham Act ([15 U.S.C. s 1064](#)) sets forth the requirements with respect to the standing of a petitioner seeking to cancel a registration of a mark on the ground of abandonment. This section of the statute provides:

> A verified petition to cancel a registration of a mark, stating the grounds relied upon, may ... be filed by any person who believes he is or will be damaged by the registration of a mark on the principal register established by this Act....
>
> (c) at any time if the registered mark ... has been abandoned, ....

It had, for many years, been the view of the board that the determinative issue under section 14 was whether the petitioner would be "damaged" by the registration. While the petitioner was not required to prove actual damage, it was incumbent upon the petitioner to prove that the registered mark was likely to cause confusion **\*1027** with a mark in which petitioner had superior rights or that the registered mark was a descriptive term which petitioner was entitled to use.[6] If the petitioner was unable to establish such "damage," the petition for cancellation would be dismissed even in instances where there was uncontroverted evidence of abandonment of the mark or other grounds showing that the subject registration should be cancelled. Moreover, the board repeatedly held that a petitioner or opposer who did not prove

Addendum Page 37

"damage" could not be heard on what it termed "ex parte" issues affecting the validity of an application or registration.[7]

In a number of cases, this court criticized the practice of the board in not deciding all issues within the inter partes proceeding.[8] Nevertheless, the practice of the board continued until its decision in Norac Co. v. Occidental Petroleum Corp., 197 USPQ 306 (TTAB 1977).

In Norac, a petitioner sought to cancel a number of registrations on the ground of prior rights in a mark with which the registrant's marks were alleged to be in conflict. In addition, some of the registrations were also challenged on the ground of abandonment because of nonuse of the marks. The board ruled that there was no likelihood of confusion between the respective uses. Under prior practice, the petition would have been dismissed without reaching the issue of abandonment. However, the board rejected its previous practice and ordered cancellation of the registrations covering abandoned marks. In so doing, the board stated:

> This past practice of the Board permitted invalid registrations to remain on the Register only because petitioner failed to prove its standing, as distinct from alleging such standing.

> The modern theory of standing, as we review the legal decisions, is that it is determined from a reading of the allegations made in good faith in the pleading. The purpose of requiring allegations that demonstrate standing is to preclude meddlesome parties from instituting proceedings as self-appointed guardians of the purity of the Register. However, a party who demonstrates a real interest in the proceeding has standing to litigate even though ultimately its allegation that he is or will be damaged is refuted. See: Federated Foods, Inc. v. Fort Howard Paper Company, 192 USPQ 24 (CCPA, 1976); and Yoder Brothers, Inc. v. California-Florida Plant Corporation, 193 USPQ 264 (CA 5, 1976).

> Although fully recognizing the change from our past practice, we nevertheless, conclude that the question of standing is to be determined upon the well-pleaded allegations of the complaint, made in good faith, and is not contingent upon re-examination based on the evidentiary record, unless such record establishes clearly and convincingly that the allegation was a sham pleading.

> Thus, where a party in good faith has pleaded several causes of action, as petitioner has in the present case before

us, it is our firm belief that petitioner is entitled to be heard on all causes of action set forth in its pleading, even if it is not successful in one or more of such actions. See: Fort Howard Paper Company v. Kimberley-Clark Corporation, 157 USPQ 55 (CCPA, 1971); and The Community of Roquefort v. Santo, 170 USPQ 205 (CCPA, 1971).

197 USPQ at 320 (emphasis added).

In seeking to rectify its previous error, the board went further in its Norac decision than necessary in that case and further than warranted as a matter of law. While **\*1028** the board now looks at a party's pleading rather than proof, it continues to equate the facts which give rise to standing with all of the facts of a separate cause of action. However, standing is a threshold inquiry directed solely to establishing interest of the party. Thus, this court held that a petitioner who asserted only one cause of action for cancellation, namely, likelihood of confusion with its subsidiary's prior mark, had standing even though it lost on the merits. Universal Oil Products Co. v. Rexall Drug & Chemical Co., 59 CCPA 1120, 463 F.2d 1122, 174 USPQ 458 (1972). Drawing a distinction between the facts creating standing and the additional facts necessary to the cause of action, we reject the premise that a petitioner should be found to have standing by virtue of its complaint alone.

*Allegations Alone Do Not Establish Standing*

To support its argument that allegations in the petition alone establish standing, appellee relies on Norac and a line of cases in which the board restated this position.[9] Appellant asserts that the board's theory is unsound and that the result of following it would transpose the responsibilities in litigation which require that a plaintiff prove a prima facie case before a defendant is required to put in any defense. In effect, appellant raises a question of procedural due process.

On this issue we agree with appellant. A petitioner's allegations alone do not establish standing. That is not to say that standing cannot be tested at the pleading stage. A party's pleading lays the foundation for standing. Thus, if it does not plead facts sufficient to show a personal interest in the outcome beyond that of the general public, the case may be dismissed for failure to state a claim.[10] However, it does not follow that the facts affording a party standing, which as pleaded are sufficient as a matter of law, do not have to be proved by that party. As stated in United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669,

Addendum Page 38

689, 93 S.Ct. 2405, 2417, 37 L.Ed.2d 254 (1973): "(I)t is equally clear that the allegations must be true and capable of proof at trial."

While the board added a caveat to its reliance on a petitioner's pleading, pointing out that standing could be destroyed if the record proved the pleading to be a sham, we agree with appellant that the board's analysis would place the burden on the respondent and is, thus, in error. The facts regarding standing, we hold, are part of a petitioner's case and must be affirmatively proved. Accordingly, appellee is not entitled to standing solely because of the allegations in its petition.

*What Constitutes Standing*

 [3]   No absolute test can be laid down for what must be proved to establish standing as a petitioner in a cancellation proceeding or as an opposer in an opposition. The starting point is the statute. Congress has defined the class in section 14 as "any person who believes he is or will be damaged by the registration." (Emphasis added.) In construing comparable language of section 13, this court stated in Federated Foods, Inc. v. Ft. Howard Paper Co., 544 F.2d 1098, 1101, 192 USPQ 24, 27 (CCPA 1976):

A party has standing to oppose within the meaning of s 13 if that party can demonstrate a real interest in the proceeding. Universal Oil Products Co. v. Rexall Drug and Chemical Co., 59 CCPA 1120, 463 F.2d 1122, 174 USPQ 458 (1972).

The same general statement is applicable to cancellation proceedings. The purpose in requiring standing is to prevent litigation **\*1029** where there is no real controversy between the parties, where a plaintiff, petitioner or opposer, is no more than an intermeddler. Congress, however, has specified a broad class who must be deemed proper litigants.

Thus, this court has found standing based on widely diverse interests:

1. importation of petitioner's products deterred by a registration, Plastilite Corp. v. Kassnar Imports, 508 F.2d 824, 184 USPQ 348 (CCPA 1975).

2. use of copyrighted appearance of doll, Knickerbocker Toy Co. v. Faultless Starch Co., 467 F.2d 501, 175 USPQ 417 (CCPA 1972).

3. pecuniary interest of trade association, Tanners' Council of America, Inc. v. Gary Industries, Inc., 58 CCPA 1201, 440 F.2d 1404, 169 USPQ 608 (1971).

4. prior registration but not priority in use, King Candy Co. v. Eunice King's Kitchen, Inc., 496 F.2d 1400, 182 USPQ 108 (CCPA 1974).

5. protection of subsidiary's mark, Universal Oil Products Co. v. Rexall Drug & Chemical Co., supra.

6. descriptive use of term in registered mark, Golomb v. Wadsworth, 592 F.2d 1184, 201 USPQ 200 (CCPA); cert. denied, 444 U.S. 833, 100 S.Ct. 63, 62 L.Ed.2d 42 (1979).

7. advertising emphasis of American origin, Singer Manufacturing Co. v. Birginal-Bigsby Corp., 50 CCPA 1380, 319 F.2d 273, 138 USPQ 63 (1963).

In Norac, petitioner proved by testimony, inter alia, that it had extensively used OXY as a trademark for certain chemical compositions. The next inquiry should have been whether its belief of likelihood of confusion with the registered mark OXY and various marks incorporating OXY for a line of products of the registrant was not wholly without merit. The error of the board in its earlier cases had been in requiring proof of a legal conclusion, likelihood of confusion, rather than directing its inquiry to whether a petitioner established facts which showed that it had a legitimate personal interest. Had the appropriate inquiry been made in Norac, petitioner would have had standing, not because of its mere allegations, but because it proved a real commercial interest in its own marks, and a reasonable basis for its belief that it would be damaged.

 [4]   Appellee asserts an interest arising from its attempt to obtain a registration for the mark FANCY FIXINS for cat food which is blocked by appellant's registration. We regard the desire for a registration with its attendant statutory advantages as a legitimate commercial interest. To establish a reasonable basis for a belief that one is damaged by the registration sought to be cancelled, a petition may assert a likelihood of confusion which is not wholly without merit (as in Norac) or, as here, a rejection of an application during prosecution.

Thus, to have standing in this case, it would be sufficient that appellee prove that it filed an application and that a rejection was made because of appellant's registration.[11] These facts do

Addendum Page 39

not provide a statutory ground for cancellation,[12] but no more is necessary for standing. Appellant could, of course, seek to attack the legitimacy of appellee's application or in some other way negate appellee's interest. American Lava Corp. v. Multronics, Inc., 461 F.2d 836, 174 USPQ 107 (CCPA 1972). However, the legitimacy of the petitioner's activity from which its interest arises will be presumed in the absence of evidence to the contrary.

 **[5]**   In determining the requirements for standing, we have taken into consideration that no ex parte vehicle for removing "dead" registrations from the register is provided in the statute except for the provisions of section 8 (15 U.S.C. s 1058) requiring **\*1030** an affidavit or declaration of use to be filed during the sixth year of its term. There is no procedure for the Commissioner of Patents and Trademarks to initiate action against defunct marks which appear in registrations. Thus, we believe the public interest is served, contrary to appellant's view, in broadly interpreting the class of persons Congress intended to be allowed to institute cancellation proceedings.

*Proof of Appellee's Standing*

 **[6]**   The final question to be answered on the issue of standing is whether the record establishes at least the minimum requirements pertinent to this case, namely an application by appellee and a rejection of the application because of appellant's registration. No evidence of such facts was offered by appellee during the trial period. Accordingly, we must determine whether appellant admitted these facts in its answer, as found by the majority below.

The pertinent pleadings are as follows:

*Petition*

 2) Petitioner has applied to register the said "Fancy Fixins" trademark for cat food in the United States Patent and Trademark Office and said application was assigned Serial No. 116,960.

*Answer*

 2. Lipton Industries, Inc. (hereinafter Defendant), upon information and belief concerning the truth and accuracy of the attachments to Plaintiff's original PETITION FOR

CANCELLATION served on Defendant's predecessor in title on 15 July 1977 by the Trademark Trial and Appeal Board (TTAB), admits the allegation in paragraph 2.

*Petition*

 3) Registration to Petitioner of the said mark has been refused under Section 2(d) of the Trademark Act as conflicting with Respondent's Registration No. 876,136 covering the mark "Fancy Fixin's" for cat food.

*Answer*

 3. Defendant, upon information and belief concerning the truth and accuracy of the attachments to Plaintiff's original PETITION FOR CANCELLATION served on Defendant's predecessor in title on July 15, 1977 by the TTAB, admits the allegation in paragraph 3.

 **[7]**   The majority below, noting FRCP Rule 8(d), found appellant's answers to be acknowledgement of the pleaded facts. We agree. No significance can be given appellant's attempted qualification of an admission by use of the words "on information and belief." Equivocal admissions are not permitted under Rule 8 of the Federal Rules. Rule 8(d) provides:

 Averments in a pleading to which a responsive pleading is required .... are admitted when not denied in the responsive pleading.

See Mesirow v. Duggan, 240 F.2d 751 (CA 8), cert. denied, 355 U.S. 864, 78 S.Ct. 93, 2 L.Ed.2d 70 (1957); Sinclair Refining Co. v. Howell, 222 F.2d 637 (CA 5 1955); Dunlop v. Quality Spring Products, Inc., 20 F.R.Serv.2d 561 (W.D.Mich.1975). Appellant's answers are, therefore, admissions. The purpose of Rule 8 is stated in 2A Moore's Federal Practice P 8.21 at 8-229 (2d ed. 1981):

 The third sentence of subdivision (b) (Rule 8) epitomizes the objective: "Denials shall fairly meet the substance of the averments denied." It follows that denials must not be evasive.

An answer which attempts to evade the pleading requirements of Rule 8 by the tactic of an equivocal admission or denial is an admission.

To negate appellee's interest, appellant asserts that the board should not have relied on appellee's answers to interrogatories and that it drew unwarranted inferences. In view of our holding on standing, we need not decide whether each of

the board's conclusions was correct. While we agree that the answers, which appellant, itself, placed in the record, were properly considered by the board for any relevant purpose, the **\*1031** board's extended findings were simply unnecessary.

Standing having been established, petitioner is entitled to rely on any statutory ground which negates appellant's right to the subject registration and may invoke the general public interest in support of its claim. Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

*Presumption of Abandonment*

Under section 45 of the Lanham Act, proof of nonuse of a mark for two consecutive years is sufficient to establish a prima facie case of abandonment.

In the answer to interrogatories given by appellant on August 8, 1978, appellant stated upon information and belief that its predecessor in interest, Usen Products Company, had made a shipment of cat food under a label bearing the mark FANCY FIXIN'S as averred in its application for registration and that this was the only use made of the mark until just prior to the submission of a Combined Affidavit under sections 8 and 15 by Lipton Pet Foods, Inc. on March 11, 1975.[13]

Appellant argues that there is no reason to believe that section 45 was intended to water down the presumption of validity of a registration under section 7(b) (15 U.S.C. s 1057(b)).[14] Moreover, a heavy burden of proof falls on a petitioner in a cancellation proceeding because of this presumption and, appellant argues, the board improperly shifted the burden of proof to appellant to justify nonuse of its mark based on a paucity of evidence.

**[8]** **[9]** We agree with appellant that a petitioner bears a heavy burden to establish the facts underlying its claim that the mark has been abandoned. Strict proof of a two year period

of nonuse is required. P.A.B. Produits et Appareils de Beaute v. Santinine Societa in Nome Collettivo di S.A. e.M. Usellini, 570 F.2d 328, 196 USPQ 801 (CCPA 1978). However, no proof could be more persuasive than appellant's admission of nonuse in this case. It was at this point that the provision of section 45 became operative, and the board properly required appellant to put forth at least some evidence to explain its nonuse which, in conjunction with the presumption of validity, might have defeated appellee's case. Sterling Brewers, Inc. v. Schenley Industries, Inc., 58 CCPA 1172, 441 F.2d 675, 169 USPQ 590 (1971). We see nothing in the board's opinion which would lead us to conclude that the board shifted the burden of proof merely because appellee established standing.

The decision of the board granting the petition for cancellation of Registration No. 876,139 is affirmed.

AFFIRMED.

MARKEY, Chief Judge, concurring.

I agree that standing is a threshold consideration. If the facts pleaded show standing, the pleader is in court. Those facts must thereafter be proved, but at the pleading stage they need only be "capable of proof at trial." United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 689, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973). The facts establishing standing were proved here. That to me ends our consideration of the standing issue. Because I am not aware of an instance in which the board has sustained standing on the basis of unproven **\*1032** allegations, or in which it has canceled a registration on the basis of mere allegations, I see no reason to discuss its past decisions. Nor, for the same reason, do I view the board's approach as shifting the burden.

**All Citations**

670 F.2d 1024, 213 U.S.P.Q. 185

Footnotes

1    209 USPQ 538 (TTAB 1981).

2    Registration No. 876,139, issued Sept. 2, 1969, to Usen Products Company for cat food, asserting a date of first use of Feb. 26, 1968. On Dec. 22, 1969, by change of name, registrant became Lipton Pet Foods, Inc. On July 6, 1977, the registration was assigned to appellant. The petition was filed June 24, 1977, and amended, following discovery, on August 24, 1978.

3  The sole difference between the respective marks of the parties is that appellant's registration shows FANCY FIXIN'S with an apostrophe. No apostrophe is in appellee's mark. This difference is de minimis, and we will refer to the marks and goods of the parties as identical.

4  Sec. 45 (15 U.S.C. s 1127). Construction and definitions

In the construction of this Act, unless the contrary is plainly apparent from the context:

Abandonment of mark. A mark shall be deemed to be "abandoned"-

(a) when its use has been discontinued with intent not to resume. Intent not to resume may be inferred from circumstances. Nonuse for two consecutive years shall be prima facie abandonment.

5  See J. McCarthy, Trademarks and Unfair Competition, s 20:12 (1973).

6  For a discussion of this practice, see E. Vandenburgh, III, Trademark Law and Procedure 290-293 (1st ed. 1959).

7  Blackstone Corp. v. Allied Paper, Inc., 176 USPQ 211 (TTAB 1972); Esso Standard Oil Co. v. Allis-Chalmers Mfg. Co., 119 USPQ 475 (TTAB 1958); see S. Lefkowitz, Recent Changes in Practice Before the Trademark Trial and Appeal Board, 69 Trademark Rep. 479 (1979).

8  See Roux Laboratories, Inc. v. Clairol, Inc., 57 CCPA 1173, 427 F.2d 823, 166 USPQ 34 (1970), and cases cited in footnote 11.

9  Inter-State Oil Co. v. Questor Corp., 209 USPQ 583 (TTAB 1980); E. M. Bailey Distrib. Co. v. Petro-Vend, Inc., 207 USPQ 769 (TTAB 1980); Dresser Indus. Inc., v. Coupling Systems, Inc., 206 USPQ 756 (TTAB 1959); Larry Harmon Pictures Corp. v. Bozo Texinos-A Mexican Cafe, Inc., 204 USPQ 430 (TTAB 1979); Burroughs Wellcome Co. v. Warner-Lambert Co., 203 USPQ 191 (TTAB 1979); and General Mills, Inc. v. Nature's Way Products, Inc., 202 USPQ 840 (TTAB 1979).

10  Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

11  In this case we note that the statute would provide appellee standing as an interference party. 15 U.S.C. s 1066 may in itself give standing in view of the virtual elimination of interferences by the PTO. See 37 CFR 2.91.

12  Morton Foods, Inc. v. Frito Co., 50 CCPA 1105, 314 F.2d 822, 137 USPQ 58 (1963).

13  The answer further stated:

Please note that: an AFFIDAVIT by Lipton Industries, Inc. by an officer of said corporation stating that the benefits of Section 15 of the Lanham Act are not claimed at this time is being filed simultaneously herewith in the USPTO.

In view of the finding of abandonment for nonuse, we do not rule on invalidity arising from a false affidavit.

14  Sec. 7(b) (15 U.S.C. s 1057(b)). Same-Prima facie evidence

A certificate of registration of a mark upon the principal register provided by this Act shall be prima facie evidence of the validity of the registration, registrant's ownership of the mark, and of registrant's exclusive right to use the mark in commerce in connection with the goods or services specified in the certificate, subject to any conditions and limitations stated therein.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Dexas International, Ltd v. Ideavillage Products Corp., Trademark Tr. &amp; App. Bd., July 24, 2018

83 U.S.P.Q.2d 1215 (Trademark Tr. & App. Bd.), 2007 WL 1676790

THIS OPINION IS PRECEDENT OF THE TTAB

Trademark Trial and Appeal Board

Patent and Trademark Office (P.T.O.)

WESTREX CORPORATION

v.

NEW SENSOR CORPORATION (AS CONSOLIDATED)

OPPOSITION 91168152; 91170940

May 11, 2007

**\*1** Before Quinn, Bucher and Taylor

Administrative Trademark Judges

**By the Board:**

This case now comes up for consideration of applicant's motion (filed December 1, 2006) for summary judgment. The motion is fully briefed.[1]

I. *Procedural Background*

On November 9, 2004, applicant applied to register the mark GENALEX GOLD LION for "electron tubes, also known as vacuum tubes," based on a bona fide intent to use the mark in commerce.[2] On June 28, 2005, applicant filed an application to register the mark GOLD LION, for the same goods, alleging June 24, 2005 as the date of first use anywhere and in commerce.[3] Opposer has opposed registration of both marks on the grounds that each mark so resembles opposer's previously used GOLD LION mark that each is likely to cause confusion, mistake, or deceive prospective consumers under Section 2(d) of the Lanham Act. In its notices of opposition, opposer alleges that it and its predecessor in interest have extensively and continuously used the mark GOLD LION in connection with electron and vacuum tubes since prior to the filing date of applicant's intent-to-use application to register the mark GENALEX GOLD LION and applicant's alleged date of first use of the mark GOLD LION.

Applicant, in its answer to both notices of opposition, denied the salient allegations and made additional assertions denominated as affirmative defenses.

On September 1, 2006, the Board consolidated the oppositions.

II. *Applicant's Motion for Summary Judgment*

Applicant has moved for summary judgment on the basis that neither opposer nor opposer's predecessor in interest is the prior user of the GOLD LION mark.[4]

Summary judgment is an appropriate method of disposing of cases in which there are no genuine issues of material fact in dispute, thus leaving the case to be resolved as a matter of law. *See* Fed. R. Civ. P. 56(c). A party moving for summary judgment

Addendum Page 43

has the burden of demonstrating the absence of any genuine issue of material fact, and that it is entitled to summary judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548 (1986). The nonmoving party must be given the benefit of all reasonable doubt as to whether genuine issues of material fact exist, and the evidentiary record on summary judgment, and all inferences to be drawn from the undisputed facts, must be viewed in the light most favorable to the nonmoving party. *See Opryland USA, Inc. v. Great American Music Show, Inc.,* 970 F.2d 847, 23 USPQ2d 1471 (Fed. Cir. 1992). When the moving party's motion is supported by evidence sufficient to indicate that there is no genuine issue of material fact, and that the moving party is entitled to judgment, the burden shifts to the nonmoving party to demonstrate the existence of specific genuinely-disputed facts that must be resolved at trial. The nonmoving party may not rest on the mere allegations of its pleadings and assertions of counsel, but must designate specific portions of the record or produce additional evidence showing the existence of a genuine issue of material fact for trial.

 **\*2**  As a preliminary evidentiary matter, we note that applicant included in its reply brief a "motion" to strike the declaration of opposer's president, Charles Whitener, on the ground that it contradicts statements made in his discovery deposition. With its reply brief, applicant has submitted excerpts from the 30(b)(6) deposition of Mr. Whitener, purportedly contradicting his declaration.

In this case, upon careful review of the deposition testimony and declaration, we find that Mr. Whitener's declaration does not contradict so much as it clarifies and explains contradictions given in his deposition. *See Sinskey v. Pharmacia Opthalmics, Inc.,* 982 F.2d 494, 25 USPQ2d 1290 (Fed. Cir. 1992), *cert. denied,* 508 U.S. 912 (1993).

Mr. Whitener acknowledges in his declaration that he "misspoke" during the deposition and attempts to clarify any discrepancies and inaccuracies. Applicant's motion to strike the declaration of Mr. Whitener is therefore denied.

A. *Analysis of the Parties' Priority Dispute*

To establish priority on a likelihood of confusion claim brought under Trademark Act Section 2(d), a party must prove that, vis-à-vis the other party, it owns "a mark or trade name previously used in the United States … and not abandoned…." Trademark Act Section 2, 15 U.S.C. Section 1052. A party may establish its own prior proprietary rights in a mark through ownership of a prior registration, actual use or through use analogous to trademark use, such as use in advertising brochures, trade publications, catalogues, newspaper advertisements and Internet web sites which create a public awareness of the designation as a trademark identifying the party as a source. *See* Trademark Act Sections 2(d) and 45, 15 U.S.C. Section 1052(d) and 1127; *T.A.B. Systems v. PacTel Teletrac,* 77 F.3d 1372, 37 USPQ2d 1879 (Fed. Cir. 1996), *vacating Pactel Teletrac v. T.A.B. Systems,* 32 USPQ2d 1668 (TTAB 1994). Priority is an issue in this case because opposer does not own an existing registration upon which it can rely under Section 2(d). *See King Candy Co., Inc. v. Eunice King's Kitchen, Inc.,* 496 F.2d 1400, 182 USPQ 108 (CCPA 1974).

In order for applicant to prevail on summary judgment, it must demonstrate the absence of a genuine issue of material fact that opposer did not make actual use or analogous trademark use of the mark GOLD LION prior to November 9, 2004 (the filing date of applicant's intent to use application for the mark GENALEX GOLD LION) and June 28, 2005 (the filing date of application's use application for the mark GOLD LION).[5]

 **\*3**  At the outset, we note that opposer does not dispute that it did not make its first sale of products bearing the GOLD LION mark until January 3, 2007 (after the filing of applicant's motion for summary judgment) when it shipped an order of electron tubes to a company located in California. As such, no genuine issue of material fact exists that opposer cannot rely upon its own technical use of the GOLD LION mark for purposes of priority.

Instead, opposer relies on two alternate theories to establish prior rights in the GOLD LION mark: (1) that since 1995 opposer has engaged in analogous trademark use by promoting and engaging in preparations to launch its products under the GOLD LION mark; and (2) that opposer acquired ownership of the GOLD LION mark by a quitclaim assignment dated December 5, 2005 from Chelmer Valve (a distributor of vacuum tubes), and as a consequence, opposer is entitled to rely on Chelmer

Addendum Page 44

Valve's date of first use to assert priority vis-à-vis applicant, which opposer alleges as June 16, 2003. Applicant contends that the undisputed facts show that neither basis is valid for asserting priority.

*1. Analogous Trademark Use*

First, we turn to the question of whether a genuine issue of material fact exists as to whether opposer has used the mark GOLD LION in a manner analogous to trademark use prior to the filing dates of applicant's applications.

The following facts regarding opposer's pre-sale activities are undisputed:

-Since 1995, opposer has spent approximately $50,000-$60,000 in advertising expenditures promoting GOLD LION electron tubes (Whitener Declaration, Para. 7). Such promotional activities included creating artwork, packaging, and a web site; announcing the product launch on the web site; issuing a press release; promoting the tubes at trade shows; sending price list of prospective purchasers; acquiring parts and equipment for manufacturer of the tubes; (Whitener Declaration, Para. 5 and Exhibits A-D);

-Opposer received e-mails dated July 10, 1999, May 22, 2000, September 15, 2000, June 26, 2002, June 4, 2003, December 2003, January 18, 2004, and October 14, 2005, and January 9, 2006 from potential customers inquiring as to the release date of the items. (Ferrari Declaration, Exhibits 9, 11);

-In October 1998, opposer took an order for GOLD LION tubes, but the order was cancelled (Opposer's responses to applicant's first set of Interrogatory Nos. 1 and 5);

-Opposer took a "bit of a hiatus" from its promotional activities between 1998-2000 "because of the Asian economic crisis" (Discovery Deposition of Mr. Whitener at 160); and

-Opposer repeatedly altered on its web site the target date for release of products bearing the GOLD LION mark until finally the web site stated "to be determined." (Ferrari Declaration, Exhibit 10; Web Site Printouts W270, 274, 276, 280, 282, 290,292, 295, 296, 303).

**\*4** Applicant argues that opposer's eleven years of pre-sales activity do not amount to analogous trademark use, and that opposer has been seeking to improperly "reserve" the GOLD LION mark. Applicant also maintains that in order to claim the benefit of analogous trademark use, opposer was required to make actual trademark use soon after its pre-sale activities. Opposer contends that it has established a reputation as being the sole source for GOLD LION tubes via its pre-sale activities, and that various circumstances delayed opposer from making actual sales of tubes under the GOLD LION mark until earlier this year.

Under the theory of analogous use, a party may rely upon pre-sale activities in order to "tack on" non-trademark usage for purposes of establishing priority under Section 2(d). *See* 3 J. Thomas McCarthy on Trademarks and Unfair Competition, § 20:16 (4th Ed. 1996). Although use analogous to trademark use is sufficient to create a proprietary right in the user for purposes of a likelihood of confusion claim, analogous use must be more than mere advertising. *In T.A.B. Systems v. PacTel Teletrac, 37 USPQ2d at 1882,* the Court of Appeals for the Federal Circuit summarized the test for the sufficiency of analogous use efforts: "[W]hether it was sufficiently clear, widespread and repetitive to create the required association in the minds of the potential purchasers between the mark as an indicator of a particular source and the [product or] service to become available later." The analogous trademark use also must be shown to have a substantial impact on the purchasing public, and the user must establish an intent to appropriate the mark. *Id.* In addition, the "tacking" theory under which use analogous to trademark use operates requires that actual technical trademark use must follow within a commercially reasonable period of time. *Dyneer Corp. v. Automotive Products plc,* 37 USPQ2d 1251 (TTAB 1995); *Evans Chemetics, Inc. v. Chemetics International Ltd.,* 207 USPQ 695 (TTAB 1980).

Addendum Page 45

After reviewing the arguments and supporting papers of the parties and construing all inferences in a light most favorable to opposer, we find that applicant has shown that there is no genuine issue of material fact that opposer failed to acquire rights through analogous trademark use in the GOLD LION mark prior to either November 9, 2004 or June 28, 2005, the filing dates of applicant's respective applications. We conclude that opposer's collective activities noted above do not constitute clear, widespread, and repetitive activities sufficient to have established prior analogous trademark use on the part of opposer. For purposes of establishing priority via analogous trademark use, the critical factor is the actual number of prospective customers reached. Based on the paucity of e-mail inquiries from prospective consumers (presumably prompted by advertising of the product launch on opposer's web site), it is clear that opposer's efforts to solicit business have neither had any significant impact on the purchasing public as a whole nor "involve more than an insubstantial number of potential customers." By illustration, the Federal Circuit emphasized this requirement for analogous use in *T.A.B. Systems v. PacTel Teletrac, supra:*

**\*5** Nor can there be any doubt that purchaser perception must involve more than an insubstantial number of potential customers. For example, if the potential market for a given service were 10,000 persons, then advertising shown to have reached only 20 or 30 people as a matter of law could not suffice. However close the linkage between the mark and the future service, analogous use could not be shown on such facts because the actual number of potential customers reached, not the strength of the linkage for some "reasonable potential customer," is the focal point of the analogous use inquiry.

*Id.* at 1883. Opposer has failed to submit any evidence to create a genuine issue of material fact that more than a negligible segment of the marketplace was impacted by its online pre-sale activities. *See id.*

Furthermore, the $50,000-60,000 in advertising expenditures over an eleven-year time period are insufficient to establish that the necessary association or public identification was indeed created among more than "an insubstantial number of potential customers." This is especially true given the absence of any indication as to the response, if any, received to any advertising (i.e. print ads, trade shows) unrelated to opposer's web site. Thus, the Board is unable to draw the critical inference that the public identified the term GOLD LION as a source indicator for opposer's goods by virtue of opposer's pre-sale activities.

Lastly, we note that a significant time period (eleven years) elapsed between opposer's pre-sale activities and first technical sale under the GOLD LION mark. Such a lengthy time period is not "commercially reasonable" and indicates that opposer's activities were far too sporadic to rise to the level of analogous use.

Since 1989, domestic applicants in the United States have had the options presented by a dual application system — filing based either on pre-application use in commerce, or based upon a *bona fide* intention to use the mark in commerce.

The legislative history of the Trademark Law Revision Act of 1988 (TLRA) demonstrates that achieving greater certainty in the acquisition of trademark rights by providing clear notice to third parties was a driving force behind the changes in the provisions of use and constructive use.

It is readily apparent that the constructive use provision of §7(c) of the Lanham Act, as amended, was intended to foster the filing of intent-to-use applications. By according conditional rights to those who publicly disclose their marks, constructive use encourages the early filing of applications and the searching of trademark records prior to the adoption of and investment in new marks. Constructive use provides an intent-to-use applicant a superior right over anyone adopting a mark after applicant's filing date (providing the applicant's mark is ultimately used and registered) and to prevent a third party from acquiring common law rights in a mark after the filing date of the intent-to-use application. Under this intent to use system, "token use" became unnecessary and inappropriate.

**\*6** Thus, a mere token sale or shipment of the goods does not constitute "use" under the Trademark Act. *See Paramount Pictures Corp. v. White,* 31 USPQ2d 1768, 1774 (TTAB 1994) [noting that the purpose of the Trademark Law Revision Act of 1988 was to eliminate "token use" as a basis for registration, and that the new, stricter standard contemplates instead commercial use of the type common to the particular industry in question]. H.R. Rep. No. 100-515, 100th Congress, 2d Sess.

Opposer, acting at its peril, failed to take advantage of the intent-to-use provisions provided by the Trademark Law Revision Act. Thus, in order to assert priority vis-à-vis applicant, opposer had to rely on the doctrine of analogous use. Based on the facts established by the evidence of record, opposer has failed to meet the threshold requirements to benefit from that doctrine.

2. *Opposer's Assertion of Prior Rights via Chelmer Valve as a Predecessor in Interest*

Next we consider opposer's second basis for asserting prior rights in the GOLD LION mark, namely, that it acquired ownership of the GOLD LION mark by assignment from Chelmer Valve, and that opposer is entitled to rely on Chelmer Valve's alleged date of first use to assert priority vis-à-vis applicant.

It is undisputed that the only evidence on record of Chelmer Valve's U.S. sales consist of two transactions, the first consisting of the sale of three tubes to an individual in Minnesota on June 16, 2003, and the second transaction consisting of the sale of two tubes to the same individual on September 26, 2003.

Applicant has moved for summary judgment on the grounds that it is undisputed that Chelmer Valve was merely a U.S. distributor of vintage electron tubes manufactured in the United Kingdom, and therefore had no authority to assign the GOLD LION mark to opposer. Applicant also maintains that there is no genuine issue of material fact that Chelmer Valve failed to continuously use the GOLD LION mark in commerce since June 2003. Opposer, however, argues that Chelmer Valve was a manufacturer of such tubes, and that it acquired ownership of the mark by quitclaim assignment dated December 5, 2005 from Chelmer Valve.

Even if issues may exist as to whether or not Chelmer Valve owned, and had the authority to assign, the GOLD LION mark (either as a distributor or manufacturer) to opposer, such issues are not material in this case. The documentary evidence of two sales transactions to the same purchaser, approximately three months apart, fails to support a finding of prior and continuous use of the GOLD LION mark by Chelmer Valve. By logical extension, opposer cannot rely on Chelmer Valve as a predecessor in interest for asserting priority over applicant.

In sum, we find that applicant has met its burden of demonstrating that there are no genuine issues of material fact regarding applicant's priority, and that applicant is entitled to judgment as a matter of law.

**\*7** Accordingly, judgment is entered against opposer, and the oppositions are dismissed with prejudice.

Footnotes

1    Applicant has submitted a reply brief which the Board has considered because it clarifies the issues herein. Consideration of a reply brief is discretionary on the part of the Board. *See* Trademark Rule 2.127(a).

    However, insofar as the Board does not consider sur-replies, opposer's "Notice of Subsequently Decided Controlling Authority" (filed February 8, 2007) and applicant's response thereto (filed February 21, 2007) have been given no consideration. *See id.* In any event, the Board is aware of the case law referenced by the parties in their communications, including *First Niagara Insurance Brokers, Inc. v. First Niagara Financial Group, Inc.,* 476 F.3d 867, 81 USPQ2d 1375 (Fed. Cir. 2007).

2    Application Serial No. 78513996.

3    Application Serial No. 78660006.

4    The Board notes that applicant included with its motion, as exhibits, papers that had previously been filed (i.e., the parties' protective order for governing the disclosure of confidential information). Applicant is reminded that these papers, by their very nature, already form part of the proceeding file. Accordingly, applicant is requested to refrain from attaching such papers to future filings.

5        Applicant states in its motion for summary judgment that it wishes to rely upon the filing dates of its applications as its priority dates.

83 U.S.P.Q.2d 1215 (Trademark Tr. & App. Bd.), 2007 WL 1676790

**End of Document**                                   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Black's Law Dictionary (11th ed. 2019), void

# VOID

Bryan A. Garner, Editor in Chief

Preface | Guide | Legal Maxims | Bibliography

**void** *adj.* (14c) **1.** Of no legal effect; to null. • The distinction between *void* and *voidable* is often of great practical importance. Whenever technical accuracy is required, *void* can be properly applied only to those provisions that are of no effect whatsoever — those that are an absolute nullity. — **void, avoid,** *vb.* — **voidness,** *n.*

- **facially void.** (1969) (Of an instrument) patently void upon an inspection of the contents. — Also termed *void on its face.*

- **void ab initio** (ab i-**nish**-ee-oh) (17c) Null from the beginning, as from the first moment when a contract is entered into. • A contract is void ab initio if it seriously offends law or public policy, in contrast to a contract that is merely voidable at the election of one party to the contract.

- **void for vagueness.** (1814) **1.** (Of a deed or other instrument affecting property) having such an insufficient property description as to be unenforceable. **2.** (Of a penal statute) establishing a requirement or punishment without specifying what is required or what conduct is punishable, and therefore void because violative of due process. — Also termed *void for indefiniteness.* See vagueness doctrine.

**2.** voidable. • Although sense 1 above is the strict meaning of *void*, the word is often used and construed as bearing the more liberal meaning of "voidable."

Westlaw. © 2019 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works. 1

Addendum Page 49